# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

S. VICTOR WHITMILL,                    )
                                       )
             Plaintiff,             )   Civil Action No. 4:11-cv-752
                                       )
             v.                     )   Judge Catherine D. Perry
                                       )
WARNER BROS. ENTERTAINMENT, INC.       )
                                       )
             Defendant.             )

## WARNER BROS.' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff seeks an unwarranted and unprecedented preliminary injunction. Based on a tattoo drawn on an actor's face, Plaintiff seeks to enjoin the distribution of a major motion picture – and to do so just days before its national release on more than 7,000 screens in over 3,600 theaters. The harm to Warner Bros. and numerous third parties from such an injunction would be devastating. Warner Bros. has already spent approximately _____ million on advertising and promotion of "The Hangover Part II" ("Hangover II"). All of that money will effectively be lost if the release of the film is enjoined. Prints of the movie have already been created and shipped to theaters across the country. If the release of the film is enjoined, those theaters – many of which have been selling advance tickets to the movie for weeks – will have nothing to replace it with over the critical Memorial Day weekend, resulting in losses to the theaters of an estimated _____ million and exposing Warner Bros. to massive damages claims by those theaters.

Moreover, given the large number of copies of the film that have already been sent to the theaters, it is a virtual certainty that if the release of the movie is enjoined the

movie will be leaked and pirated, which would largely destroy the value of the movie. Even if that did not occur (a virtual impossibility), the delay in opening the movie that would inevitably result from an injunction would severely diminish the ultimate box office performance of the movie once it is released.  Absent the posting of a bond of at least $100 million, these enormous losses will be unrecoverable.

In stark contrast, Plaintiff has not shown and cannot show that he will suffer any irreparable harm if the injunction he requests is denied.  Not only are images of Mike Tyson's tattoo ubiquitous, but Tyson appeared (with his tattoo) in the first "Hangover" movie and in theatrical trailers, television ads and advertising posters for the movie, all without any objection by Plaintiff.  In the unlikely event that Plaintiff prevails on his claim of infringement, any harm he has suffered from the related use of Tyson's tattoo in "Hangover II" can be adequately compensated by money damages.

Furthermore, Plaintiff will not be able to establish that he is likely to succeed on the merits of his claim.  The very copyrightability of tattoos is a novel issue, and there is no legal precedent for Plaintiff's radical claim that he is entitled, under the Copyright Act, to control the use of a tattoo that he created on the face of another human being. Beyond that, as explained in detail below, Plaintiff is unlikely to succeed on the merits of his claim because (i) the tattoo on the face of actor Ed Helms in "Hangover II" is a fair use parody of Tyson's tattoo, (ii) Warner Bros.' use of the tattoo was permitted by Tyson's implied license to make commercial use of his tattoo and (iii) Plaintiff is estopped from asserting a claim against Warner Bros. for infringement of Tyson's tattoo because of his failure to object to the use of the tattoo in "The Hangover."

Having never objected, over the past *two years*, to the use of Tyson's tattoo in the first "Hangover" movie, theatrical trailers, advertising posters and television ads, Plaintiff now stands before this Court just days before the release of the sequel objecting to a related use. Plaintiff's own behavior has demonstrated that plaintiff has no real objection to the use of the work in motion pictures. Plaintiff's real objective is to use an injunction as a weapon with which to extract far greater compensation than the Court might ultimately determine to be just and proper if Plaintiff were to prevail on the merits.

For all these reasons, as more fully explained below, the injunction requested by Plaintiff should be denied and the case should proceed on its merits.

I.   **STATEMENT OF FACTS.**

**Tyson's Facial Tattoo.**

On February 10, 2003, former heavyweight boxing champion Mike Tyson went to Paradox-Studio of Dermagraphics in Las Vegas to get a tattoo. (*See* Verified Complaint ("Compl.") (Doc. 1), Ex. 3.) According to the Complaint, Plaintiff "created and applied an original and distinctive tattoo" to the upper left side of Tyson's face. (*Id.* ¶ 5.)

Before submitting to the tattooing procedure, Tyson executed a one-page "Tattoo Release Form." (*Id.* Ex. 3.) As the title of the form suggests, its purpose is to release the tattoo studio and its owners and employees, including the tattoo artist, from potential liability to Tyson in the event Tyson were for some reason unhappy with the tattoo. The release also provides that "all artwork, sketches and drawings related to my tattoo and any photographs of my tattoo are property of Paradox-Studio Dermagraphics." (*Id.*) The release does not contain the word "copyright" or any reference to "rights" at all. (*Id.*) The tattoo is described simply as "Tribal tattoo." (*Id.*)

Tyson's facial tattoo has become central to his identity – indeed, his defining feature.  According to Plaintiff, a Google search for "Tyson face tattoo" turns up over three million results, including 493,000 images of the tattoo.  (Plaintiff's Mem. in Support of Motion for Preliminary Injunction ("Plf. Mem.") (Doc. 4) at 6.)  Furthermore, there are numerous third-party uses of the tattoo separate from Tyson's face.  (*See* Ex. 1, Declaration of Michelle Schultz ("Schultz Decl.") ¶¶ 3-11.)

In 2008 Tyson appeared, with his tattoo, in a documentary entitled "Tyson."  *See* www.imdb.com/title/tt1032821/.  The advertising for "Tyson" prominently featured his facial tattoo, which was depicted in  dark red against a gray-scale drawing of Tyson's head and shoulders.  *Id.*  Tyson also appeared, with his tattoo, in the movie "Rocky Balboa," and a Mike Tyson action figure with tattoo accompanied the release of the film.  *See* www.imdb.com/title/tt0479143/.[1]

### Tyson's Trademark Application

On January 26, 2011, Tyson filed an application to register a two-dimensional image of his tattoo as a trademark for use on a wide variety of products, including posters, decals, dry transfer characters, key chains, vitamins, gym bags, wearing apparel, action figures and ornamental face masks.  (*See* Ex. 2, Declaration of Chris Wheeler ("Wheeler Decl."), ¶¶ 4-7 and Exs. 1-3.)  Tyson's trademark counsel has discussed the application with Plaintiff's counsel and has been told by Plaintiff's counsel that Plaintiff will not oppose the application.  (*Id.* ¶¶ 9-13.)  Tyson's commercial use of his tattoo has

---

[1] The Tyson action figure can be purchased at Amazon.com.  www.amazon.com/Jakks-Pacific-Rocky-Action-Figure/dp/B002C7YTNS/ref=sr_1_2?ie=UTF8&s=toys-and-games&qid=1305671056&sr=8-2.

already begun.  For example, a mobile phone "App" that makes use of Tyson's tattoo, and which Tyson has actively promoted, is available.  (Schultz Decl. ¶¶ 6-7.)

**"The Hangover"**

In 2009, Tyson appeared as himself, with his tattoo, in the Warner Bros. movie "The Hangover."  (Ex. 3, DVD of "The Hangover.")  "The Hangover" centers on three groomsmen who wake up the morning after a Las Vegas bachelor party unable to remember anything that happened the night before, including why there is a tiger in their bathroom or what has become of the groom.  They set out to find the missing groom by reconstructing the events of the night before.  At one point they return to their hotel suite to find Tyson sitting at the piano.  It turns out that the tiger belongs to Tyson, and he is none too pleased that it has been taken.  He knocks out one of the groomsmen, without warning, and is menacing towards the others.  (*See* "The Hangover" DVD.)

Tyson appeared in "The Hangover" pursuant to an employment contract with Warner Bros. Pictures, a division of WB Studio Enterprises Inc.  (Schultz Decl. ¶ 12 and Ex. A.)  This contract included the following provision concerning the use of Tyson's name and likeness:

> Except for the unrestricted right for Producer to use one or more film clip(s) from the Picture (including still photographs), which may contain the name, voice and/or likeness of Employee [Tyson] for purposes of advertising, promotion and/or publicity for the Picture, Employee does not grant Producer any right to use Employee's name, voice and/or likeness in connection with merchandising, unless otherwise agreed by Employee.

(*Id.* Ex. A**,** ¶ 6(e).)  There is no suggestion in this provision, which was negotiated by Tyson's counsel, that anyone other than Tyson owns any rights in his tattoo or that Tyson's ability to authorize Warner Bros. to use his tattoo was limited in any way.  (*Id.*)

On the contrary, the broad grant to use Tyson's likeness in clips and stills implies broad rights owned by Tyson. (*Id.*)

Tyson (with his tattoo) was featured in a poster that was displayed in theaters for "The Hangover," in theatrical trailers that ran nationwide between March 6, 2009 and May 22, 2009, and in virtually every television commercial for the film. (Ex. 4, Declaration of Sue Kroll ¶¶ 18-20 and Ex. C.) "The Hangover" was released in the United States in 3,269 theaters and on 4,525 screens on June 5, 2009. (Ex. 5, Declaration of Dan Fellman ("Fellman Decl."), ¶ 6.) It is the highest grossing R-rated comedy of all time, earning domestic box office receipts of _____ million and foreign box office receipts of _____ million. (*Id.*) The DVD, released in December 2009, has sold over 18 million copies. (*Id.*) "The Hangover" received the 2010 Golden Globe award for Best Motion Picture – Musical or Comedy. *See* www.imdb.com/title/tt1119646/awards.

Plaintiff never objected in any way to Warner Bros.' use of Tyson's tattoo in "The Hangover" or in the advertising for the film. As of the date "The Hangover" was released, Plaintiff had not registered a copyright in Tyson's tattoo, and there is, of course, no copyright notice on Tyson's face.

### "Hangover II"

On October 6, 2010, Tyson entered into a contract to appear in a sequel to "The Hangover." (Schultz Decl. ¶ 13 and Ex. B.) For "Hangover II," the producers negotiated an even broader right to use Tyson's likeness than had been provided for in his contract for "The Hangover." Specifically, Tyson's contract for "Hangover II" provides:

> Employee grants to Producer the right to issue and authorize publicity concerning Employee, and to use Employee's name, voice, likeness and biographical data as approved pursuant to Paragraph 6A in connection with the distribution, exhibition, advertising and other exploitation of the

Picture, including without limitation, in connection with publications, merchandise, commercial tie-ins, and goods and services of every kind if reference is made to the Picture or the literary property or screenplay upon which the Picture is based . . . .

(*Id.* Ex. B ¶ 6(e).)  Again, there is nothing in this provision that suggests that anyone other than Tyson owned any rights in his tattoo or that Tyson's ability to authorize Warner Bros. to use his tattoo was limited in any way.

There is no evidence that Tyson ever objected to the use of the tattoo on Helms's face.

### Advertising and Promotion of "Hangover II"

Warner Bros. began promoting "Hangover II" on February 24, 2011 with the release of a "teaser trailer" that included Ed Helms with the tattoo on Apple.com. (Kroll Decl. ¶ 8.) Even before Warner Bros. began officially promoting the film, however, set photos of Helms with the tattoo appeared online on November 11, 2010. (*Id.* ¶ 7.) These photos were widely picked up in the media. (*Id.*)

The theatrical trailer for "Hangover II," which clearly shows Helms's tattoo, was first released on February 25, 2011. (*Id.* ¶ 9.) Posters advertising the film, several of which show Helms with the tattoo, were in theaters as early as April 8, 2011. (*Id.* ¶ 10 and Ex. A.) Television ads, all of which include scenes of Helms with the tattoo, began running nationwide on April 15, 2011. (*Id.* ¶ 9.) An outdoor advertising campaign (*e.g.*, buses, bus shelters, billboards), again including images of Helms with the tattoo, debuted April 4, 201 and was rolled out nationwide on May 2, 2011. (*Id.* ¶ 10.)

### Plaintiff's Infringement Claim and Request for Injunctive Relief

Although "Hangover II" was being promoted in theaters across the country by early April in trailers that prominently focused on Helms's tattoo and was being advertised on television by mid-April, Plaintiff took no action to notify Warner Bros. of either his claim that he owns a copyright in Tyson's tattoo or his claim that the film infringes that purported copyright. Plaintiff failed to contact Warner Bros. even though

Plaintiff's counsel represented Warner Bros. in a different case, and was therefore already acquainted with in-house counsel at Warner Bros.

Instead, on April 19, 2011 – more than eight years after Tyson obtained the tattoo – Plaintiff registered Tyson's tattoo with the Copyright Office.  (Compl. ¶ 9 and Ex. 5.)[2] The copyright registration identifies the author as "Victor Whitmill, dba Paradox-Studio of Dermagraphics" and describes the nature of his creation as "Artwork on 3-D object" – *i.e.*, Tyson's head.  (*Id.* Ex. 5.)  Plaintiff filed as a deposit copy of his creation a photo of Mike Tyson.  (Schultz Decl. ¶ 14 and Ex. C.)  On April 28, 2011 – two months after the trailer for "Hangover II" started running in theaters and five months after photos of the tattoo on Helms's face were first published – Plaintiff filed this lawsuit asserting that Warner Bros.' use of Tyson's tattoo in "Hangover II" is a violation of his purported copyright in the tattoo.   Plaintiff's Complaint seeks a preliminary and permanent injunction enjoining and restraining Warner Bros. "and all others in active concert or participation with them" from making any use of the tattoo on Helms's face "both in the Movie and otherwise."  (Compl. at 7-8.)  Plaintiff also seeks compensatory damages and an award of Warner Bros.' profits from the alleged infringement.  (*Id.* at 8.)

The same day that Plaintiff filed his Complaint he also filed a motion for preliminary injunction.   (Doc. 2.)   Yet Plaintiff chose not to move for a temporary restraining order, despite the fact that Warner Bros. was aggressively promoting the film in posters, trailers and television ads that clearly showed the tattoo on Helms's face and that clearly stated the film was scheduled to open on May 26, 2011.

---

[2]  Because Plaintiff waited so long to register Tyson's tattoo, there is no presumption of validity.  17 U.S.C. § 410(c).

**Harm to Warner Bros. and Others from an Injunction.**

"Hangover II" is scheduled to open nationwide, in approximately 3,600 theaters and on over 7,000 screens, on May 26, 2011.  (Fellman Decl. ¶ 3.)[3]  "Hangover II" is the most anticipated R-rated comedy of all time.  (Kroll Decl. ¶ 14.)  Warner Bros.' expects "Hangover II" to double the opening box office grosses of "The Hangover" and believes it will surpass "The Hangover" as the highest grossing R-rated comedy of all time *if* it opens on May 26, 2011 as scheduled.  (Fellman Decl. ¶¶ 7, 8 and 10.)

The financial consequences to Warner Bros., its exhibitors and its financial partners of a preliminary injunction enjoining the release of "Hangover II" would be, in a word, catastrophic.  If the scheduled release is cancelled it will be many months before Warner Bros. could schedule another opening for the film.  (*Id.* ¶ 9.)  Warner Bros. would lose the        million that it has already spent advertising and promoting the film.  (Kroll Decl. ¶ 15.)  In addition, given the very short time before the May 26 release date, the 3,600 theaters that have contracted to exhibit the movie – many of which have pre-sold tickets to the movie – will not be able to find a replacement movie to show.  (Fellman Decl. ¶¶ 3 and 10.)  Many of these theaters passed on other films in order to show "Hangover II" on the key Memorial Day holiday weekend, and they are likely to lose at least        million in ticket receipts if the release of the movie is enjoined.  (*Id.* ¶ 10.)  They would also stand to lose the money they would have made in concession sales to viewers of "Hangover II" (approximately 25% of gross box office).  (*Id.*)

Moreover, thousands of prints of the movie have already been created and shipped to theaters across the country.  (*Id.* ¶ 13-14.)  If the release of the movie were

_____

[3] There are also approximately 80 private showings of the film in various theaters scheduled for May 25, 2011.

enjoined Warner Bros. would not only be out the funds expended in creating and shipping those prints, but it is a virtual certainty that, with so many copies in circulation, the movie will be leaked and pirated, resulting in huge losses to Warner Bros., its financial partner, and theaters. (*Id.* ¶ 14.) Even if that did not occur, the delay in opening the movie that would inevitably result from an injunction would dramatically reduce its box office receipts, again resulting in a substantial loss of revenue to both Warner Bros. and its financial partner, Legendary Pictures. (*Id.* ¶ 12.)

Finally, enjoining the film would harm the public. "Hangover II" is the most highly anticipated comedy movie of the summer. Tens of thousands of movie-goers have already purchased tickets and made plans to attend the film. An injunction would disrupt the public's settled expectations and plans.

## II.   THE LEGAL STANDARD.

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, __, 129 S. Ct. 365, 374 (2008). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Id.* at 376. In each case, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Id.* (internal quotations omitted). The burden of establishing the necessity of a preliminary injunction rests on the party seeking the injunction. *General Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). Because a preliminary injunction is "an extraordinary and drastic remedy," it "should not be granted unless the movant, by a clear

showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

Moreover, in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), the Supreme Court made it clear that there is no presumption of irreparable injury or entitlement to injunctive relief in patent and copyright cases – to the contrary, all the normal, equitable factors must be weighed in considering the appropriateness of this extraordinary remedy.  547 U.S. at 391-93.  The present case, in which the balance of hardships and other factors weigh strongly against granting an injunction, serves as a perfect example of what the Supreme Court had in mind in clarifying the framework that governs the award of injunctive relief under the Patent and Copyright Acts.

## III. PLAINTIFF IS NOT LIKELY TO SUCCEED ON THE MERITS OF HIS INFRINGEMENT CLAIM.

Plaintiff cannot establish that he is likely to succeed on the merits of his infringement claim, for several reasons.  First, there is no legal basis for Plaintiff's radical proposition that a tattoo created in the first instance on a human being is copyrightable at all.  There are no reported cases addressing the copyrightability of tattoos, and a rule that would permit one person (or entity) to own a physical attribute of another person – which is what Plaintiff claims here – would raise serious constitutional and policy concerns.  Second, even assuming that Plaintiff owns a valid copyright in Tyson's tattoo, Warner Bros.' use of a similar tattoo in "Hangover II" parodies Tyson's tattoo and is therefore a fair use under Section 107 of the Copyright Act.  Third, Plaintiff cannot prevail on his infringement claim against Warner Bros. because Warner Bros.' use of the tattoo in "Hangover II" is permitted by the broad implied license that Plaintiff has given Tyson to use his tattoo for commercial purposes.  Finally, Plaintiff is estopped to assert an

12

infringement claim against Warner Bros. because of his failure to voice any complaint about or objection to Warner Bros.' use of Tyson's tattoo in "The Hangover."

### A.   Plaintiff Does Not Own A Valid Copyright In Tyson's Tattoo.

Plaintiff's Complaint simply assumes that Plaintiff owns a valid copyright in a work that was created on, and has become part of, another person's body.  But Plaintiff has cited no legal authority to support this assumption – and none exists.  If Plaintiff were permitted to copyright the work in question here, it would amount to owning a copyright in Tyson's face.   Plaintiff could dictate whether and how Tyson could appear in magazines, on television, in film and on the Internet, and could potentially prevent Tyson from removing or changing his tattoo.

The above proposition is not only unprecedented, it would have highly invidious, and potentially unconstitutional, results under the Copyright Act.  The Court must avoid a construction of the Act that will lead to absurd or unintended results.  *See, e.g., Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 453-55 (1989).  The Court is also required to "construe the [Copyright Act] to avoid constitutional problems, if the statute is subject to such a limiting construction."  *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982).

By enacting the Copyright Act of 1976, Congress never remotely intended to provide any author with the ability to control another person's body.  The only reasonable interpretation of the Copyright Act is that a tattoo initially created for and registered as part of another person's body stands outside copyright protection.

1.     **The Human Flesh In Which Whitmill Inscribed His Artistic Efforts Cannot Support Copyright Protection.**

Two elements are essential for copyright protection in the United States: (i) an original expressive work and (ii) a material substrate.  17 U.S.C. § 102(a).  The eligible categories of expressive works are set forth in paragraphs (1) through (8) of Section 102(a) and include "pictorial, graphic, and sculptural work."   *Id.*   As to material substrates, the statute affords protection only to "works of authorship fixed in any tangible medium of expression."  *Id.*

In this case, Plaintiff registered for protection a work that he entitled "Tribal Tattoo," which he describes as "Artwork on 3-D object."  (Compl. Ex. 5.)  As indicated by the registration number, VA 1-767-704, Plaintiff registered "Tribal Tattoo" as a work of the "Visual Arts."  (*Id.*)  The "3-D object" referenced in Plaintiff's registration is none other than Tyson's head.  (*See* Schultz Decl. ¶ 14 and Ex. C.)  Extending copyright protection to a tattoo created on a human being, such as Plaintiff claims here, would lead to troubling and unintended results under the Copyright Act.

First, if a tattoo created on a human being is a copyrightable pictorial work, then it could also qualify as a "work of visual art."  *See* 17 U.S.C. § 101 (defining that term).  If it gains notoriety – not difficult to imagine, when affixed to one of the most famous individuals in the country, as in this case – then it may gain "recognized stature" under the Act.[4]  17 U.S.C. § 106A(a)(3)(B).  The Copyright Act authorizes courts to enter injunctions "to prevent any destruction of a work of recognized stature."   *Id.*

---

[4] Indeed, Plaintiff argues in his Memorandum that Section 106A applies to Tyson's tattoo.  (*See* Plf. Mem. at 3.)

Accordingly, the specter arises of Plaintiff obtaining a judicial order barring Tyson from removing his tattoo. (*See* Ex. 6, Declaration of David Nimmer ("Nimmer Decl."), ¶ 20.)

Second, the logic of Plaintiff's position is that, if Tyson chooses to obtain an adjacent or overlapping tattoo on his face, of a type that he likes but that offends Plaintiff's artistic sensibilities about how he would like to have "his" proprietary artwork displayed, Tyson will have violated Plaintiff's exclusive right to prepare derivative works of the copyrighted material that he owns. *See* 17 U.S.C. § 106(2). Plaintiff could sue Tyson for copyright infringement, and a court could order that the offending work be destroyed. *See* 17 U.S.C. §§ 501(a) and 503(b). An order that vindicates Plaintiff's statutory rights by ordering laser removal of the unauthorized product would again pervert the Copyright Act into an instrument allowing Plaintiff to control what Tyson does with his body. (*See* Nimmer Decl. ¶ 20.)

Third, a magazine article that features a picture of Tyson's face would violate Plaintiff's display right under the statute. *See* 17 U.S.C. § 106(5). Indeed, his release arguably says as much. (Compl. Ex. 3.) A television network that broadcasts Tyson's boxing match would violate Plaintiff's performance right. *See* 17 U.S.C. § 106(4). A studio that makes a documentary about Tyson and the theater that screens the film would also be liable on the same theories. And if Tyson authorized those various usages, he would be a contributory infringer in each instance. (*See* Nimmer Decl. ¶ 20.)

For all of these reasons, a tattoo created on a human body cannot be the subject of copyright protection. *Public Citizen*, 491 U.S. at 453-55 (statutes must be construed to avoid absurd results). Thus, Plaintiff cannot show that he owns a valid copyright in Tyson's tattoo and therefore cannot succeed on the merits of his claim.

2.      **Because It Lacks Physical Separability, There Can Be No Copyright Protection in Tyson's Tattoo.**

Even if the Court were to find that a human body part may serve as a "medium of expression" under the Copyright Act, Tyson's tattoo would still not be copyrightable because it adorns a "useful article" – specifically, Tyson's head.   Under the Copyright Act, the substrates used to display expressive works fall into one of two categories: objects devoted exclusively to expressing the original work and so-called "useful articles."  (*See* Nimmer Decl. ¶ 31.)  The Copyright Act defines "useful article" as "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information."  17 U.S.C. § 101.  For example, a lamp that has a sculptural base includes a creative element, but also serves the utilitarian purpose of producing light, and is therefore considered a "useful article."  *See Esquire, Inc. v. Ringer*, 591 F.2d 796 (D.C. Cir. 1978).  The "useful article" definition limits the scope of copyright protection as follows:

> [T]he design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

17 U.S.C. § 101.

In this case, the work in question is incorporated into a part of Tyson's body – specifically, his head.   Obviously, Tyson's head is not used "merely to portray the appearance of [a tattoo] or to convey information."  17 U.S.C. § 101.  To the contrary, Tyson's storied career amply demonstrates that his body serves many functions beyond displaying Plaintiff's tattoo.   From helping him to complete the most mundane, daily activities to enabling him to win boxing championships, Tyson's body has an intrinsically

16

utilitarian function.  (*See* Nimmer Decl. ¶¶ 37-38.)   Therefore, in the parlance of the Copyright Act, Tyson's body, including his head and face, is a "useful article."   (*Id.*) Consequently, in order for Tyson's tattoo to be protected under the Copyright Act, it must meet the "separability" requirement of Section 101.

The cases have articulated two approaches to determine whether a useful article has features that are capable of existing independently of the article.  *See generally* 1 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 2.08[B][3].   One considers whether the design aspect is *physically* separable from the useful article.  *See Esquire,* 591 F.2d at 800-04.   The other considers whether the design aspect is *conceptually* separable from the useful article.  *See Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989, 991-94 (2d. Cir. 1980).

When an author seeks to gain copyright protection over an image inscribed on another person's body, the only cognizable test for courts to apply is physical separability.  If the tattoo in this case were composed of a material that rendered it easily removable – along the lines of decorative sculptures on buildings – then there would be physical separability.   In that event, Plaintiff's exclusive rights under copyright law would not give him effective control over Tyson's actions and personal expression.  He would then be allowed to assert copyright ownership over the product.

But under the actual facts of this case, Plaintiff registered a copyright in "Artwork on a 3-D object," the unique combination of his tattoo on Tyson's face. (Compl., Ex. 5.) His deposit copy of his creation with the Copyright Office is a picture of Tyson. (Schultz Decl. ¶ 14 and Ex. C.)  The tattoo cannot be physically separated from Tyson's body without painful laser treatment or skin grafting.  If the tattoo were so removed, it would

simply cease to exist, much like a noncopyrightable sand castle that disappears at high tide.  Because the tattoo on Tyson's face cannot "exist[] independently of[] the utilitarian aspects" of Tyson's head, it is not subject to copyright protection.

**B.      Warner Bros.' Use Of Tyson's Tattoo In "Hangover II" Is A Parody That Constitutes Fair Use Under The Copyright Act.**

"Hangover II" is a creative work that makes transformative use of Tyson's tattoo for the purpose of parody and satire.  Therefore, even to the extent Tyson's tattoo is capable of copyright protection, the movie's use of Tyson's tattoo is a statutorily protected "fair use."

The ownership rights created by the Copyright Act are not absolute, but are subject to statutory exceptions intended to advance the objective of the Copyright Act to motivate creative activity of authors, as "excessively broad protection would stifle, rather than advance the [law's] objective."  *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006) (internal quotations omitted); *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 636-637 (4th Cir. 2009) (same).

One of these statutory exceptions is "fair use," which is codified in §107 of the Copyright Act.  That section, in relevant part, provides:

> [T]he fair use of a copyrighted work . . . for purposes such as criticism, comment, news reporting, teaching . . ., scholarship, or research, is not an infringement of copyright.  In determining whether the use made of a work in a particular case is a fair use the factors to be considered shall include—
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for non-profit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

As the Supreme Court has explained, "[t]he fair use doctrine thus 'permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994), *quoting Stewart v. Abend*, 495 U.S. 207, 236 (1990).

> "The task is not to be simplified with bright-line rules, for the statute, like the doctrine it recognizes, calls for case by case analysis. . . . Nor may the four statutory factors be treated in isolation, one from another.  All are to be explored, and the results weighed together, in light of the purposes of copyright."

*Campbell*, 510 U.S. at 577-578 (citations omitted).

A weighing of the statutory factors here establishes that "Hangover II" makes "fair use" of Tyson's tattoo, as three of the four factors strongly favor a finding of fair use, with the remaining factor neutral.

**1.      The Purpose And Character Of The Use Favors Warner Bros.**

The "purpose and character of use" factor "asks 'to what extent the new work is transformative' and does not simply 'supplant []' the original work and whether the work's purpose was for-and not-for-profit." *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 800 (9th Cir. 2003) *quoting Campbell*, 510 U.S. at 584.  "A work must add 'something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Mattel*, 353 F.3d at 800 *quoting Campbell*, 510 U.S. at 579.  The goal of copyright "is generally furthered by the creation of transformative works." *Campbell*, 510 U.S. at 579.  "The use of a copyrighted work need not alter or

augment the work to be transformative in nature. Rather, it can be transformative in function or purpose without altering or actually adding to the original work." *Vanderhye*, 562 F.3d at 639.

One well recognized type of transformative use is parody. "[P]arody has an obvious claim to transformative value" as "it can provide social benefit, by shedding light on an earlier work, and, in the process, creating a new one." *Campbell*, 510 U.S. at 579. Thus, the Supreme Court has held that "parody, like other comment or criticism, may claim fair use under § 107." *Id.* "[P]arodic elements in a work will often justify fair use protection." *Mattel*, 353 F.3d at 801. "The threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived." *Campbell*, 510 U.S. at 582. A fair use parody "needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination . . . ." *Id.* at 580-581. Such use need only "in part" comment on the author's work. *Id.* at 580. Similarly, satire – using a work to comment on society and culture – is a related but separately recognized form of transformative fair use. *See Cambpell,* 510 U.S. at 581; *Blanch*, 467 F.3d at 254-55.

"Hangover II" is transformative parody and satire. Its use of Tyson's tattoo is precisely to give it "new expression, meaning [and] message," and the parodic transformation is more than "reasonably perceived" – it is clear. Plaintiff's work is a Maori-style warrior tattoo that appears on the face of Mike Tyson, one of the toughest "warriors" known in our culture. Tyson, playing himself, played a prominent role in the first "Hangover" movie. That movie played up Tyson's toughness (he knocks out one of the main characters and is menacing toward the others) as well as his outrageous lifestyle

(he owns a live tiger).   It is this same outrageous lifestyle that is manifest in Tyson's tattoo.

In stark contrast is the Stu character, a timid, frightened and milquetoast dentist with a decidedly conservative lifestyle.  When, in "Hangover II," the Stu character wakes up bearing the tattoo, it conjures up a warrior as well as Mike Tyson from the first "Hangover" movie.  The millions of viewers who saw the first "Hangover" movie will immediately understand the reference to Tyson and the first film.  Meanwhile, through Stu's contrasting personality, the film pokes obvious fun at the specific "warrior" symbol and the serious intentions of Tyson's tattoo as a personal and cultural expression.

The stark contrast between the "tough" and "outrageous" tattooed warrior (Tyson) and the meek Stu is an element of the commentary on the tattoo.  The theme of Stu's transformation from lacking to developing toughness is central to the film.  At the beginning of the film, Stu's future father-in-law calls Stu a "coward" and likens him to soft white rice.  Stu's fear and reticence are on display throughout the film.  This perpetuates a tension and contrast between Stu's docile personality and his appearance with his tattoo, which conjures up Tyson's tattoo, and therefore Tyson himself.  As "Hangover II" progresses, however, Stu gains assertiveness and toughness, which culminates in his confronting his future father-in-law, taking on an assertive personality and, in effect, finding his "inner Tyson" and "growing into" his tattoo.  The tattoo joke then pays off in full when Tyson himself appears in the film and, in a final scene, sits with Stu and tells him that he needs to get rid of the tattoo.

"Another element of the first factor analysis is whether the work's 'purpose' was commercial or had a non-profit aim."  *Mattel*, 353 F.3d at 803.  However, as the Supreme

Court has observed, works involving comment or criticism "are generally conducted for profit in this country."  *Campbell*, 510 U.S. at 584.  "[T]he more transformative the new work, the less will be the significance of the other factors, like commercialism, that may weigh against a finding of fair use."  *Vanderhye*, 562 F.3d at 639; *see also Mattel,* 353 F.3d at 803 (commercial aspect did not "weigh much against [defendant]" due to transformative nature of work).  The same analysis should apply here.  Because the appearance of Stu's tattoo in the film is highly transformative, the commercial aspect of the film should not weigh against Warner Bros.

In light of the clearly transformative, parodic and satirical nature of Warner Bros.' use, the first factor weighs strongly in favor of Warner Bros.

### 2.   The Nature of the Copyrighted Work Factor Is At Most Neutral

"'[F]air use is more likely to be found in factual works than in fictional works,' whereas 'a use is less likely to be deemed fair when the copyrighted work is a creative product.'"  *Vanderhye*, 562 F.3d at 640 *quoting Stewart*, 495 U.S. at 237.  However, as the Supreme Court has held, the fact that a copyrighted work is creative is not "ever likely to help much in separating the fair use sheep from the infringing goats in a parody case, since parodies almost invariably copy publicly known, expressive works." *Campbell*, 510 U.S. at 586.  Because "Hangover II" clearly parodies Tyson's tattoo, this factor is neutral.

### 3.   The Amount And Substantiality Of The Use Is Justified By Warner Bros.' Parody.

The third fair use factor considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  Although, generally, the more that is copied, the more this weighs against fair use, even copying an

entire work "'does not preclude a finding of fair use.'"  *Vanderhye*, 562 F.3d at 642 (citation omitted).   As the Supreme Court further held, "[p]arody's humor, or in any event its comment, necessarily springs from recognizable allusion to its object through distorted imitation. . . . When parody takes aim at a particular original work, the parody must be able to 'conjure up' at least enough of that original to make the object of its critical wit recognizable." *Campbell*, 510 U.S. at 588.   The "heart of the original" is "what most readily conjures up" a work for parody and "it is the heart at which parody takes aim."  *Id*.   The court must examine "the extent to which the [work's] overriding purpose and character is to parody the original or, in contrast, the likelihood that the parody may serve as a market substitute for the original." *Id*.

Here, the amount of Tyson's tattoo used in "Hangover II" is justified by Warner Bros.' parodic and satirical intent and execution.   Such use was needed to conjure up Mike Tyson and his appearance in the first film and to use Tyson as a symbol of Stu's emerging toughness.   The similarities between the tattoos, and the build-up achieved by introducing Stu's tattoo relatively early in the narrative of "Hangover II," were creatively necessary in order for the parodic joke at the end of the movie to pay off.   If Stu's tattoo had not been similar to Tyson's, Tyson would have had no reason to tell Stu that he needs to have it removed.   There is, of course, no likelihood that "Hangover II" will serve as a "market substitute" for Tyson's tattoo.

This factor also strongly favors a finding of fair use.

### 4.    "Hangover II" Has No Effect On The Market For Tyson's Tattoo

The fourth factor examines actual market harm that results from defendant's use and whether "unrestricted and widespread conduct of the sort engaged in by the

23

defendant . . . would result in a substantially adverse impact on the potential market" for the original or its derivatives. *Campbell*, 520 U.S. at 590.  The Supreme Court has held this factor to be the "single most important element of fair use." *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985).  "[A] use that has no demonstrable effect upon the potential market for, or the value of, the copyrighted work need not be prohibited in order to protect the author's incentive to create." *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417, 450 (1984).  The focus is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives but [on] whether the secondary use *usurps the market for the original work.*" *NXIVM Corp. v. The Ross Institute*, 364 F.3d 471, 482 (2d Cir. 2004) (emphasis added).  "[A]s to parody pure and simple, it is more likely that the new work will not affect the market for the original in a way cognizable under this factor, that is, by acting as a substitute for it ('supersed[ing] its objects'). . . .  This is so because the parody and the original usually serve different market functions." *Campbell*, 510 U.S. at 591.  Moreover, "[t]he fact that a parody may impair the market for derivative uses by the very effectiveness of its critical commentary is no more relevant under copyright than the like threat to the original market." *Id*. at 593.

Here, no argument can be made that "Hangover II" will act "as a substitute for" or will "usurp" Tyson's tattoo.  "Hangover II," a work of public entertainment, serves a different market function than Tyson's tattoo.  Similarly, Plaintiff cannot argue that the release of the film will somehow suppress or even affect any market for Tyson's tattoo.  Any such argument defies common sense as well as the facts.  As a factual matter,

"Hangover II" cannot remotely affect the "market for the original." This "most important" factor also strongly favors a finding of fair use.

In sum, an analysis and balancing of the fair use factors establishes overwhelmingly that, to the extent plaintiff owns any copyright in Tyson's tattoo, "Hangover II" makes a statutory "fair use" of the tattoo and thus does not infringe any copyright that Plaintiff may have in the tattoo.

### C.    Warner Bros.' Use Of Tyson's Tattoo Is Within The Scope Of Tyson's Implied License To Make Commercial Use Of His Tattoo.

A license is a defense to a claim of copyright infringement. *Field v. Google Inc.*, 412 F. Supp. 2d 1106, 1115 (D. Nev. 2006), citing *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558-59 (9th Cir. 1990); *see also Quinn v. City of Detroit*, 23 F. Supp. 2d 741, 749 (E.D. Mich. 1998) ("If Defendant had a license to make a particular use of a copyrighted work, defendant cannot have committed infringement."). A copyright owner may grant an implied license through conduct. *Field*, 412 F. Supp. 2d at 1115; *National Assoc. for Stock Car Auto Racing, Inc. v. Scharle*, 356 F. Supp. 2d 515, 525-26 (E.D. Pa. 2005) (hereafter, "*NASCAR*"); 3 *Nimmer on Copyright* § 10.03[A] [7]. The scope or extent of permissible use under an implied license is determined from the conduct of the parties. *Herbert v. United States*, 36 Fed. Cl. 299, 310 (Fed. Cl. 1996); *see, e.g.*, *NASCAR*, 356 F. Supp. 2d at 525-28 (examining parties' conduct to determine scope of implied license for NASCAR to use independent contractor's drawings to design and manufacture NASCAR championship trophy).

Plaintiff's conduct here supports a finding that Tyson has an implied license to make broad commercial use of his tattoo, which includes the right to appear in a movie, to authorize the distribution, exhibition and promotion of the movie and to authorize the

movie producer to copy Tyson's tattoo onto another actor appearing in the movie with Tyson.

To begin, Tyson has an implied license to appear, with his tattoo, in movies. "The Hangover" was widely advertised by means of theatrical trailers that included Tyson and a poster that featured Tyson. The movie was released in June of 2009 on over 3,000 screens and was seen by millions of people. Yet, Plaintiff never voiced any objection to Tyson's appearance in the movie and promotional materials or to Warner Bros.' distribution and exhibition of the movie.[5] A copyright owner's knowledge of the use of its copyright coupled with the owner's silence in the face of that use can create an implied license. *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 947 (S.D.N.Y. 1997); *Field*, 412 F. Supp. 2d at 1116.

Tyson's implied license to appear in a movie, with his tattoo, includes the authority to authorize the distribution, exhibition and promotion of the movie, without which the license would be meaningless. Furthermore, the scope of Tyson's implied license, as evidenced by Plaintiff's conduct, is broad enough to encompass Warner Bros.' use of a facsimile of Tyson's tattoo on the face of another actor appearing in the movie. As noted above, Tyson has filed an application to register his tattoo – separate from his face – as a trademark, with an intent to use the trademark in commerce on a wide variety of products, which will necessarily be manufactured and sold by third parties, not by Tyson himself. Plaintiff, through his counsel, has informed Tyson that he *will not oppose* Tyson's trademark registration. (Wheeler Decl. ¶ 13.) Indeed, such use has already

---

[5] Plaintiff also apparently did not object to Tyson's 2008 appearance in the documentary "Tyson" or to the advertising for that film, which prominently featured Tyson's tattoo.

begun on a game that Tyson has actively promoted.  (Schultz Decl. ¶¶ 6-9.)  Plaintiff's

non-opposition to Tyson's stated intent to use the tattoo as a trademark is strong evidence

that Tyson's implied license permits him to make broad, commercial use of his tattoo,

separate and apart from his face, and to authorize third parties (such as Warner Bros.) to

do so as well.  *See, e.g.*, *NASCAR*, 356 F. Supp. 2d at 527-28 (holding that NASCAR had

an implied license to use trophy based on independent contractor's drawings despite the

lack of direct contact between NASCAR and independent contractor where independent

contractor knew and intended that his drawings would be distributed to NASCAR or its

sponsors for the purpose of manufacturing the trophy).

Finally, Tyson did in fact authorize Warner Bros. to use his tattoo in whatever

way it saw fit for purposes of "Hangover II."   Tyson's contract for "Hangover II"

authorizes Warner Bros. to use Tyson's "likeness . . . in connection with the distribution,

exhibition, advertising and other exploitation of the Picture."  *See supra* at __.   Tyson's

likeness certainly includes his tattoo.  *See, e.g.*, *Newcombe v. Adolf Coors Co.*, 157 F.3d

686, 692-93 (9th Cir. 1998) (holding that whether drawing of baseball player in pitching

stance characteristic of Donald Newcombe used Newcombe's likeness presented a triable

issue of fact precluding summary judgment); *cf. World Wrestling Fed'n Entm't, Inc. v.

Big Dog Holdings, Inc.*, 280 F. Supp. 2d 413, 419 (W.D. Pa. 2003) (identifying tattoo of

a Brahma Bull as part of the "trade dress" of World Wrestling Federation character "The

Rock").  Moreover, Tyson implicitly authorized Warner Bros. to use the tattoo on Ed

Helms's face by participating in scenes with Helms in which Helms's tattoo is not only

shown, but is commented upon by Tyson. *See supra* at 8.

Because the evidence supports a finding that Tyson has an implied license that encompasses Warner Bros.' use of his tattoo on Ed Helms's face, Plaintiff is not likely to succeed on the merits of his infringement claim and his motion for a preliminary injunction should be denied.

### D.  Plaintiff Is Estopped From Asserting His Infringement Claim.

A plaintiff is estopped from asserting a claim for copyright infringement if (1) plaintiff knew of defendant's conduct, (2) plaintiff intended that his conduct be acted on or acted in a way that the defendant had a right to believe it was so intended, (3) defendant was ignorant of the true facts and (4) defendant relied on plaintiff's conduct to its detriment. *Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003); *Field*, 412 F. Supp. 2d at 1116; *Quinn*, 23 F. Supp. 2d at 752-53; *Carmichael Lodge No. 2103 v. Leonard*, No. Civ. S-07-2665 LKK/GGH, 2009 WL 2985476, at *15 (E.D. Cal. Sept. 16, 2009). In this case, all four elements are met and Plaintiff is therefore estopped from asserting a claim against Warner Bros. for copyright infringement based on its use of Tyson's tattoo in "Hangover II."

The motion picture "The Hangover" was the highest grossing R-rated comedy of all time. *See supra* at 6. It won the 2010 Golden Globe award for Best Motion Picture – Musical or Comedy. *Id.* Tyson was featured in both the theatrical trailer for the movie and the nationwide television ad campaign, and was the sole figure in one of the posters used to advertise the movie in theaters. *Id.* It is simply inconceivable that Plaintiff was not aware of Tyson's appearance, with his tattoo, in "The Hangover."

Plaintiff never objected to Warner Bros.' distribution of millions of copies of Tyson's tattoo in the advertising of "The Hangover" or in the film itself. Plaintiff never contacted anyone associated with "The Hangover" to advise them of his claim that he,

not Tyson, owned the rights to Tyson's tattoo.  "[I]t is accepted that estoppel may be accomplished by silence and inaction."  *Carson*, 344 F.3d at 453, *citing* 4 *Nimmer on Copyright* § 13.07; *see also DeCarlo v Archie Comic Pubs., Inc.*, 127 F. Supp. 2d 497, 510 (S.D.N.Y. 2001) (second element of estoppel found where plaintiff "had never so much as voiced his discontent" about defendant's use of characters that plaintiff claimed he owned, or otherwise made it known to defendant that he claimed rights to the characters).  In this case, given the nature of the work at issue – a tattoo on the face of an actor and celebrity – and Warner Bros.' widespread distribution of images of that work, Warner Bros. had a right to believe based on Plaintiff's silence that no one other than Tyson claimed any rights to Tyson's tattoo.

There is no question that Warner Bros. was ignorant of Plaintiff's claim that he owns the copyright in Tyson's tattoo.  There is no copyright notice on Tyson's face, Plaintiff never contacted Warner Bros. about its use of the tattoo in "The Hangover" and Plaintiff did not register the tattoo until approximately one month ago, almost two years after "The Hangover" was released.  And Tyson's agent never suggested during the negotiations for his appearances in "The Hangover" and "Hangover II" that anyone other than Tyson had any right to control the use of Tyson's tattoo.

Finally, there is no doubt that Warner Bros. relied on Plaintiff's silence to its detriment.  Warner Bros. has invested over         million in the production, advertising and distribution of "Hangover II," all of which is now at risk because of Plaintiff's lawsuit.  Had Warner Bros. known that someone other than Tyson claimed the right to control the use of Tyson's tattoo, it could have chosen to forego the parodic use of Tyson's tattoo.  *See, e.g.*, *Keane Dealer Servs.*, 968 F. Supp. at 947-48 (detrimental

reliance element of estoppel supported by evidence that if defendants had known they were violating a copyright they could have easily negotiated a license agreement with plaintiff or created a software program of their own).

Because the evidence supports a finding that Plaintiff is estopped from asserting a copyright infringement claim against Warner Bros., Plaintiff is not likely to succeed on the merits of that claim, and his motion for a preliminary injunction should be denied.

## IV.   PLAINTIFF IS NOT LIKELY TO SUFFER IRREPARABLE HARM IF THE RELEASE OF "HANGOVER II" IS NOT ENJOINED.

Regardless of the strength of its claim on the merits, a party seeking a preliminary injunction must show that he will suffer irreparable harm absent an injunction. *General Motors Corp.*, 563 F.3d at 318. In order to obtain a preliminary injunction, a party "must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425 (8th Cir. 1996). Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages. *General Motors Corp.*, 563 F.3d at 319. "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." *Watkins, Inc.*, 346 F.3d at 844; *see also General Motors Corp.*, 563 F.3d at 320 (same).

Plaintiff asserts that, "[o]nce the movant has established the likelihood of success on the merits [in a copyright infringement case], irreparable harm is presumed." (Plf. Mem. at 8, internal quotations omitted.) Even if this assertion were a correct statement of the law, it would have no application here because Plaintiff has not established a likelihood of success on the merits. In any event, Plaintiff's statement is incorrect under the Supreme Court's decisions in *eBay*, *supra*, and *Winter*, *supra*. There is no

30

presumption of irreparable harm, and Plaintiff cannot establish that he will suffer irreparable harm if the injunction he seeks is not entered.   For this reason as well, Plaintiff's motion for a preliminary injunction should be denied.

### A.      There Is No Presumption Of Irreparable Harm.

In the *eBay* case, the Supreme Court reversed a Federal Circuit decision that had entered a permanent injunction based on the Federal Circuit's "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances." *eBay*, 547 U.S. at 391 (internal quotations omitted).  The Supreme Court began its analysis with the "well-established" four-factor test for the entry of a permanent injunction, which requires the plaintiff to demonstrate that it has suffered an irreparable injury and that damages are inadequate to compensate for that injury.  *Id.*   The Court stated that "[t]hese familiar principles apply with equal force to disputes arising under the Patent Act.  As this Court has long recognized, 'a major departure from the long tradition of equity practice should not be lightly implied.'"  *Id.* (*quoting Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982)).  The Court observed that "[n]othing in the Patent Act indicates that Congress intended such a departure.   To the contrary, the Patent Act expressly provides that  injunctions 'may' issue 'in accordance with the principles of equity.'"  *Id.* (*quoting* 35 U.S.C. § 283).

The Court then looked to the treatment of  injunctions under the *Copyright* Act. *Id.* at 392.  The Court observed that, "[l]ike the Patent Act, the Copyright Act provides that courts 'may' grant injunctive relief 'on such terms as it may deem reasonable to prevent or restrain infringement of a copyright.'"  *Id.* (*quoting* 17 U.S.C. § 502(a)).  The Court further observed that "[t]his Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a

determination that a copyright has been infringed." *Id.* at 392-93. The Court concluded that, because neither the Federal Circuit nor the district court in the case before it had "correctly applied the traditional four-factor framework that governs the award of injunctive relief," the Federal Circuit's decision had to be vacated and the case remanded so that the district court could "apply that framework in the first instance." *Id.* at 394.

Two years later, the Supreme Court confirmed that "[a] preliminary injunction is an extraordinary remedy never awarded as of right" and that "[i]n each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 129 S. Ct. at 376; *see also Gowan Co., LLC v. Aceto Agric. Chems.*, No. CV-09-1124-PHX-JAT, 2009 WL 2028387, at *4 (D. Ariz. July 10, 2009) (stating that the Supreme Court's decision in *Winter* "confirmed that irreparable harm should no longer be presumed").

The Second Circuit has held that, while *eBay* dealt with a permanent injunction under the Patent Act, the decision "applies with equal force (a) to preliminary injunctions (b) that are issued for alleged copyright infringement." *Salinger v. Colting*, 607 F.3d 68, 77-80 (2d Cir. 2010). Other courts agree. *See, e.g., Gowan*, 2009 WL 2028387 at *4 (stating that after *eBay* and *Winter*, irreparable harm should not be presumed in copyright cases seeking preliminary injunctive relief); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1212-14 (C.D. Calif. 2007) (discussing cases); *see also* 4 *Nimmer on Copyright*, § 14.06[A][3][a] (discussing cases); *Peter Letterese and Assocs., Inc. v. World Inst. of Scientology Enters., Int'l*, 533 F.3d 1287, 1323 (11th Cir. 2008) (stating that, under *eBay*, "a permanent injunction does not automatically issue upon a finding of copyright infringement"); *Christopher Phelps & Assocs., LLC v.*

*Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (holding that *eBay* applies to request for permanent injunction under Copyright Act).  As Nimmer has observed, "[g]iven that the Court reached its ruling by noting that 'this Court has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed,' it only makes sense to apply it to the instant domain of enjoining copyright infringement as well."  4 *Nimmer on Copyright* § 14.06[A][3][a] (*quoting eBay*, 547 U.S. at 392-93).  After *eBay* and *Winter*, there is no presumption of irreparable injury, and Plaintiff must demonstrate that he will suffer irreparable harm in order for an injunction to issue.  Because Plaintiff cannot do so, his motion for a preliminary injunction should be denied.[6]

### B.    Plaintiff Has Not Shown That He Will Suffer Irreparable Harm If The Requested Injunction Is Not Granted.

Irreparable harm is defined as an injury "that is not remote or speculative but . . . actual and imminent," and for which a monetary award "cannot be adequate compensation."  *International Swaps and Derivatives Ass'n, Inc. v. Socratek, L.L.C.*, 712 F. Supp. 2d 96, 103 (S.D.N.Y. 2010); *see also CDI Energy Servs., Inc. v. West River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir. 2009) (explaining that preliminary injunctive relief is not available where a plaintiff "has an adequate remedy at law"); *Iowa Utils. Bd.*, 109 F.3d at 425 (party seeking preliminary injunction must show "that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief").  Moreover, where the alleged irreparable harm has already taken place, an

---

[6] In any event, the pre-*eBay* presumption of irreparable harm falls when, as here, opposing evidence is offered.  *Berlent v. Focus Features, LLC*, No. 06 Civ. 2834(SCR), 2006 WL 1494478, at *2 (S.D.N.Y. June 8, 2006).

injunction will not issue. *Berlent,* 2006 WL 1594478, at *1; *see also CDI Energy Servs.,* 567 F.3d at 403; *Scott-Blanton v. Universal Studios Production LLP*, 495 F. Supp. 2d 74, 80 (D.D.C. 2007).

Plaintiff makes vague reference to his purported right to "control the use" of Tyson's tattoo. (Plf. Br. at 9.)   It is clear from the facts of this case, however, that Plaintiff already has given up that right (if he ever had it).   Plaintiff concedes that images of Tyson's tattoo are ubiquitous.   A Google search for "Tyson face tattoo" results in literally hundreds of thousands of images.   Tyson appeared in a 2008 documentary, the advertising for which emphasized his facial tattoo.   And he appeared, with his tattoo, in "The Hangover," the theatrical trailer for "The Hangover" and advertising for "The Hangover," not to mention the literally hundreds of public and media appearances of which the Court may take judicial notice.   Plaintiff has also acquiesced in Tyson's commercial use of his tattoo, separate from his face, by agreeing not to oppose Tyson's trademark application, and the tattoo is already being used, separate from Tyson's face, by both Tyson and third parties. (*See* Schultz Decl. ¶¶ 3-11.)   Plaintiff has not explained and cannot explain why, in view of the extensive public exposure that the tattoo already has received and his willingness to allow Tyson to make commercial use of the tattoo, the release of a sequel to "The Hangover" in which a tattoo similar to Tyson's is placed on another actor's face will cause Plaintiff any injury, much less an injury that cannot be compensated by monetary damages.   Indeed, Plaintiff's apparently selective enforcement of his claimed rights in Tyson's tattoo suggest that his motivation in bringing this suit is something other than a lofty protection of his artistic work.

In addition, to the extent Plaintiff claims that copying the tattoo onto Ed Helms's face has somehow caused additional harm to Plaintiff (which Plaintiff has not established), that harm already has occurred. Helms appears, with the tattoo, in every trailer and television advertisement for the movie, every billboard, and several of the advertising posters. Such uses started as early as February 24 in online trailers, February 25 in theaters, and April 15 in television spots. *See supra* at 8. Based on the filing of his copyright registration, Plaintiff learned about the use of the tattoo in "Hangover II," at the very latest, in early April. Yet he waited until April 28 to take any action at all, and then failed to seek a temporary restraining order to stop the ongoing promotion of the movie. In the unlikely event that Plaintiff were to prevail on the merits of his claim, any harm he has suffered could be compensated by an award of damages. 17 U.S.C. § 504(b).

Plaintiff's assertions that the use of the tattoo in "Hangover II" may violate his moral rights under Section 106A of the Copyright Act, 17 U.S.C. § 106A, or that the movie's portrayal of the tattoo artist may libel him, do not support his claim for injunctive relief.[7] Section 106A of the Copyright Act protects only the *original* of a work of art – in this case (assuming the Copyright Act applies at all), the actual tattoo that is on Tyson's face. *See 3 Nimmer on Copyright* § 8D.06[A][1]. Putting aside the obvious threat to Tyson's personal freedom that would arise from applying Section 106(A) to his tattoo, Section 106A has nothing to say about *copying* the tattoo, which is what Warner Bros. has allegedly done here.

As for plaintiff's concern that the movie may libel him, there is nothing in the movie to suggest that the character of the tattoo artist is based on or intended to portray

---

[7] Notably, Plaintiff has not asserted either cause of action in his Complaint.

Plaintiff, and in any event concern about possible defamation is generally not a basis for injunctive relief. *See Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Employees and Rest. Employees Int'l Union*, 239 F.3d 172, 177 (2d Cir. 2001) ("[C]ourts have long held that equity will not enjoin a libel.").

In short, Plaintiff has failed to establish that he will suffer irreparable harm if the release of "Hangover II" is not enjoined. For this reason as well, his motion for a preliminary injunction should be denied.

## V.   ENTRY OF A PRELIMINARY INJUNCTION WOULD RESULT IN SUBSTANTIAL HARM TO WARNER BROS. AND OTHERS.

The Supreme Court has stated that, in each case where preliminary injunctive relief is sought, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 129 S. Ct. at 376. In this case, the harm that Warner Bros., its exhibitors, its co-financing partners and its promotional partners would suffer if the release of "Hangover II" were enjoined easily exceeds       million, far outweighing any potential irreparable harm to Plaintiff from the denial of the requested injunction.

If the scheduled release is cancelled it will be many months before Warner Bros. could schedule another opening for the film. *See supra* at 10. Warner Bros. will lose the       million that it has already spent advertising and promoting "Hangover II." *Id.* In addition, the 3,600 theaters that have contracted to exhibit the movie will not be able to find a replacement movie to show on the critical Memorial Day holiday weekend. *Id.* If the release of the movie is enjoined these theaters are likely to lose as much as       million in ticket receipts, not including the amount they would have made in concessions, which is approximately 25% of gross box office receipts. *Id.* Enjoining the release of the

film would thus result in substantial harm to Warner Bros. in the form of injury to the reputation and goodwill that Warner Bros. has worked for over 80 years to build, as well as damages claims by the theaters against Warner Bros. that could amount to tens of millions of dollars.  (Fellman Decl. ¶ 11.)

Moreover, thousands of prints of "Hangover II" have already been created and shipped to theaters across the country.  *See supra* at 10.  With so many copies in circulation, if the release of the movie were enjoined it is virtually certain that the movie will be leaked and pirated.  (Fellman Decl. ¶ 14.)  If that were to occur, it would substantially erode box office receipts and DVD sales when the movie is ultimately released, costing Warner Bros., its financial partner, and theaters hundreds of millions of dollars.  (*Id.*)  Even in the highly unlikely event that the movie were not pirated, the delay in opening the movie that would inevitably result from an injunction would dramatically reduce its box office receipts once it is released, resulting in a substantial loss of revenue to Warner Bros., its financial partner, and theaters.  (*Id.* ¶ 12.)

Courts have held that harm of the type just described – even where far less substantial – justifies the denial of preliminary injunctive relief.  In *John Lemmon Films, Inc. v. Atlantic Releasing Corp.*, 617 F. Supp. 992 (W.D.N.C. 1985), for example, the court found that the defendant movie distributor had "presented strong evidence that it would suffer a substantial hardship if it were forced to abandon its use of the title 'STARCHASER: The Legend of Orin'" a month before the scheduled release of the movie.  In particular, the court observed that:

> If the Defendant were ordered to refrain from advertising and releasing its film with its present title, theaters contracted to show the film would be lost, prints of the film would have to be changed, and a new advertising campaign and strategy developed at considerable delay, expense and

embarrassment.   The Defendant has already spent over $470,000 on its "STARCHASER" promotional campaign.

*Id.* at 996-97; *see also Scott-Blanton*, 495 F. Supp. 2d at 81 (finding that defendants would suffer significant harm if an injunction against further sale, distribution, display and marketing of "Brokeback Mountain" were granted "due to the time and the money invested to distribute *Brokeback Mountain* DVDs and the commercial arrangments to broadcast *Brokeback Mountain* through a variety of mediums"); *Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F. Supp. 2d 277, 283 (S.D.N.Y. 1998) (finding that balance of hardships favored defendant where "the erroneous issuance of a preliminary injunction would interrupt the marketing of a hit recording that is generating very substantial revenues"); *Tsiolis v. Interscope Records, Inc.*, 946 F. Supp. 1344, 1357 (N.D. Ill. 1996) (finding that the harm to defendants in delaying the release of a record album "far outweigh[ed]" the potential harm to the plaintiff, and noting that defendants "intend to release the Album for the Christmas sales season" and "have already spent over one million dollars recording, producing and marketing the Album").   The harm that Warner Bros. would suffer if "Hangover II" were enjoined just 36 hours before its scheduled release would be orders of magnitude greater than the harm in these cases.

Finally, given the enormous harm to Warner Bros. that will result from enjoining the release of "Hangover II," Plaintiff should be required to post a bond of at least $100 million.   Federal Rule 65(c) states that a court "may issue a preliminary injunction . . . *only* if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."   *See* Fed. R. Civ. P 65(c) (emphasis added).   It is clear in this case that Plaintiff would be wholly unable to pay the enormous damages Warner Bros. would

sustain from a wrongful injunction against the movie's release.  Accordingly, if Plaintiff is unable to post a bond sufficient to pay those damages, the injunction he seeks should not issue.  *See, e.g.*, *Scott-Blanton*, 495 F. Supp. 2d at 81 n.2 (observing that, because plaintiff would only be able to post a "nominal bond," the defendant "would be in even greater danger of suffering significant harm if the court granted the plaintiff's request for injunctive relief"); *Berlent*, 2006 WL 1594478, at *3 (denying plaintiff's motion to enjoin continued sale and distribution of "Brokeback Mountain" based in part on plaintiff's admission that he would not be able to post the "substantial bond" that would be required if the Court granted his request).

## VI.   AN INJUNCTION IS CONTRARY TO THE PUBLIC INTEREST.

Finally, the court must ensure that the "public interest would not be disserved" by the issuance of a preliminary injunction.  *eBay*, 547 U.S. at 391; *accord Winter*, 129 S. Ct. at 374.  Entry of the preliminary injunction requested by Plaintiff would cause a disservice to the public.  "Hangover II" is one of the most highly anticipated releases of the season.  *See supra* at 10.  Based on public awareness of and excitement about the film, Warner Bros. expects it to be the highest grossing R-rated comedy of all time. (Fellman Decl. ¶ 7; Kroll Decl. ¶ 14.)  Indeed, theaters have been selling advance tickets to midnight showings (at 12:01 a.m. on May 26) on over 2,000 screens all over the country.  (Fellman Decl. ¶ 3.)  In short, the public wants to see this movie, and an injunction will prevent them from doing so.

Moreover, as established in section III.B, *supra*, Stu's tattoo in "Hangover II" is a parody of Tyson's tattoo, and is therefore a fair use under the Copyright Act.  When a defendant presents a colorable fair use defense, as Warner Bros. has done here, a preliminary injunction disserves the public interest.  As the Supreme Court has explained,

"[b]ecause the fair use enquiry often requires close questions of judgment as to the extent of permissible borrowing in cases involving parodies (or other critical works), courts may also wish to bear in mind that the goals of the copyright law . . . are not always best served by automatically granting injunctive relief when parodists are found to have gone beyond the bounds of fair use." *Campbell*, 510 U.S. at 578 n.10.

For this reason as well, Plaintiff's motion for a preliminary injunction should be denied.

<u>**Conclusion**</u>

Plaintiff bears a heavy burden in seeking the extraordinary remedy of a preliminary injunction.  As the foregoing discussion makes clear, the equities of this case weigh heavily against the granting of an injunction, particularly given the serious questions Warner Bros. has raised about the viability of Plaintiff's claim.  Accordingly, Warner Bros. request that this Court deny Plaintiff's motion for a preliminary injunction.

Dated:  May 20, 2011                        Respectfully submitted,

                                              /s/ Frederick J. Sperling_____
                                            Frederick J. Sperling
                                            Sondra A. Hemeryck
                                            SCHIFF HARDIN LLP
                                            6600 Sears Tower
                                            Chicago, Illinois  60606
                                            fsperling@schiffhardin.com
                                            shemeryck@schiffhardin.com

                                            Marc Sableman
                                            # 36276MO
                                            THOMPSON COBURN LLP
                                            One US Bank Plaza
                                            St. Louis, Missouri  63101
                                            msableman@thompsoncoburn.com

                                            Attorneys for Defendant Warner Bros.
                                            Entertainment Inc.

40

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 20, 2011 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will cause an electronic copy to be served on counsel of record.

_____/s/ Mark Sableman_____
