# EXHIBIT 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| S. VICTOR WHITMILL, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 4:11-cv-752 |
| | ) |
| v. | ) Judge Catherine D. Perry |
| | ) |
| WARNER BROS. ENTERTAINMENT, INC. | ) |
| | ) |
| Defendant. | ) |

## DECLARATION OF DAVID NIMMER

I, David Nimmer, hereby state:

1. I am an attorney at law admitted to practice law in the State of California in 1980 and a professor at the UCLA School of Law. My specialty is domestic and international copyright law. Among many other works on the subject, I am the current author of *Nimmer on Copyright*. My curriculum vitae is appended hereto as Exhibit A.

2. Warner Bros. Entertainment Inc. has retained my services, through Irell & Manella LLP, in connection with the above-captioned case.

3. In this case, plaintiff S. Victor Whitmill claims copyright ownership over an Original Tattoo that he "originally created . . . on the upper left side of [famous boxer Mike] Tyson's face"; he further maintains that his copyright has been infringed by defendant's production and distribution of a motion picture (*The Hangover Part 2*) that "features a virtually exact reproduction of the Original Tattoo, which appears on the upper left side of the Stu Price character's face, played by actor Ed Helms." Complaint, ¶¶ 11-13.

4. This Declaration investigates that claim.

A. **Background Regarding Pictorial Works**

5. The United States Copyright Act of 1976 recognizes protection for the category of "pictorial, graphic, and sculptural works." 17 U.S.C. § 102(a)(5). On that basis, Figure 1 by M.C. Escher may constitute a protectible work of authorship as a picture.

Figure 1



Drawing Hands

6. By parallel logic, Figure 2 by Auguste Rodin may constitute a protectible work of authorship as a sculpture.

Figure 2



The Thinker

7. In the case at bar, plaintiff Whitmill registered for protection a work that he entitled "Tribal Tattoo," which he describes as "Artwork on 3-D object." Complaint, Ex. 5, Registration Number VA 1-767-704.

8. By registering "Tribal Tattoo" in category VA, plaintiff Whitmill affirmed that it constituted a work of the Visual Arts.

9. The "3-D object" (to use plaintiff Whitmill's terminology) referenced by the registration of VA 1-767-704 is that depicted in Figure 3:





Mike Tyson

### B. Requisite Medium of Expression

10. The question arises whether copyright protection can subsist in a work incorporated into a human body.

11. Two elements are essential for copyright protection in the United States: (a) an original expressive work and (b) a material substrate.

12. The eligible categories of *expressive works* are set forth in paragraphs (1) through (8) of 17 U.S.C. § 102(a). In this case, the implicated category, as explained above, is "pictorial, graphic, and sculptural works."

- 3 -

13. As to *material substrates*, the statute affords protection only to "works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). The instant question is whether the "3-D object" depicted in Figure 3 qualifies as a "medium of expression." The following examination of copyright law reveals that Mr. Tyson's head cannot constitute a protectible medium of expression.

14. Copyright doctrine recognizes that various physical substrates may be inadequate bases to secure protection. Classic examples include writing a literary work in the wet sand before the oncoming tide or inscribing a pictorial work in the frost of a windowpane. *See* 1 *Nimmer on Copyright* §§ 1.01[B][2][a], 2.03[B][2]; Ira L. Brandriss, *Writing in Frost on a Window Pane: E-Mail and Chatting on RAM and Copyright Fixation*, 43 J. Copyright Soc'y 237 (1996).

15. In years past, I tacitly assumed that a tattoo could "presumably qualify as a work of graphic art, regardless of the medium in which it is designed to be affixed" such as "human flesh." In writing up a 2000 case, I even posited one line to that effect in a footnote, without purporting to cite any authority in support. *See* 1 *Nimmer on Copyright* § 1.01[B][1][i] n.392.

16. About a decade ago, in composing a book-length treatment of copyright subsistence, I began to reconsider that proposition. *See* David Nimmer, *Copyright in the Dead Sea Scrolls: Originality and Authorship*, 38 Hous. L. Rev. 1 (2001). In sketching out a score of different cases, I formulated one to consider whether a human body may ever qualify as the requisite "medium of expression" to secure copyright protection. After first ruminating that a court faced with such a claim should "dismiss it summarily, if on no other basis than the constitutional prohibition on involuntary servitude and other badges of slavery," I concluded that "a body, even as augmented, simply is not subject to copyright protection." *Id.* at 29-30, 209 (citing U.S. Const. amend. XIII) (footnotes omitted).

- 4 -

17. In reviewing this case, I have given intense consideration to the question that occupied those few paragraphs of my 2001 exposition. For all the reasons detailed in this Declaration, I re-affirm my earlier conclusion that live bodies do not qualify as a "medium of expression" sufficient to ground copyright protection.

18. At the outset, let us consider case law. My review of published decisions has uncovered no case that usefully explicates the issue. In one decision, the plaintiff owned copyrights to designs imprinted on T-shirts, which the defendant infringed by embodying one in a temporary tattoo. *See Gonzales v. Transfer Techs., Inc.*, 301 F.3d 608 (7th Cir. 2002). That case, focusing on the *defendant's* conduct, offers no illumination on whether a *plaintiff* may secure copyright protection in a tattoo.

19. In terms of cases that treat a plaintiff's allegation to own an interest, protectible under copyright law, in a tattoo, I have found none. In short, copyright protection for tattoos is unprecedented.

20. Let us imagine that this Court were to adopt the unprecedented stance that plaintiff Whitmill urges—that he owns rights in an image as inscribed into another human being's flesh. The consequences of recognizing copyright protection for a tattoo, *qua* tattoo, include the following:

> a. The tattoo qualifies as an original "work of visual art" that may gain "recognized stature," with the result that a court may enjoin its destruction. *See* 17 U.S.C. § 106A(a)(3)(B). After a court invokes that provision to bar him from removing his tattoo, Mr. Tyson literally may not show his own face to the world; that is, he will be required to keep Mr. Whitmill's handiwork spread across his face, regardless of his own desires. Copyright law thereby becomes the instrument to impose, almost literally, a badge of involuntary servitude, akin to the mark with which ranchers brand the cattle they own. *See generally* Thomas F. Cotter & Angela M. Mirabole, *Written on the Body: Intellectual Property Rights in Tattoos, Makeup, and Other Body Art,* 10 UCLA Ent. L. Rev. 97, 112-14 (2003
>
> b. If Mr. Tyson chooses to obtain an adjacent or overlapping tattoo on his face, he will have compromised the copyright owner's right to prepare derivative works,

- 5 -

thereby becoming a copyright infringer. *See* 17 U.S.C. § 106(2). As such, he is subject to a court order that the offending work be destroyed. *See* 17 U.S.C. § 503(b). A court that vindicates Mr. Whitmill's statutory rights by ordering laser removal of the unauthorized product has allowed the Copyright Act to be perverted, once again, into an instrument rendering Mr. Tyson into a virtual slave.

        c.     A magazine article that features a picture of Mr. Tyson's face violates the copyright owner's display right. *See* 17 U.S.C. § 106(5). A television network that broadcasts Mr. Tyson's boxing match violates the copyright owner's performance right. *See* 17 U.S.C. § 106(4). The same applies to a studio that makes a documentary about Mr. Tyson and the theater that screens the film. If Mr. Tyson authorized those various usages, he is a contributory infringer in each instance.

Those considerations could be multiplied throughout the spectrum of copyright doctrine, but the foregoing three examples suffice to illustrate the dangers of adopting the unprecedented stance that tattoos are subject to copyright protection.

    21.    In the present case, plaintiff Whitmill evidently avers that he granted a license to Mr. Tyson, whose scope may arguably overcome some of the foregoing detriments in this particular case. But the question before this Court is whether copyright protection can ever arise for a tattoo physically attached to a person's body. If the answer is affirmative then, regardless of the particular facts of this case, there is no reason for other tattooists to grant any such license. They may draft their form contracts not only to reserve all copyright in the subject tattoo but also explicitly to disclaim any license, express or implied.

    22.    Indeed, a previous artist filed suit as a plaintiff against the individual on whom he affixed his purportedly copyrighted tattoo. *See* Christopher A. Harkins, *Tattoos and Copyright Infringement: Celebrities, Marketers, and Businesses Beware of the Ink*, 10 Lewis & Clark L. Rev. 313 (2006) (describing complaint brought against Rasheed Wallace, subsequently dismissed pursuant to a confidential settlement). To the extent that this Court validates copyright protection for tattoos, such lawsuits could well become routine in the future.

23. Even when the tattooist assigns away by contract all right, title, and interest in the copyright, he can still return 35 years later to assert an inalienable right to terminate the grant. *See* 17 U.S.C. §§ 203(a)(3) and (5). For example, a 20-year old actress might get a tattoo from X, subject to his agreement (negotiated by her counsel) to assign to her all copyright interests in the image and never to terminate the grant. When she turned 55, she might nonetheless be shocked to learn that X now has the right to block merchandising of her image.

24. Accordingly, the specters raised in paragraph 20 are all live and could apply across the board, if this Court becomes the first in the history of the United States to accord copyright protection to a tattoo, *qua* tattoo.

25. For all these reasons, human flesh cannot serve as the "medium of expression" that Congress intended to embody legally protectible authorship. For that reason, plaintiff's claim of copyright over a tattoo on Mike Tyson's body must be summarily rejected.

C.    **Useful Articles**

26. If, to the contrary of the argument set forth above, this Court were to consider the possibility that an image inscribed on a human being may be subject to copyright protection, further questions rise to the fore.

27. In crafting the 1976 Act, Congress was sensitive to the fact that "pictorial, graphic, and sculptural works" are often combined into physical substrates that raise concerns regarding the scope of copyright protection.

28. Pictures and sculptures can, at times, be embodied into physical forms that serve no ends beyond serving as the vehicle to express the subject picture or sculpture. The painting portrayed in Figure 1 and the sculpture featured in Figure 2 have no ulterior functionality; that is, the ink/paper and the bronze/marble in those instances are designated entirely to serve as the substrate for Escher's and Rodin's respective expressions.

29. In contrast, many cases have faced pictorial, graphic, and sculptural works that are incorporated into items that serve other purposes, ranging from lamp bases to bicycle racks. For instance, *Kieselstein-Cord v. Accessories by Pearl, Inc.*, 632 F.2d 989 (2d Cir. 1980), featured two belt buckles, the Vaquero and the Winchester. The former is pictured in Figure 4:

Figure 4



The Vaquero buckle

30. Figure 4 exemplifies a physical item that has at least one purpose other than to serve as the substrate for an expressive work, *i.e*, it can hold up a pair of trousers. In the eyes of the Copyright Act, it therefore qualifies as a "useful article," which the statute defines as follows:

> A "useful article" is an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information. An article that is normally a part of a useful article is considered a "useful article".

17 U.S.C. § 101.

31. Therefore, under the Copyright Act, the substrates used to display expressive works will fall into one of two categories: objects devoted exclusively to expressing the original work and useful articles.

32. In turn, Congress used the "useful article" definition to limit the scope of protection in defining what qualifies as "pictorial, graphic, and sculptural works."

> [T]he design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article.

- 8 -

17 U.S.C. § 101.

33. How does that limitation translate to the instant domain of tattoos? As previously noted, copyright protection for tattoos is unprecedented. Also as previously set forth, human flesh should not serve as the requisite "medium of expression" sufficient to ground copyright protection.

34. Nonetheless, if tattoos may be subject to copyright protection, then they must be pigeon-holed into their appropriate statutory classification.

35. The question thereupon arises how to characterize Figure 3, over which plaintiff Whitmill asserts copyright protection. In particular, the question is whether the physical medium shown therein has "an intrinsic utilitarian function that is not merely to portray the appearance of the article."

36. The "3-D object" on which plaintiff Whitmill has inscribed his putatively copyrighted expression happens to be Mr. Tyson's head. Far from that physical medium serving solely as the substrate for expression, as was the case in Figures 1 and 2, a human head—so long as connected to a body, with a beating heart—is a very useful item, indeed (particularly to the person whose brain it encases).

37. A live person's head serves vastly more functions than any material object ever could. In fact, on the spectrum of utility, a head qualifies as infinitely more of a "useful article" than does a belt buckle, bicycle ramp, lamp base, or anything else that has ever been litigated.

    a. As illustrated in Figure 5, the material substrate of a painting or sculpture has no functionality other than to depict that particular painting or sculpture.

    b. As to all litigated cases, of which *Kieselstein-Cord* may be taken as representative, the material substrate has both a functional aspect and an aesthetic aspect.

    c. When we consider Mr. Tyson's head, it stands poles apart—it serves a minor role to portray the aesthetic aspect of plaintiff Whitmill's handiwork, and countless other functional aspects, each of which is far more important.

Figure 5



Spectrum of Non-Expressive Utility

38. For each of us, our own bodies are of supreme worth, making any artwork that a person might happen to own pale into insignificance by comparison. The irony of this particular case is that Mr. Tyson, a retired professional athlete, has earned his livelihood from his body. Thus, it would be difficult to imagine a worse test case than this one to vindicate the proposition that the body of someone bearing a tattoo serves no functionality, other than to exist as the substrate for a third party's artistic expression.

39. We have now seen that the consequence of treating human flesh as a "medium of expression" sufficient to ground copyright protection is the corollary that a body part qualifies as a "useful article." In ordinary parlance, an "article" is not considered animate. To the extent that Congress never intended to use the word "article" to refer to a portion of somebody's body, it follows that Congress never contemplated that flesh could embody a copyrightable work. We thus return to our first proposition, namely that human flesh is not a "medium of expression" that Congress intended to embody legally protectible authorship.

40. These considerations should suffice to reaffirm the proposition set forth in part B above, that tattoos fail to qualify as copyrightable because not fixed in a cognizable "medium of expression." That conclusion avoids the need to go further and thus face the odd concomitant of labeling bodies as "articles."

41. Nonetheless, if tattoos are deemed subject to copyright protection, then they are incorporated into items (human bodies) that form "useful articles" in the copyright sense. The

- 10 -

next question, therefore, is to determine how much copyright protection to afford to those "useful articles."

### D. Physical Separability

42. Consider a pale substitute for a live head: mannequins of a human torso with hollowed backs. When adjudicating their status, the Second Circuit held those mannequins to be useful articles, and for that reason to stand outside copyright protection. *See Carol Barnhart Inc. v. Economy Cover Corp.*, 773 F.2d 411 (2d Cir. 1985).

43. It will be recalled that the statutory definition quoted above limits protection to "pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing independently of, the utilitarian aspects of the article." The requisite separability has given rise to the longest-standing dispute extant in all of United States copyright doctrine.

44. On the one hand, the Second Circuit (exemplified by the *Carol Barnhart* and *Kieselstein-Cord* cases cited above) allows copyright to subsist given the existence of only "conceptual" separability. On the other, *Esquire, Inc. v. Ringer*, 591 F.2d 796 (D.C. Cir. 1978), requires "physical" separability as a condition to copyright protection. To my knowledge, no published decision by the Eighth Circuit takes a side in that dispute.

45. As applied to tattoos, the only legally cognizable result is to apply the strict requirement of physical separability. Such a construction is necessary to avoid the constitutional infirmity that would arise if the Copyright Act attempted to set at naught the Thirteenth Amendment's prohibition of badges of slavery. It is also the sole possibility consonant with sound public policy of a non-constitutional dimension.

46. To review, the subject matter over which plaintiff Whitmill asserts copyright protection is the following:

Figure 3



Mike Tyson

As Figure 3 makes manifest, the physical substrate of the putatively copyrighted work in this case is Mr. Tyson's head. There can be no physical separation of the work over which plaintiff Whitmill asserts legal ownership from a live person's flesh and blood.

47.     As set forth above in paragraph 20, the consequences of recognizing copyright protection for a tattoo include the possibility that a court could order the bearer not to remove it, if it has gained recognized stature; or to order the bearer to undergo laser removal, if he has added an additional tattoo adjacent to it; or to prevent magazine, television, and film coverage of the bearer with the tattoo on his face. Further, as set forth above in paragraph 23, there is no possible way for the bearer of the tattoo to protect herself against those consequences; because the statute gives the tattooist an inalienable right to terminate prior grants, he may always belatedly claim ownership even of an image that he has previously conveyed away (and even if he has expressly agreed never to reclaim it).

48.     Those considerations mandate adoption of the rule of physical separability with respect to tattoos. The design inked onto a human being should never constitute the property of another individual. Thus, even on the questionable assumption that live human flesh may serve

as the "medium of expression" that Congress intended to allow as the substrate to secure copyright protection, copyright protection still must be denied to tattoos.

E.      **Effect of Copyright in Artwork on Tattoos**

49.     Plaintiff Whitmill inked the subject image in this case directly onto Mike Tyson. The discussion set forth above has considered the precise circumstances of this case. But it is also worth exploring what *this case is not*. The instant claim differs fundamentally from one involving creation by an artist of an image, such as the one portrayed in Figure 6:



Figure 6

Ferocity

50.     That painting is a pictorial work. Assuming it results from original expression (as opposed to being copied from antecedent sources), then Figure 6 may qualify for copyright protection. That painting is wholly separate from anyone's body. It therefore poses none of the invidious consequences catalogued above.

51.     A different case would arise to the extent that a tattooist first created an image as a template, before inking the subject individual. Even in that case, however, the image would give the tattooist no right to control application of that same image to other individuals, for the reasons set forth below.