IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

S. VICTOR WHITMILL,                    )
                                       )
          Plaintiff,                   )
                                       )
     v.                                )     Civil Action No. 4:11-cv-752 CDP
                                       )
WARNER BROS. ENTERTAINMENT INC.,       )
                                       )
          Defendant.                   )

**PLAINTIFF'S REPLY MEMORANDUM**
**IN SUPPORT OF HIS MOTION FOR PRELIMINARY INJUNCTION**

**INTRODUCTION**

Warner Bros. struggles to complicate the issues in this case. Its grab bag of contentions include an erroneous conflation of trademark and copyright principles, a mislabeled and misleading "quotation" from the Copyright Act, a "fair use" argument refuted by its own conduct, and a series of law school hypotheticals in which protection for Mr. Whitmill's creation becomes the first step down a dark pathway to a world where omnipotent tattoo artists control the bodies, lives and destinies of their clients. Despite Warner Bros.'s efforts, this remains a simple case.

Warner Bros. admits copying the tattoo from Mike Tyson's face (the "Original Tattoo") to the face of the character Stu Price in THE HANGOVER PART II (the "Movie"). There is no dispute that the Original Tattoo is an original work of art. The Original Tattoo is a "pictorial work" protected by copyright (17 U.S.C. § 102). Absent a written assignment of the copyright, the creator of the tattoo owns the copyright. (17 U.S.C. § 201(a). While Mr. Tyson — or ***anyone*** with a tattoo — has an implied license to use that tattoo as part of that person's identity, that

limited license does not include the other exclusive rights of the copyright owner, such as the right of reproduction and adaptation. Warner Bros. — a company that aggressively guards its copyright portfolio through lawsuits across the nation — should have known it needed the artist's permission to reproduce the tattoo onto its character's face. It should have known that it needed a license to make the tattoo the prominent focus of not only the Movie but of an $               advertising campaign and a licensed 7-Eleven promotional Movie tie-in that features a collectible Big Gulp cup with the tattoo and an iPhone app that allows a player to download a badge consisting of the tattoo alone, *i.e.*, Mr. Whitmill's artwork on a plain background.

The tattoo is a central plot device. Once the characters in the story reach Bangkok, the tattoo appears in over half of the film.

Notably, however, the tattoo design chosen for Stu Price's face is ***not*** essential to the Movie. Stated differently, the character could have awoken that morning-after with a striking face tattoo of any design and the Movie's storyline would not have been affected.

This absence of a genuine artistic reason to copy Mr. Whitmill's original design refutes Warner Bros.'s "fair use" defense. The only reason to use the Tattoo is commercial, namely, to capitalize on the now-iconic image Mr. Whitmill created on Mr. Tyson's face and to provide a vivid image for a massive marketing campaign. The strained effort to justify Warner Bros's intentional infringement as "parody" is nothing more than post hoc rationalization.

In the end, the best argument Warner Bros. can muster is that it has spent a lot of money promoting the Movie and it will lose a lot of profits if the Movie's opening is delayed. But as Warner Bros. and other movie studios have repeatedly argued when ***they*** were the plaintiffs in copyright injunction cases, the scales of justice are not tipped by the profits that could have been

2

earned through theft of intellectual property. As another District Court held in dismissing similar economic arguments by another Hollywood studio and granting a preliminary injunction to a plaintiff whose pencil drawing had been used without his permission *for less than five minute*s in the 130-minute movie entitled *12 Monkeys*, "Copyright infringement can be expensive. The Copyright Law does not condone a practice of 'infringe now, pay later.'" *Woods v. Universal City Studios, Inc.*, 920 F. Supp. 62, 65 (S.D. N.Y. 1996).

## ARGUMENT

## I.   Defendant's Arguments Do Not Undermine Plaintiff's Likelihood of Success.

Warner Bros. conjures four arguments in its effort to question Plaintiff's likelihood of success on the merits. The first — that an otherwise copyrightable image forfeits its protection when expressed in the form of a tattoo — is a sloppily constructed legal argument that requires a substantial re-write of copyright law and ignores its own absurd results. The other three — (a) that the use of an otherwise infringing copy of Mr. Tyson's tattoo is a "fair use" parody, (b) that the tattoo on Stu's face falls within the scope of Mr. Tyson's implied license, and (c) that Mr. Whitmill is estopped because he didn't sue Warner Bros. over Mr. Tyson's appearance in the first Hangover movie — are all affirmative defenses for which Warner Bros. cannot meet its burden of proof.

### A.   An Otherwise Copyrightable Image Does Not Lose Protection When It Becomes a Tattoo.

Not even Warner Bros. can dispute that original tattoo *designs* are protected by copyright. They are "pictorial works" "fixed in any tangible medium of expression . . . from which they can

be perceived . . . directly." 17 U.S.C. § 102(a).[1] Instead, Warner Bros. contends that an otherwise protectable work of art falls into the public domain the moment it becomes a tattoo.

To assert this novel contention, Warner Bros. needs to ignore the plain language of the statute, pretend the phrase "material substrate" appears in the statute, ignore the implied license granted to Mr. Tyson, tiptoe around a scholarly article published in the UCLA Entertainment Law Review that refutes the contention,[2] and find a different UCLA faculty member to posit hypotheticals in which tattoo artists could be granted powers contrary to the 13th Amendment.

But as the Supreme Court reminds us, "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 576 (1982). Such is the case here, where the implied license of public display and use granted to all tattoo bearers, plus their personal "fair use" rights under 17 U.S.C. § 107, insures that they will have full rights of expression in their bodies and identities. This case presents narrow legal and factual issues, none of which implicate any of Professor Nimmer's doomsday hypotheticals.

Warner Bros.'s other contention — that the Tattoo is not protectable because it cannot be "physically" separated from Mr. Tyson's face, which it argues is a "useful article" under the copyright law — is both silly and deceptive. Indeed, Warner Bros. anchors its argument on a carefully edited quotation that it represents to be the definition of "useful article" under the Copyright Act. (Warner Bros. Br. at 16.) In fact, that truncated quote is ***not*** from the definition of "useful article" but from the definition of "pictorial, graphic and sculptural works." The real

---

[1] *See, e.g., Gonzales v. Transfer Technologies, Inc.*, 301 F.3d 608 (7th Cir. 2002) (sale of temporary tattoo infringed plaintiff's copyright in those designs); *Home & Nature Inc. v. Sherman Specialty Co.*, 322 F.Supp.2d 260 (E.D.N.Y. 2004) (complaint sufficiently pleaded copyright infringement over plaintiff's copyrights in "tattoo-like jewelry designs); *Kabushiki Kaiser Stone Corp. v. Affliction, Inc.*, 2009 WL 3429560 (N.D.Cal. 2009) (copyright infringement claim by tattoo artist against company using the artist's tattoos on a line of clothing).
[2] Thomas F. Cotter & Angela M. Mirabole, *Written on the Body: Intellectual Property Rights in Tattoos, Makeup, and Other Body Art*, 10 UCLA ENT. L. REV. 97 (2003).

definition of "useful article" defines it as "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." 17 U.S.C. § 101. Thus, as the Copyright Office's Factsheet SL 103 explains, examples of useful articles "are clothing; automobile bodies; furniture; machinery, including household appliances; dinnerware; and lighting fixtures."[3] Missing from these examples, of course, are human body parts.

And missing from the "quotation" that Warner Bros. represents to be the definition of "useful article" is the front half of the actual definition of a different term. The portion Warner Bros. omitted is highlighted below:

> **"Pictorial, graphic, and sculptural works" include two-dimensional and three-dimensional works of fine, graphic, and applied art, photographs, prints and art reproductions, maps, globes, charts, diagrams, models, and technical drawings, including architectural plans. Such works shall include works of artistic craftsmanship insofar as their form but not their mechanical or utilitarian aspects are concerned;** the design of a useful article, as defined in this section, shall be considered a pictorial, graphic, or sculptural work only if, and only to the extent that, such design incorporates pictorial, graphic, or sculptural features that can be identified separately from, and are capable of existing in dependently of, the utilitarian aspects of the article.

17 U.S.C. § 101. Thus, while a cocktail dress or an umbrella might not be copyrightable, the fabric design or pattern of that useful article could be. As the above-referenced Copyright Office Factsheet explains, "a useful article can have both copyrightable and uncopyrightable features. For example, a carving on the back of a chair or a floral relief design on silver flatware can be protected by copyright, but the design of the chair or the flatware itself cannot, even though it may be aesthetically pleasing."

The entire Warner Bros. discussion of copyrightability is misleading and without merit, beginning with its coining of the term "material substrate," which appears nowhere in the Copyright Act but which Warner Bros. treats as if it were a term of art in § 102(a). (Warner Bros.

---

[3] The Factsheet is available at the U.S. Copyright Office's website at http://www.copyright.gov/fls/fl103.html

Br. 14.) Instead, to quote that UCLA law journal article on tattoos, "An original pictorial work that is embodied in a tattoo or facial makeup design, however, would appear to be copyrightable, *as long as it is fixed in a tangible medium of expression such as a human body*." Cotter & Mirabole, *supra* note 1, at 103 (citations omitted).

Finally, Warner Bros. appears to have ignored the necessary and absurd result of its own legal position. If Warner Bros. is correct that otherwise copyrightable visual art loses its copyright protection when it becomes a tattoo, then Warner Bros. itself risks losing a significant portion of its own copyright portfolio any time someone gets a tattoo of Bugs Bunny.

As discussed in more detail below, all of this absurdity can be avoided by simply recognizing — as copyright law long has — the existence of an implied license, such as the one granted by every tattoo artist to every tattoo recipient.

## B.   Defendant's Conduct Reveals Its "Fair Use" Argument to be Nothing More than Filler and Misdirection.

In its definitive "fair use" decision involving a claim of parody, the Supreme Court cautioned that an accused infringer would have to demonstrate under Section 107 that its allegedly "transformative use" of the plaintiff's copyrighted work was more than merely an attempt "to get attention" or "to avoid the drudgery in working up something fresh." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 580 (1994):

> If . . . the commentary has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger.

Warner Bros. cannot overcome those hurdles here because there is no legitimate artistic purpose — and certainly no "transformative" use — in the placement of a pirated copy of the Original Tattoo on the face of the Stu Price character. Quite simply, the plot and the Movie

would not have been affected in any way if Stu had woken up the morning after with any of dozens of other "warrior-like" images. At no point during the Movie does anyone make reference to the fact that the Movie Tattoo is the same as the one on Mike Tyson's face. Indeed, even Mr. Tyson's final direction to Stu to remove the tattoo would have worked just as well with any face tattoo.

That the bar for "fair use" parody is set far higher than Warner Bros. could ever reach is best exemplified by the preliminary injunction halting Penguin Books' publication of *The Cat NOT in the Hat! A Parody by Dr. Juice*, a rhyming summary of the O.J. Simpson double murder trial. *Dr. Seuss Enterprises, LP v. Penguin Books*, 109 F.3d 1394 (9th Cir. 1996). While the defendant's parody defense was stronger there than here, the Court of Appeals affirmed the district court's finding that the commercial purpose behind the use of the Dr. Seuss copyrights far outweighed any purported commentary use. Its characterization of the defendant's parody explanation as "pure shtick" and "completely unconvincing" fully applies here, too. *Id.* at 1403.

Indeed, the commercial purpose here is overwhelming. As the evidence will demonstrate, the Movie Tattoo is the prominent focus of a multi-million-dollar advertising campaign and a licensed 7-Eleven promotional Movie tie-in that features a collectible Big Gulp cup with the Movie Tattoo and an iPhone app that allows a player to download a badge consisting of the Tattoo alone, *i.e.*, the artwork on a plain background. The goal of Warner Bros.' use is purely commercial, namely, to provide a vivid image for a massive marketing campaign that would remind viewers of the original Movie.

Thus factor 1 under Section 107 — the purpose and character of the use — favors plaintiff. "[P]roducers of plays, films, and television programs should generally expect to pay a license fee when they conclude that a particular work of copyrighted art is an appropriate component of the

decoration of a set," or in this case, a character's face. *See Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 80 (2d Cir. 1997) (reversing district court's finding of fair use where Warner Bros. affiliate HBO produced TV episode in which poster of quilt decorated set and was observable for less than thirty seconds in single scene; noting that incorporation of visual work into film usually serves same decorative purpose); *see also Brown v. McCormick*, 23 F. Supp. 2d 594, 607 (D. Md. 1998) (rejecting movie maker's fair use defense where it included derivative quilt design in portions of movie as prop), 87 F. Supp. 2d 467, 481 (D. Md. 2000) (awarding damages for infringement) *aff'd*, 1 F. App'x. 215 (4th Cir. 2001), cert. denied 534 U.S. 815 (2001). Factors 2 and 3 — the nature of the copyrighted work and the portion of the work used in relation to the entire work — strongly favor plaintiff as well. Indeed, Warner Bros. used the *entire* copyrighted work.

As for Factor 4 — the effect of the accused use on the market or value of the copyrighted work — Warner Bros. is callous and dismissive of Mr. Whitmill's interests. As will become clear at the hearing, other than the implied license granted to Mr. Tyson himself, Mr. Whitmill has *never* licensed the Original Tattoo for any purpose. As the artist and the owner of the Tattoo, he has the right to control uses of his work. By infringing Mr. Whitmill's copyright on such massive scale in advertising featuring his Tattoo for an R-rated motion picture that denigrates tattoo artists and their clients, Warner Bros. has not only trashed his copyright but preempted his right to control his copyright. *Salinger v. Random House, Inc.*, 811 F.2d 90 (2d Cir. 1987) (ordering preliminary injunction barring publication of biography containing Mr. Salinger's correspondence).

**C.     The Facts and the Law Refute Warner Bros.'s "Implied License" and "Estoppel" Arguments.**

Warner Bros.'s implied license argument is built on two false premises. The first is that Mr. Whitmill impliedly granted to Mr. Tyson a full and unfettered license in his entire bundle of exclusive rights in his copyright in the Original Tattoo. Neither the facts nor the law would support the contention that Mr. Whitmill effectively transferred his copyright to Mr. Tyson via an implied license of unprecedented breadth. The second error — which taints Warner Bros.'s estoppel argument as well — is its conflation of trademark and copyright law. Mr. Tyson's use of his personal identity, including his face with the Tattoo, is entirely consistent with his rights under trademark law and his related rights of publicity.

**1.     Warner Bros. Use of the Movie Tattoo Far Exceeds the Scope of Mr. Tyson's Implied License**

Warner Bros. spends a significant portion of its brief arguing over something that is not in dispute, namely, that Mr. Tyson has an implied license to make commercial use of the Tattoo on his face. He has that license. Literally and figuratively, the license covers Mr. Tyson wherever he goes. But it does ***not*** grant Warner Bros. — or anyone else — the right to copy the tattoo and place it on someone else. Moreover, under no set of facts can Warner Bros. be considered an implied licensee of Mr. Whitmill. Given that Warner Bros. has never had any contact with Mr. Whitmill, it is left to argue that it is somehow an implied sublicensee of an implied licensee—a legal position for which Warner Bros. provides no support because there is none

Copyright law does not require that a license be express or written. "[A] nonexclusive implied license can be granted verbally or implied from conduct." *Teter v.Glass Onion, Inc.*, 723 F. Supp. 2d 1138, 1147 (W.D. Mo. 2010) (citing *Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 831 (8th Cir. 1992) and Melville B. Nimmer & David Nimmer, NIMMER ON COPYRIGHT § 10.03[A] at 10-36.1 (3d ed.1995)). "Consent given in the form of mere permission or lack of objection is also

equivalent to a nonexclusive license and is not required to be in writing." *Id.* (quoting *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 775 (7th Cir.1996)). By granting an implied license, the copyright owner permits the use of a copyrighted work in a particular manner. *Id.*

"The scope of an implied license takes its form from the circumstances and conduct that created them . . . . The core focus lies in determining what scope of the parties' conduct reasonably suggests as the range of permitted use of the licensed rights." *Id.* (quoting Raymond T. Nimmer, Jeff  Dodd, *Modern Licensing Law,* § 10:17 (2009)). Circumstances establishing permission, or even lack of objection, can establish a nonexclusive license. *I.A.E.,* 74 F.3d at 775. However, since an implied nonexclusive license does not transfer ownership, there can still be a claim of copyright infringement if the use goes beyond the scope of the license. *MacLean Assoc., Inc. v. Wm. M. Mercer-Meidinger-Hansen, Inc.,* 952 F.2d 769, 779 (3d Cir.1991); s*ee, e.g., Oddo v. Ries,* 743 F.2d 630, 634 (9th Cir. 1984) (implied license to use articles in manuscript did not give licensee the right to use articles in any work other than the manuscript itself, including book written by another author); *Gilliam v. American Broadcasting Cos.,* 538 F.2d 14, 19-21 (2d Cir.1976) (license to use underlying work in a particular derivative work does not permit licensee to use underlying work in any other derivative work); *Pinkham,* 932 F.2d at 831 (authorization to print and sell 13,000 books did not grant authorization to print and sell 300,000 copies of same book).

The scope of the implied license granted here to Mr. Tyson is broad in one sense and narrow in another — and it is entirely consistent with the realities of tattoos. The implied license gives Mr. Tyson the right to go anywhere, appear anywhere, be photographed, be videotaped, appear in documentaries, news features, sporting events, movies — and yes, in all types of marketing and promotional events involving his persona. Wherever Mike Tyson goes, his tattoo goes. The

implied license also gives Mr. Tyson the right to alter or remove the tattoo, or cover it with a mask or makeup, for example if he were to appear in a movie as a fictional character. The implied license granted to the bearer of a tattoo necessarily also includes the tattoo artist's moral rights — insofar as the tattoo remains on the bearer's body. None of that is in dispute. The only question is whether the scope of that limited license authorizes a third-party such as Warner Bros. to create a derivative work. It does not.

The scope of an implied license is defined by the conduct of the parties. *Teter*, 723 F. Supp. 2d at 1147; *Pinkham*, 983 F.2d at 831. In this case, Plaintiff's conduct conclusively defines both the breadth and the limits of the implied license. That Plaintiff has never once complained about Mr. Tyson appearing as himself in any medium for any reason confirms the breadth of the license: it is a simple acknowledgement of Mr. Tyson's rights to his own face and identity. However, the other undisputed fact — namely, that Mr. Whitmill has never knowingly permitted anyone else to use the tattoo for anything other than in connection with Mr. Tyson's face and identity — defines the limits of the license: it is limited to Mike Tyson as Mike Tyson.

Mr. Tyson's conduct also conclusively establishes the limits of his implied license. The Release he signed when he received the tattoo (Cmplt. Ex. 3) expressly states that all rights in the original artwork remain the property of the artist. Thus all of the exclusive rights of a copyright owner — including the right to authorize derivative works such as the Warner Bros. copy here — remained with Mr. Whitmill, subject only to the limited implied promise granted to the tattoo wearer. A contemporaneously executed writing between the parties is the best evidence of their intent. *See Konigsberg Int'l Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994) ("Rather than look to the courts every time they disagree as to whether a particular use of the work violates their mutual understanding, parties need only look to the writing that sets out their respective rights.").

Here, we have a contemporaneous writing unequivocally eliminating any argument that Mr.

Tyson had any rights in the tattoo beyond the limited scope of his implied license — and

certainly not the right to grant anyone else a sublicense to use the tattoo.

Warner Bros. offers no evidence, because there is none, that Mr. Whitmill knew, should have

known or should have expected — at the time he created the tattoo — the type of use that

Warner Bros. is making here. "[A]n implied license . . . does not extend to uses not contemplated

by the copyright owner, such as distribution to third parties." 2 William F. Patry, PATRY ON

COPYRIGHT § 5:131; *Embroidery Industries, Inc. v. Brasking, Inc.*, 60 Fed. Appx. 111 (9th Cir.

2003) (jury finding that creation of garment samples for nominal fee did not extend to

reproduction, distribution, or sale of garments); *cf, National Ass'n For Stock Car Auto Racing,

Inc. v. Scharle*, 356 F. Supp. 2d 515 (E.D. Pa.2005) (finding scope of implied license extended to

third-party use because artist knew of such intended use at time he created work).

The relevant conduct is that of the licensor, Mr. Whitmill, and his conduct refutes Warner

Bros.'s arguments. Any reliance on Mr. Tyson's conduct to imply a sublicense to Warner Bros.

is wholly unsupported. *See Catalogue Creatives, Inc. v. Pac. Spirit Corp.*, 2005 WL 1950231 (D.

Or. Aug. 15, 2005) (recognizing that there is no case law supporting the proposition that the

recipient of an implied license may grant an implied sublicense by its conduct).

The amount of money paid by Mr. Tyson also reinforces the limited scope of his implied

license. As is typical for tattoos, Mr. Tyson paid Plaintiff a modest fee for his time and his skill

— in this case, $200 plus a $100 tip. For that, he got an original work of art tattooed on his face,

and he got the right to go out into the world with this art on his skin. He also executed a written

release acknowledging what copyright law already provided — namely, that all of the other

rights in the original artwork remained the property of the artist. These facts belie any argument

that the implied license extended to any use of the original art beyond appearing on Mr. Tyson's face.

### 2.      The Implied License Addresses All of the Concerns Allegedly Raised by Recognizing Copyrights in Tattoos.

The undisputed existence of this implied nonexclusive license belies all of Warner Bros. arguments against allowing copyrights in tattoos. The entire parade of horribles described by Warner Bros. is avoided by the simple recognition of the nature of the implied nonexclusive license given by the tattoo artist to the tattoo recipient. That license necessarily includes the right to display the tattoo in public on the recipient's body without any restriction regarding what else the recipient does to or with his body. He can add designs to the tattoo with other tattoos, he can cover up the tattoo by either clothing or makeup (as routinely happens in movies every day), or he can have the tattoo removed. The recipient of a tattoo has all of the same freedoms he had before he got the tattoo.

The implied nonexclusive license also addresses the potential implication of a copyright termination under 17 U.S.C. § 203. Warner Bros. contends that if tattoos are afforded copyright protection, tattoo recipients risk being forced to remove tattoos 35 years after they receive them. This hyperbolic threat is actually nonexistent because of the nature of the implied nonexclusive license embedded with every tattoo. As Professor Patry explains, an implied license is not a contractual grant, it is a fictional construct created by law to give effect to the intent of the parties as demonstrated by their conduct. "It may well be, under the facts of a particular dispute, that the parties did intend the use to continue indefinitely and therefore without the copyright owner being able to stop the use (as when special effects are created solely for one motion picture), but that intention, like all questions of intent, must be proved." 2 PATRY ON COPYRIGHT § 5:132. The facts of every tattoo everywhere are that the artist and the recipient intend that the

13

recipient have the right to wear the tattoo indefinitely. As with all of the other concerns raised by Warner Bros., the threat of termination risk is entirely addressed by the common sense interpretation of the implied license granted with every tattoo.

The basic human rights to freely go about in the world wearing one's own skin — which no one suggests do not exist in tattoo recipients — are not threatened by recognizing that tattoos are copyrightable. They are, in fact, completely protected by a well-known creature of copyright law — the implied nonexclusive license. There is no need for this Court to write convoluted new copyright or constitutional law to redress rights that are not under attack in this or any other case.

### 3.      Mr. Whitmill is Not Estopped From Asserting His Copyright Infringement Claim Against Warner Bros.

Warner Bros.' entire estoppel argument is based on the fact that Mr. Whitmill did not object when Mr. Tyson appeared as himself — wearing his tattoo, of course — in the first THE HANGOVER movie. As discussed above, Mr. Whitmill did not object because the implied license that came with the tattoo permitted Mr. Tyson to appear in that movie, and in all of the marketing materials associated with that movie. Nothing about Mr. Tyson's appearance in the first movie, however, suggested that Warner Bros. — or anyone else — planned to place an exact copy of Mr. Whitmill's artwork on someone other than Mr. Tyson. That is the relevant "defendant's conduct" in this case. Thus, Warner Bros. cannot even satisfy the first element of an estoppel claim. *See Carson v. Dynegy, Inc.*, 344 F.3d 446, 453 (5th Cir. 2003) (first element of estoppel claim is plaintiff's knowledge of defendant's conduct).

Warner Bros. has essentially submitted a trademark brief disguised as a copyright brief, even including a reference to Mr. Tyson's application to register a trademark in the Tattoo design, as if that were relevant to any issue in the case. To state the obvious, there is no overlap between the rights protected by copyright and the rights protected by trademark:

14

> When one is alleged to have infringed another's copyright in a work, such as a picture or music, the fact that the defendant has acquired and registered valid trademark rights in that picture or music is no defense to the copyright infringement charge . . . .

1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 6:14 (4th ed.) (citations omitted). As McCarthy explains (*id.*),

> Copyright law gives the author the right to prevent copying of the copyrighted work in any medium. Trademark law prevents the use of a similar mark on such goods or services as would probably cause confusion. Thus, the scope of rights in copyrights and trademarks is defined quite differently. A copyright is infringed if one violates any of the "bundle" of exclusive rights of copyright.

Trademark rights can be diminished or even waived by the owner's failure to object to a third-party's unlicensed use, thus preventing the trademark owner from suing a subsequent user for infringement. Copyrights, on the other hand, cannot be waived—the only way a copyright owner can lose the right to sue for infringement is through an implied license, and only for conduct included within the license. The copyright owner always has the right to sue for infringement for any conduct outside the scope of the implied license, as is Warner Bros.'s conduct in this case. *Pinkham*, 932 F.2d at 831; *MacLean*, 952 F.2d at 779; *Oddo*, 743 F.2d at 634.

### 4. Mr. Tyson's Right of Publicity Releases Did Not Relieve Warner Bros. of its Obligations to Obtain Mr. Whitmill's Copyright.

Warner Bros. places a great deal of emphasis on the fact that it obtained releases from Mr. Tyson to use his identity in both HANGOVER movies. It needed to do so. Mr. Tyson's releases are completely silent on the issue of copyright, however, and are in fact irrelevant to Mr. Whitmill's copyright claims.

Indeed, Warner Bros. seems confused by the Right of Publicity. Like trademark rights, this personal right of a public figure to control the use of his identity in commerce stands wholly independent of any underlying copyrights. *See Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 910

(7th Cir. 2005) (holding that advertiser wishing to use copyrighted picture of celebrity needed both copyright in the picture *and* celebrity's right of publicity — one is "irrelevant" to the other). In this case, Warner Bros. appears to have gone to considerable length to obtain Mr. Tyson's Right of Publicity, but apparently considered Mr. Whitmill's copyright irrelevant. The law says otherwise.

Not only does it fail as a matter or law, Warner Bros.' post-hoc reliance on Mr. Tyson's releases does not even factually support its position. Warner Bros. posits no facts — because there are none — to suggest that Mr. Tyson believed his implied license to the copyrighted tattoo extended beyond his own identity. The releases Mr. Tyson granted to Warner Bros. for the first and second HANGOVER movies only address Mr. Tyson's Right of Publicity, an entirely different right owned exclusively by Mr. Tyson. It was Warner Bros.' obligation to obtain the two sets of rights necessary in order to copy Mr. Tyson's tattoo and put it on someone else. The fact that it obtained one set did not absolve it of the requirement to obtain the second set. And Warner Bros., of all parties, knows this. Amazingly, it appears to have actually relied on Mr. Tyson's releases of his Right of Publicity as a reason to ignore the underlying copyright in the tattoo. Warner Bros. can only be described as being grossly negligent, especially considering its high degree of sophistication and experience as a copyright plaintiff.

Finally, Warner Bros.' attempts to blame Mr. Whitmill for its failure to uncover the existence of his copyright are simply ludicrous. Anyone with even a rudimentary knowledge of copyright law — and certainly a highly sophisticated copyright owner and frequent copyright litigant like Warner Bros. — would know that a work of visual art created only eight years ago is protected by someone's copyright. The fact that Mr. Whitmill did not put a copyright notice on Mr. Tyson's face or register his copyright earlier are meaningless. Throughout their apparently

16

lengthy negotiations with Mr. Tyson and his counsel, it appears they simply forgot to ask him who created his tattoo. They also must not have watched the documentary film made about Mr. Tyson — the film referenced in Warner Bros.' Response brief at 26, n.5 — because they would have heard Mr. Tyson mention Mr. Whitmill by name. Warner Bros. has only itself to blame for its predicament.

Warner Bros. cannot meet its burden of proof on any defense to Mr. Whitmill's copyright infringement claim. Accordingly, Mr. Whitmill has shown a very strong likelihood of success on the merits of that claim.

## II.     Warner Bros.'s History Of Infringement Until Enjoined Demonstrates That Warner Bros. Will Not Stop Infringing Mr. Whitmill's Copyright Unless Enjoined And Thus, Establishes The Threat Of Irreparable Harm.

Despite Warner Bros.'s arguments to the contrary, it is difficult to conceive of how the balance of the equities could possibly favor such obvious and intentional infringement by Warner Bros. Warner Bros.'s involvement in prior copyright infringement actions demonstrates a practice of substituting a business calculation to achieve its ends for respecting the intellectual property rights of others. After admittedly copying Mr. Whitmill's original creation, Warner Bros. attempts to evade accountability for its willful infringement by arguing that it and its movie are simply, too big to stop. Mr. Whitmill is entitled to injunctive relief because Warner Bros. is unlikely to be deterred from its apparent business model of infringing activity thereby causing Mr. Whitmill irreparable harm and rendering legal remedies inappropriate.

Warner Bros. is not a first-time copyright infringer. *See, e.g., Twentieth Century Fox Film Corp. v. Warner Bros. Entm't, Inc.*, 630 F. Supp. 2d 1140, 1144 (C.D. Cal. 2008) (granting partial summary judgment against Warner Bros. for infringing copyright in WATCHMEN, scheduled for release 72 days later); *Moonrunners Ltd. Partnership v. Time Warner, Inc. et al.*,

17

No. CV 05-1362 (Docs. 57 (Order) at 2-3, 58 (Memo. & Order) at 3) (U.S. D. Ct. C.D. Cal. June 17, 2005) (granting preliminary injunction against Warner Bros. for infringing copyright in THE DUKES OF HAZZARD; impounding copies and preventing release scheduled for 56 days later); *Hart v. Warner Bros., Inc.*, No. 1:97-cv-1956 (Docket Entry 2/10/1998 (Minute Entry)) (U.S. D. Ct. E.D. Va. Feb. 10, 1998) (granting preliminary injunction against Warner Bros. for infringing copyright in THE DEVIL'S ADVOCATE that had already been released). Warner Bros. past infringing conduct confirms that Mr. Whitmill does not have an adequate remedy at law and that he will suffer irreparable harm because Warner Bros. will continue to infringe his copyright interests unless enjoined. Warner Bros. has a history of infringing copyrights and therefore there is a serious threat of continuing violations which justifies issuance of injunctive relief. *See e.g., United Features Syndicate, Inc. v. Spree, Inc.*, 600 F.Supp. 1242 (E.D. Mich. 1984) (enjoining defendants from committing any further infringement of plaintiffs' copyright; stating prior lawsuits for copyright establish history and therefore threat of continuing violations by defendants).

**III.   The Eighth Circuit's Four-Part *Dataphase* Analysis Remains The Standard For Deciding Injunctions In Copyright Cases After *eBay*.**

Warner Bros. has represented to this Court that irreparable injury is no longer presumed in copyright cases after the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), and that *eBay* dramatically changes the principles under which the Court must decide the injunction issue. Warner Bros. is wrong, and its position in this case is contrary to the position Warner Bros has taken, and other Courts have adopted, in copyright infringement cases post-*eBay*. Under the traditional four-part test described in *eBay*, irreparable injury continues to be presumed in copyright infringement cases like this one, and in any event, the undisputed facts

of this case reveal clear irreparable injury if Warner Bros. were permitted to release the

HANGOVER PART II with the pirated Tattoo included.

   **D.     The Rebuttable Presumption of Irreparable Harm Applies In This Case To Shift The Burden From Plaintiff To Defendant, But Warner Bros. Has Failed To Overcome Mr. Whitmill's Evidence Of Irreparable Harm.**

   To date, the Eight Circuit has not cited *eBay*,[4] nor has it cited *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008). This is not surprising because the factors set forth by the Supreme Court are the same factors the Eighth Circuit has applied since its 1981 *en banc* decision, *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.1981). Contrary to Warner Bros.'s representations to this Court, *eBay* has no language suggesting that the presumption of irreparable injury in copyright cases has been abrogated. Rather, *eBay* determined that the Federal Circuit's adoption of "a 'general rule,' unique to patent disputes, 'that a permanent injunction will issue once infringement and validity have been adjudged'" overstated the traditional four-part test. *eBay Inc.*, 547 U.S. at 393-394 (citations omitted). The problem with that approach was that it failed to consider the traditional four-factor test — as instructed in *Dataphase* — which includes the question of irreparable injury. *Id.* The Supreme Court nowhere states that irreparable injury is not presumed in patent or copyright cases.

   The concurring opinions in eBay emphasize that application of the four-part test is not intended to write a "clean slate" for district courts exercising their discretion to grant injunctive relief in infringement cases. Chief Justice Robert's concurring opinion (joined by Justices Scalia and Ginsburg) makes this clear:

---

   [4] In the Eastern District of Missouri, Judge Webber has cited *eBay* in two patent infringement cases. *See FURminator, Inc. v. Kim Laube & Co., Inc.*, 4:08CV00367 ERW, 2011 WL 1226944 at *2 (E.D. Mo. Mar. 30, 2011), *Litecubes, L.L.C. v. N. Light Products, Inc.*, 4:04CV00485 ERW, 2006 WL 5700252 (E.D. Mo. Aug. 25, 2006) *aff'd on other grounds sub nom. Litecubes, LLC v. N. Light Products, Inc.*, 523 F.3d 1353 (Fed. Cir. 2008).

> From at least the early 19th century, courts have granted injunctive relief upon a finding of infringement in the vast majority of patent cases. This 'long tradition of equity practice' is not surprising, given the difficulty of protecting a right to exclude through monetary remedies that allow an infringer to use an invention against the patentee's wishes-a difficulty that often implicates the first two factors of the traditional four-factor test. This historical practice, as the Court holds, does not entitle a patentee to a permanent injunction or justify a general rule that such injunctions should issue. . . . At the same time, there is a difference between exercising equitable discretion pursuant to the established four-factor test and writing on an entirely clean slate. 'Discretion is not whim, and limiting discretion according to legal standards helps promote the basic principle of justice that like cases should be decided alike.' [citations omitted]. When it comes to discerning and applying those standards, in this area as others, 'a page of history is worth a volume of logic.' [citations omitted]."

*Id.* at 395.

Similar sentiments are expressed in the concurring opinion by Justice Kennedy (joined by Justices Stevens, Souter and Breyer):

> "To the extent earlier cases establish a pattern of granting an injunction against patent infringers almost as a matter of course, this pattern simply illustrates the result of the four-factor test in the contexts then prevalent. The lesson of the historical practice, therefore, is most helpful and instructive when the circumstances of a case bear substantial parallels to litigation the courts have confronted before."

*Id.* at 396.

With no less than seven Justices expressing the view that historical practice for granting injunctive relief continues to hold sway in applying the four-part test, it is not surprising that, following *eBay*, Courts have continued to find that irreparable injury is "presumed" in copyright cases, as it has been for decades, where the question is whether a party holding copyright interests is injured by the defendant's unauthorized release or distribution of a work. As applied in this Circuit, that presumption has not been irrebuttable. Even when citing that presumption, the Eighth Circuit has looked to the other evidence of irreparable harm. *See W. Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1229 (8th Cir. 1986) (noting evidence of irreparable harm after citing presumption based on "strong claim for copyright infringement"); *see also Monarch*

20

*Productions, LLC v. Zephyr Grafix, Inc.*, 2010 WL 1837711 (E.D. Mo. May 4, 2010) (noting

presumption of irreparable harm, but analyzing additional evidence on irreparable harm and

collecting twenty-four cases considering whether defendants rebutted presumption of irreparable

harm) *order vacated in part on reconsideration*, 2010 WL 2348625 (E.D. Mo. June 9, 2010)

(adjusting bond amount only).

Indeed, as discussed below, when Warner Bros. is the plaintiff seeking to enforce its

copyrights interests, Warner Bros. itself has taken exactly this position.

**E.**   **Warner Bros. Is Judicially Estopped From Arguing Against Irreparable Harm In This Case, Because Its Prior Arguments For Presumption Of Irreparable Harm Have Enabled It To Obtain Injunctions In Other Copyright Cases.**

In *Warner Bros. Entertainment, Inc. vs. RDR Books*, 575 F.Supp.2d 513 (S.D.N.Y. 2008)

Warner Bros. sought to protect Warner Bros.' valuable copyright interests in the "Harry Potter"

works by suing to enjoin the defendant from marketing or selling its planned book THE HARRY

POTTER LEXICON. In a brief filed by Warner Bros. two years after *eBay* was decided, Warner

Bros. argued that,

> Courts routinely hold that . . . copyright infringement gives rise to a presumption of irreparable injury. *See, e.g., ABKCO Music*, 96 F.3d at 66 (a prima facie case of copyright infringement supports a presumption of irreparable harm) . . . . As Plaintiffs have clearly demonstrated a likelihood of success on the merits of their copyright . . . infringement claims, irreparable injury may be presumed.

*Warner Bros. Entm't v. RDR Books*, 575 F.Supp.2d 513, No. 1:07-cv-9667 (Doc. 38 (Warner

Bros. Memo. in Supp. of Mot. for Prelim. Inj.) at 22) (S.D. N.Y. Jan. 16, 2008).

Warner Bros.'s argument was adopted by the District Court when it granted the injunction

requested by Warner Bros. in an opinion concluding that this result was appropriate after *eBay*.

The Court held:

> Because Plaintiffs have demonstrated a case of copyright infringement, and because Defendant has failed to establish its affirmative defense to copyright infringement, irreparable injury may be presumed in this case. In view of *eBay*,

21

which applied the traditional four-part test for injunctive relief in the context of a patent claim, there is some question of whether the presumption of irreparable harm still applies. District courts, however, have continued to apply the presumption post-*eBay. See, e.g., Warner Bros. Entm't, Inc. v. Carsagno*, No. 06 Civ. 2676, 2007 WL 1655666 at *6 (E.D. N.Y. June 4, 2007) (finding irreparable harm where plaintiff had demonstrated that without an injunction, its copyrighted work would be subject to continued copyright infringement); *UMG Recordings, Inc. v. Blake*, No. 06 Civ. 00120, 2007 WL 1853956, *3 (E.D. N.C. June 26, 2007) (stating that irreparable injury is presumed when plaintiff succeeds on the merits).

Warner Bros Entm'v. RDR Books, 575 F.Supp.2d at 552.[5]

The *Carsagno* case, identified by the Court in the Harry Potter case, is a second example of Warner Bros. relying upon and benefiting from the presumption of irreparable injury in another copyright case post-*eBay*. In that case, Warner Bros. sought to enjoin the defendant from distributing (on the Internet and otherwise) MILLION DOLLAR BABY, a work in which Warner Bros held copyright interests. After reviewing the decision in *eBay* and the four-part test identified therein, the Court found no trouble concluding that irreparable injury was presumed:

> Plaintiff has demonstrated irreparable harm in that without an injunction, its copyrighted film remains subject to continued, repeated infringement. *See Video Trip Corp. v. Lightning Video, Inc.*, 866 F.2d 50, 51- 52 (2d Cir.1989) ("In a copyright action the existence of irreparable injury is presumed upon a showing of a prima facie case of copyright infringement."); *Island Software II*, 2006 WL 1025915, at *2 ("[W]hen a copyright plaintiff has established liability and a threat of continuing infringement, he is entitled to an injunction.")

Warner Bros. Entm't v. Carsagno, 2007 WL 1655666 at *6.

When Warner Bros. is protecting its own copyrights interests, the presumption of irreparable injury in copyright cases to restrain copyright infringement post-*eBay* is "routine" and has been applied at least twice to enjoin the release of works in which Warner Bros. has a copyright interest.

---

[5] The opinion goes on to point out that even if not presumed, irreparable injury was established, a holding equally applicable here. *Id.* at 552.

**F.    Warner Bros. Cannot Defeat The Rebuttable Presumption of Irreparable Harm In This Case Because Warner Bros. Conduct Violates Mr. Whitmill's First Amendment Right Not To Speak, In That Warner Bros. Assumes Control Over When And How Mr. Whitmill's Copyrighted Artwork Will Be Used.**

Even if Warner Bros. were not judicially stopped from arguing against Mr. Whitmill's irreparable harm, Warner Bros. planned conduct will release Mr. Whitmill's copyrighted artwork in thousands of theaters, to millions of viewers, in a way in which Mr. Whitmill does not want his work released. Thus, Warner Bros. will irreparably harm Mr. Whitmill's right not to speak.

The Second Circuit acknowledged in a post *eBay* case relied upon by Warner Bros.that, "the Supreme Court has suggested, a copyright holder might also have a First Amendment interest in not speaking." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (remanding for analysis of all four equitable factors (citing *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 559, (1985); noting defendant's First Amendment rights do not extend to infringing speech).

> After *eBay*, . . . courts must not simply presume irreparable harm. *See eBay*, 547 U.S. at 393 . . . . This is not to say that most copyright plaintiffs who have shown a likelihood of success on the merits would not be irreparably harmed absent preliminary injunctive relief. As an empirical matter, that may well be the case, and the historical tendency to issue preliminary injunctions readily in copyright cases may reflect just that. *See* H. Tomás Gómez-Arostegui, *What History Teaches Us About Copyright Injunctions and the Inadequate-Remedy-at-Law Requirement*, 81 S. CAL. L.REV. 1197, 1201 (2008) (concluding, after a thorough historical analysis, that "the historical record suggests that in copyright cases, legal remedies were deemed categorically inadequate").

*Salinger v. Colting*, 607 F.3d 68, 81-82 (2d Cir. 2010).

Mr. Whitmill has been a professional artist for nearly twenty years. While the majority of his work has been as a tattooist, that is not his only medium and does not define who he is. Over two decades he has built a reputation with awards and accolades for a wide range of works. Indeed, his award-winning tattoo portrait was what first brought him to Mr. Tyson's attention. The now-famous facial tattoo was the second tattoo Mr. Whitmill created for Mr. Tyson. While Mr.

Whitmill takes pride in that artwork, he has never wanted that particular work to define his career or his artistic identity.

Eight years ago, when the newly created tattoo became a media sensation, Mr. Whitmill declined interviews and avoided the spotlight. In the years since, he has worked hard to be known as someone more than the tattooist who created Mr. Tyson's facial tattoo. Mr. Whitmill never wanted this particular tattoo to be the focal point of a major motion picture, much less an $             marketing blitz that has caused this tattoo to overshadow the other works in his portfolio. Mr. Whitmill's copyright includes the right to control that decision. Warner Bros. appropriated that right without permission and is thus responsible for the adverse consequences that flow from it and from Mr. Whitmill's legitimate efforts to regain control over his art and his reputation.

Prior to this Spring, a Google search for "Victor Whitmill" images would bring up pages of his artwork. Indeed, he was proud that a Google search for "Victor Whitmill" placed him in the company of the great and groundbreaking artists creating tattoos. No more. Because Warner Bros. put an $             marketing campaign behind its appropriation of his art, the Google search results now are dominated by THE HANGOVER PART II, the infringing tattoo, and Mr. Tyson's facial tattoo. No longer can Mr. Whitmill simply tell a prospective client, "Look me up on Google." The severe impact this will have on prospective clients who were previously willing to drive eight hours or take a plane flight to get a tattoo from Mr. Whitmill is impossible to determine. It is doubtful that any amount of time or money will repair the harm done to Mr. Whitmill's professional reputation.

Warner Bros. may think that any fame is good fame, but Mr. Whitmill never wanted to be famous as the artist "whose best work can be seen on Mike Tyson's face." For a visual artist like

24

Mr. Whitmill, the very essence of copyright is the ability to control how his art may be used and how his name may be associated with it. Mr. Whitmill spent decades shaping his reputation as an artist. Warner Bros. spent millions of dollars destroying that reputation.

Mr. Whitmill has refused requests over the years to assist news or commercial ventures that would depict tattoo artists or tattooed people in an unfavorable light. THE HANGOVER PART II does just that. Warner Bros. has chosen to depict tattoo artists

Warner Bros. has chosen to depict tattoo artists as

Warner Bros. has chosen to depict tattoo artists as

Warner Bros. has chosen to depict tattoo artists as

. Warner Bros. has chosen to depict tattooed people as

.

Whitmill has the right not to allow his artwork to be used to promote these negative depictions of tattooed persons and tattoo artists.

Where there is irreparable injury, there is no adequate remedy at law. *Cadence Design Systems, Inc. v. Avant! Corp.*, 125 F.3d 824, 827 (9th Cir. 1997). Nor is there any question that the public interest is served, not disserved, by enforcing Mr. Whitmill's copyright interests. For over 100 years, the Copyright Act has never countenanced an "infringe now, pay later" mentality that permits infringers to avoid injunction by offering to pay the plaintiff damages. *See e.g., Triad Systems Corp. v. Southeastern Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995).

### G.    Warner Bros. Hardship Cannot Include Damages It Caused For Itself By Infringing Mr. Whitmill's Copyrighted Work.

Nor can Warner Bros. claim outweighing hardships if the picture is enjoined — it is not disputed that Warner Bros. chose to pursue its May 2011 plans for marketing, promotion, distribution, and release of the movie after it was fully aware of Mr. Whitmill's registered copyright and this lawsuit. Warner Bros. has been sued in the past for copyright infringement. Warner Bros. has a business strategy of ignoring the copyrights of third parties and instead pursuing projects and later taking its chances in court. *Pret-A-Printee, Ltd. v. Allton Knitting Mills, Inc.*, 218 U.S.P.Q. 150, 153 (S.D.N.Y. 1982) (stating that because of prior repeated lawsuits against defendant for the type of violation at issue, "the almost unavoidable inference is that [defendant] has built a business based on deliberate infringement of the copyrights of other converters.") Warner Bros. clearly implemented that very same business plan with THE HANGOVER PART II, when it proceeded full speed with plans for marketing, promotion, distribution, and release of the movie after it was fully aware of Mr. Whitmill's registered copyright. Warner Bros. chose to ignore Mr. Whitmill's rights, distribute the movie and then take its chances before this Court.

Warner Bros. perhaps explained it best when it successfully obtained a preliminary injunction over the Harry Potter copyrights:

> This [movie] is not the only work that RDR sells, as demonstrated by the listings on its website, but even if RDR had invested millions and the [movie] constituted its entire business, as Judge Hand made clear, injunctive relief would still be appropriate in light of RDR's deliberately infringing conduct. See My-T Fine Corp. v. Samuels, 69 F.2d 76, 78 (2d Cir. 1934) (Hand,J.) ("advantages built upon a deliberately plagiarized makeup do not seem to us to give the borrower any standing to complain that his vested interests will be disturbed"); see also Concrete Mach. Co. v. Classic Lawn Ornaments, 843 F.2d 600, 612 (1st Cir. 1988) (internal quotations and citations omitted) ("[w]here the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable

26

consideration . . . . Such considerations apply even to a business whichis exclusively based on an infringing activity and which would be virtually destroyed by a preliminary injunction."); Apple Computer Inc. v. Franklin Computer Corp., 714 F.2d 1240, 1255 (3d Cir. 1983), cert. dismissed, 464 U.S. 1033 (1984) (internal citations omitted) (if defendant's reliance on infringing activity for survival barred issuance of injunction, "a knowing infringer would be permitted to construct its business around its infringement, a result we cannot condone.").

*Warner Bros. Entm't v. RDR Books*, 575 F.Supp.2d 513, No. 1:07-cv-9667 (Doc. 38 (Warner Bros. Memo. in Supp. of Mot. for Prelim. Inj.) at 24-25) (S.D. N.Y. Jan. 16, 2008). Substitute "Warner Bros." for "RDR" in that quote and it fits perfectly here.

The vast majority of Warner Bros. alleged costs associated with a preliminary injunction appear to have been incurred after Warner Bros. was sued in April 2011. Warner Bros. proceeded at its own peril to market, promote, distribute, and release THE HANGOVER PART II.

**IV.    Warner Bros. Request For A $100 Million Bond Is Completely Out Of Proportion To The Potential Harm That Might Be Caused By Temporarily Delaying Release To Avoid Infringement.**

Determining the amount of an injunction bond is is a matter of weighing equities and rests within the sound discretion of the court. Courts in this Circuit have not uniformly held that Federal Rule of Civil Procedure 65(c) requires a preliminary injunction plaintiff post a bond in copyright infringement cases. *See, e.g., Northwestern Bell Tel. Co. v. Bedco of Minnesota, Inc.*, 501 F. Supp. 299, 304 (D. Minn. 1980) (requiring no preliminary injunction bond in copyright infringement case); *Thimbleberries, Inc. v. C & F Enterprises, Inc.*, 142 F. Supp. 2d 1132, 1141 (D. Minn. 2001) (setting "nominal" bond of $1,000 in copyright infringement case where likelihood of success on merits was strong). Courts are nevertheless required to demonstrate that they have exercised their discretion in setting a bond and authority exists for the proposition that a bond of some sort is required. *See Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1275-

1280 (N.D. Iowa 1995) (collecting and analyzing cases on bond requirements and exercising discretion in setting injunction bonds).

"A district court can properly 'fix the amount of the bond' when 'the risk of harm is remote.'" *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 745 (8th Cir. 2002) (affirming District Court's discretion in setting $1 million bond over defendant's request for $54 million bond); *see Monarch Productions, LLC v. Zephyr Grafix, Inc.*, 2010 WL 2348625 (E.D. Mo. June 9, 2010) (increasing preliminary injunction bond amount in copyright infringement case on reconsideration, but refusing to set bond in amount requested by defendants "due to the obvious strength of Plaintiffs' case"). Given the speculative nature of Warner Bros.'s alleged damages in the event of incorrectly entered injunction, the strength of Mr. Whitmill's case, Mr. Whitmill's willingness to bifurcate liability and damages and proceed with an expedited schedule for trial on the merits before the end of July, and the bonds required for other comparable preliminary injunctions, the bond in this case should not exceed $50,000. *See, e.g., Hart v. Warner Bros., Inc.*, No. 1:97-cv-1956 (Docket Entry 2/10/1998 (Minute Entry)) (U.S. D. Ct. E.D. Va. Feb. 10, 1998) (setting preliminary injunction bond against Warner Bros. for infringing copyright in THE DEVIL'S ADVOCATE at $100,000); *Minnesota Min. & Mfg. Co. v. Rauh Rubber, Inc.*, 130 F.3d 1305, 1309 (8th Cir. 1997) (affirming district court's decision not to increase injunction bond because it served as security device, not limit on damages).

## CONCLUSION

For the foregoing reasons and those set forth in the opening memorandum, plaintiff respectfully requests the Court to grant his motion for a preliminary injunction.

Respectfully submitted,

/s/ Pete Salsich III_____

Michael A. Kahn (#35411MO)
mkahn@brickhouselaw.com
Pete Salsich III (#44886MO)
psalsich@brickhouselaw.com
Geoff G. Gerber (#47097MO)
ggerber@brickhouselaw.com
**The BrickHouse Law Group**
PROFESSIONAL CORPORATION
1006 Olive Street, Ste. 303
St. Louis, Missouri 63101-2048
Tel: (314) 932-1070

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served via the Court's electronic filing system on this 23rd day of May, 2011 on all counsel of record.

*/s/ Pete Salsich III___*
*Attorney for Plaintiff*
*S. Victor Whitmill*