1                    IN THE UNITED STATES DISTRICT COURT

2                  FOR THE EASTERN DISTRICT OF MISSOURI

3

4

S. VICTOR WHITMILL,

5                Plaintiff,

6          vs.                              NO. 4:11-CV-752 CDP

7

WARNER BROTHERS ENTERTAINMENT,

8    INC.,

9                Defendant.

10

      – – – – – – – – – – – – – – – – – – – – – – – – – – – – –

11

PRESENT:    The Honorable Catherine D. Perry, Presiding

12

ATTORNEYS FOR PLAINTIFF:  Michael A. Kahn, Geoffrey G. Gerber,

13   Peter W. Salsich, III

14   ATTORNEYS FOR DEFENDANT:  Frederick J. Sperling, Sondra A.
     Hemeryck

15

16
                              REDACTED
17          Hearing on Motion for Preliminary Injunction
                          May 23, 2011
18                        First Session

19   Witness S. Victor Whitmill
             Direct Examination by Mr. Kahn  . . . . . . . . . . . .5
20           Cross Examination by Mr. Sperling. . . . . . . . . . .34
             Redirect Examination by Mr. Kahn. . . . . . . . . . . 52

21

22

23

                     TERI HANOLD HOPWOOD, RMR, CRR
24                   Thomas F. Eagleton Courthouse
                         111 South Tenth Street
25                    St. Louis, Missouri  63102

```
 1              THE COURT:  Good afternoon.  We're here in the case

 2   of S. Victor Whitmill versus Warner Brothers Entertainment,

 3   case number 4:11-CV-752.  I would like to start by asking who

 4   will be speaking here today on behalf of the plaintiff.  Will

 5   you all identify yourselves for the record?

 6              MR. KAHN:  Your Honor, Michael Kahn, Jeffrey Gerber,

 7   and Pete Salsich.

 8              THE COURT:  This is your client?

 9              MR. KAHN:  That's Mr. Whitmill.

10              THE COURT:  For the defendants?

11              MR. SPERLING:  Good afternoon, Your Honor.  Fred

12   Sperling and Sondra Hemeryck on behalf of defendant Warner

13   Brothers Entertainment, and I would like to introduce to the

14   Court Warner Brothers' general counsel John Rogovin; the head

15   of litigation at Warner Brothers, Zazi Pope; the senior

16   litigation -- senior intellectual property counsel at Warner

17   Brothers, Jeremy Williams; and senior litigation counsel,

18   Michelle Schultz.

19              THE COURT:  Okay.  All right.  So, I have the

20   various filings.  I guess the one thing I wanted to talk to you

21   all about before we begin is, well, first of all, the plaintiff

22   had filed a motion for leave to file an overlength brief, and

23   that was filed this morning, and I'll tell the clerk to grant

24   that by minute entry, and so that is granted, and I have

25   received and reviewed -- and I can't remember the motion
```

1   number.  I have received and reviewed the brief itself.

2         Also, I would like defense counsel to come take this

3   copy of the DVD back --

4         MR. SPERLING:  Thank you, Your Honor.

5         THE COURT:  -- so that's no longer in the Court's

6   possession.  You did not file -- you didn't file one, you just

7   handed that one to me, right?  It's not in the clerk's office.

8         MR. SPERLING:  That's correct, Your Honor.

9         THE COURT:  That's fine.  That exhibit is returned

10  to defense counsel.  The plaintiff filed a motion in limine to

11  exclude a defense witness.  Do you all want to talk about that?

12  It seems pretty obvious to me, Mr. Sperling.  It looks like

13  he's going to talk about the law, and we don't usually do that

14  in this court.

15        MR. SPERLING:  I wonder if we might hold that in

16  abeyance until after the plaintiff has presented his sole

17  witness.

18        THE COURT:  That's fine.  Mr. Kahn, are you ready to

19  proceed?

20        MR. KAHN:  I am, Your Honor.

21        THE COURT:  You may call your witness.

22        MR. KAHN:  Before I do, Judge, I couldn't keep track

23  of all the introductions.  I don't know if Warner Brothers has

24  any witnesses in the courtroom.  We would ask they be excluded.

25        THE COURT:  All right.

```
 1          MR. SPERLING:  We do have our witnesses present,
 2   Your Honor.  I don't see a basis for their exclusion.  They are
 3   testifying about the financial impact on Warner Brothers.  I
 4   don't believe the plaintiff's testimony is going to impact
 5   their testimony, and I think they should be allowed to be
 6   present.
 7          THE COURT:  Well, I'm going to exclude the
 8   defendant's witnesses as I believe that the rule has been
 9   invoked, and I always apply it to preliminary injunction
10   hearings, and I believe it's appropriate to do so.  Please have
11   your witnesses go out, and I'm sure the attorney/client rooms
12   are unlocked outside.  We'll double check.  They can sit out
13   there in those rooms.
14          MR. SPERLING:  One of the witnesses is not a Warner
15   Brothers employee, but is being called by Warner Brothers.  Do
16   you want that witness out of the courtroom as well?
17          THE COURT:  That's normally how the rule works.
18          MR. SPERLING:  I wanted to be fair.  Thank you.
19          THE COURT:  All right.
20          MR. KAHN:  Your Honor, the plaintiff had one
21   witness, and it is the plaintiff.  We would call to the stand
22   Mr. Whitmill.
23          THE COURT:  Mr. Whitmill, would you just step right
24   up here?
25          MR. SPERLING:  I apologize on one issue.  One of the
```

1    witnesses for Warner Brothers is the senior litigation counsel

2    who is responsible on a day-to-day basis for this case.

3                 THE COURT:  You may keep one client representative

4    in the room.  I don't care who that is.  That's up to you.

5    That can be a witness.  In other words, you're entitled to a

6    client representative, so who is that going to be?  I assume

7    your general counsel aren't going to testify.

8          Mr. Whitmill, while we're doing that, I'll ask the clerk

9    to swear you.

10                         S. VICTOR WHITMILL,

11            having been duly sworn, testified as follows:

12                 THE COURT:  Mr. Spelling, who is going to be your

13    client representative?

14                 MR. SPERLING:  The senior litigation counsel, who is

15    one of our witnesses, is not in the courtroom, Your Honor, so

16    the other --

17                 THE COURT:  You can bring her in if you want to.

18                 MR. SPERLING:  We'll have the other counsel from

19    Warner Brothers who are not witnesses remain.  Thank you.

20                 THE COURT:  That's fine.  Mr. Kahn, you may proceed.

21                         DIRECT EXAMINATION

22    BY MR. KAHN:

23    Q.  Mr. Whitmill, you are a professional artist, correct?

24    A.  That is correct.

25    Q.  What types of art do you create?

 1   A.  All kinds of art, dabble in most mediums that I've ever

 2   found interesting; oils, air brush, primarily tattooing.

 3   Q.  And how long have you been a professional artist?

 4   A.  Approaching 20 years.

 5   Q.  Do you have any formal training?

 6   A.  Out of high school, maybe some community college art

 7   courses.

 8   Q.  And during your years as a professional artist, Mr.

 9   Whitmill, have you ever won any awards or any recognition for

10   your artwork?

11   A.  I've won quite a few, yes, I have.

12   Q.  Without telling all of it, can you tell the Judge and the

13   Court some of the awards you've won for your artwork?

14   A.  Oh, well, in the tattoo community you can enter various

15   tattoos, and I've won Best Back Piece, Best Black and Gray,

16   Best Sleeve.  I used to pursue that really hard.  I thought

17   having a lot of awards meant a lot.

18   Q.  Have you won more than ten awards?

19   A.  Yeah, yeah, easily.

20   Q.  And where do you live?

21   A.  I live in Waynesville, Missouri.

22   Q.  And for those who don't know, where is Waynesville,

23   Missouri?

24   A.  Right on I-44 about halfway between St. Louis and

25   Springfield.

1   Q.   Okay.  How long have you lived in Waynesville, Missouri?

2   A.   About four years.

3   Q.   Where did you live before that?

4   A.   Las Vegas.

5   Q.   And in fact, you were living in Las Vegas at the time you

6   created the tattoo that's at issue in this case, correct?

7   A.   That's correct.

8   Q.   Why did you -- what brought you to Waynesville, Missouri,

9   from Las Vegas?

10   A.   I lived in Las Vegas for quite sometime, 11 years or so,

11   and I was a little tired of the big city, wanted to slow things

12   down.  The cost of living was getting to be a bit much, and I

13   wanted a change of pace.  Specifically Waynesville, I've got

14   some friends out there, and it looked like a good place to just

15   kind of relax and take things slower.

16   Q.   Do you operate a studio in Waynesville?

17   A.   Yes, I do.

18   Q.   I'm going to show you a portion of what has been marked as

19   Plaintiff's Exhibit 11, which is actually -- well, can you

20   identify what this document is?

21   A.   That's the waiting room of my tattoo shop.

22   Q.   Is this from your website?

23   A.   Yes, it is.

24   Q.   Okay.  And there appears to be artwork on the walls in the

25   waiting room.

1   A.  Yeah.

2   Q.  Whose artwork is that, sir?

3   A.  That's mostly my work.  As a matter of fact, I think that's

4   all my work in that photo.

5   Q.  Okay.  What about the guitars?

6   A.  The guitars are guitars that I've purchased at a music

7   store and then carved the wood away and re-sculpted it and

8   refinished the guitars.

9   Q.  Okay.  And where do your clients come from?

10  A.  I'm sorry?

11  Q.  The clients who are interested in having you create a

12  tattoo, where do they come from?

13  A.  Well, largely from the, you know, that area, Pulaski

14  County.  There is a military base near by, and so a large

15  percentage of our clients are local, but not all.  I get some

16  clients that have found my work online and traveled pretty good

17  distances to get an appointment with me.

18  Q.  Okay.  We were talking earlier about awards.  Since you

19  moved to Waynesville, Mr. Whitmill, have you won any awards?

20  A.  Actually, my shop won an award.  The Waynesville -- well,

21  the City of Waynesville gave me an award for the Beautification

22  of Downtown award, and --

23  Q.  Did you accept that award with anyone?

24  A.  I accepted the award with the contractor that had built the

25  building and the owner of the building because they built it,

 1   but I decorated it, so I felt it was fair that -- they had a

 2   lot to do with it, so sure.

 3   Q.  So, would you describe yourself in addition to being a

 4   tattoo artist as being a small business owner?

 5   A.  Yes.

 6   Q.  How many employees do you have, sir?

 7   A.  Well, including myself, there is an artist there, two

 8   artists, and two receptionists.

 9   Q.  Okay.  And the place you're in, do you own that or do you

10   rent it?

11   A.  The building is rented.

12   Q.  Okay.  I want to now switch to talking in general about

13   tattoo art.  I don't have a tattoo, Mr. Whitmill, and don't

14   really know how it works.  Can you briefly describe to us how

15   tattoo art is created, at least by you?

16   A.  By me, the way I like to do this at my shop is schedule a

17   consultation with a potential client where I book an hour, hour

18   and a half put aside to discuss a project with a client.

19   Generally that might take a week or two or three to get an

20   appointment, a consultation with them, and then at the consult,

21   we will discuss the ideas and where the tattoo is going and try

22   to cover all the bases so that myself and the client are seeing

23   eye to eye, at which point -- at which point we book the tattoo

24   appointment because we have a pretty good idea of how long it

25   may take, and then the tattoo appointment gets booked, and we

1    take it from there.

2    Q.   Okay.   And in the actual creation of the art, do you --

3    that is the art that's going to become the tattoo, do you

4    sketch that on paper, on computer, on the person themselves?

5    A.   Yes, you know, all of the above, actually.   I find myself

6    using the computer more and more as I become more proficient

7    with digital art and digital drawing tablets and what not, it

8    allows me the opportunity to show -- for me and my client to

9    both be looking at the same surface and make changes quickly

10   and discuss a project, but oftentimes there might be a need to

11   bring out a sheet of paper, there might be a need to --

12   sometimes might draw directly on the skin to, you know, help

13   illustrate movement, or I think it really boils down to the

14   best tool for the job.

15   Q.   Now, you've provided us a very short video of one of your

16   creations, correct?

17   A.   Yes, I did.

18   Q.   And what is that?   What does that video show?

19   A.   That video was a recording in real time of -- it's

20   obviously condensed down to just a few minutes.   The video of

21   the actual drawing took about an hour.

22   Q.   And this was with a client?

23   A.   This was with a client.

24   Q.   This is where you were creating the image to eventually be

25   applied to the client?

1   A.  Yes, this was during a consultation, and we had gotten a

2   fairly good idea of the direction and the image and the

3   artwork, and I started drawing this and we recorded it.

4           MR. KAHN:  Mr. Gerber, what is the Exhibit Number on

5   this?  Your Honor, it takes less than two minutes, but I think

6   it would be helpful to the Court to see the creative process if

7   we could play it.

8           THE COURT:  Any objection?

9           MR. SPERLING:  No objection.

10          THE COURT:  Exhibit what?

11          MR. GERBER:  Exhibit 12.

12          THE COURT:  You may play Exhibit 12.

13              (Exhibit 12 played for the Court.)

14  Q.  (By Mr. Kahn) As it's playing, it's silent, can you explain

15  what we're seeing?

16  A.  Yes, I'll give it a shot.  All right, this was drawn with a

17  digital pen on a digital tablet in Adobe Photoshop Elements.

18  Like I said, this is an hour's worth of work reduced down to

19  about three minutes.  It's kind of at this point, you know,

20  mapping out movement, and well, now kind of getting into some

21  of the tones, some of the values of the piece, starting to make

22  little refinements here, just kind of a gradual build up, make

23  adjustments as you go.

24  Q.  While you're doing this, the client is watching?

25  A.  Yeah, the client is sitting right next to me, and this goes

1    back to saying a consultation being an hour or hour and a half.

2    This is one example of how a consultation might happen.

3    Q.  In the end, if you and the client agree, this would be the

4    form of the tattoo that you would apply to some part of your

5    client's body?

6    A.  In this case here, I would finish up the digital art, and

7    show that to my client, and say, "What do you think of this,"

8    and if they are good to go with it, in this particular case, I

9    would create a line art from that, basically just reducing all

10   the shading so there is no shading at all, and it's just an

11   outline that I could apply to the skin and start the tattoo.

12   Q.  Okay.  Are we close to the end?

13   A.  I think we're just about done.  A couple little details.

14   Q.  And once this is complete and the client agrees to have it

15   applied, how is this tattoo then applied to a client?

16   A.  Well, like I said, in this particular case, I would create

17   a line art of it, which might be, you know, making a tracing of

18   the drawing itself, and create a line art and make a stencil

19   and apply the stencil to the skin, and start the tattoo

20   process, and that's that.

21   Q.  Thank you.  Now before we move to Las Vegas and Mr. Tyson,

22   you testified to being a professional artist for nearly

23   20 years, correct?

24   A.  Yeah, for the better part of it, yes.

25   Q.  And a great bulk of your work has been in the tattoo art

1   field, correct?

2   A.  That's correct.

3   Q.  Over those years, have you become aware of any negative

4   stereotypes about tattoo artists?

5   A.  Since the beginning, yeah, tattoo, the art of tattoo shops,

6   tattoo artists have had a negative stereotype that I'm aware of

7   for the better -- yeah.

8   Q.  What does that stereotype as you're aware of include?

9   A.  Dirty shops, unprofessional behavior, poor quality artists,

10  a number of things.  I can imagine the seedy kind of

11  environments.  That's what the negative stereotype is all

12  about.

13  Q.  And did your design of your studio have any reaction to

14  that stereotype?

15  A.  I'm sorry?

16  Q.  We're looking at the front of your studio.  Was that at all

17  influenced by this negative stereotype?

18  A.  What I'm hoping to do here is show a positive, make a

19  positive impression, trying to elevate what professional

20  tattooing can be all about, and show a higher caliber of

21  artwork in a more comfortable setting, and show original pieces

22  by the artists that work in the shop to illustrate to potential

23  clients the caliber of artists that they might be working with

24  in the future, should they choose to get a tattoo in that shop.

25  Q.  You talked about tattoo artists being dirty, unclean shops

1   and what not.  What are some of the standards that you enforce

2   at your studio?

3   A.  Well, modern tattoo shops are regulated by the health

4   department, be it on the state level, sometimes the county

5   level.  We follow all those guidelines.  Being in the business

6   all these years, I'm well aware of the universal precautions of

7   disease transmission, and that answered your question.

8   Q.  Yes, it certainly does.  Let's move back to Las Vegas and

9   Mr. Tyson.  In your verified complaint, you identify the date

10  that you created the tattoo as February 10th, 2003.  Is that

11  correct?

12  A.  That's correct.

13  Q.  Prior to that date, Mr. Whitmill, had you created any other

14  art, tattoo art, that is for Mr. Tyson, for --

15  A.  Definitely.

16  Q.  -- Mr. Mike Tyson?

17  A.  Yes, I did.

18  Q.  Could you tell us about that prior art?

19  A.  The rib panel on his left rib area of Che Guevara.

20  Q.  Okay, and when did you do that?  When was that created?

21  A.  It was a few years earlier, three years, maybe, two years.

22  Q.  So you and Mr. Tyson at least knew each other, and he had

23  seen an example of your art before February 10th, 2003.  He was

24  walking around with it on his rib cage, correct?

25  A.  Oh, yeah, yeah.

1   Q.  So let's move to that date, February 10th, 2003.  Beginning

2   your description, I'll ask you questions, but from the time

3   that Mr. Tyson arrives, and he arrives at your studio in Las

4   Vegas -- I'm sorry, did he arrive at the studio?

5   A.  Yes.  Yes, he did.

6   Q.  Tell me what happens.  He comes in.  Describe your session

7   with Mr. Tyson.

8   A.  He came in the shop.  Actually I had another appointment

9   scheduled for that day, but Mr. Tyson had offered to pay for

10  the previous client's session if Mike Tyson could take the

11  spot, so that's what happened.  I think there was, I don't

12  know, some pleasantries, chit chat, whatever, for a little bit,

13  and then we started getting into what he was there to do.

14  Q.  And did he have an idea when he arrived as to what kind of

15  tattoo he wanted?

16  A.  He did.  He did.  He indicated -- he indicated some various

17  shapes, hearts or diamonds around the eye area.

18  Q.  So he came in and he had an idea, he wanted you to put

19  hearts or diamonds around his eye?

20  A.  Well, he threw that out there.  He said he knew that he

21  wanted to get a tattoo in this area, and he said maybe

22  something like this, and so that was kind of, you know, the

23  opening of our consultation.

24  Q.  And tell me what happened after he described his idea, and

25  you started talking?  In fact, let me stop.  How long was Mr.

1    Tyson in your tattoo parlor that night?

2    A.  In the studio?  Maybe in the neighborhood of four hours.

3    Q.  Four hours.  Okay.  So he arrives, he tells you this idea

4    for a tattoo, you have a conversation, and at some point, and

5    you're going to describe it for me, you move from the diamonds

6    and hearts to something else.  Tell me how that happened.

7    A.  Well, that happened -- well, I think when a client comes to

8    the shop, I feel somewhat responsible for maybe throwing out

9    some ideas that maybe they hadn't considered yet, and so

10   thinking of facial tattoos, I thought of the New Zealand Maori

11   tattoos, facial tattoos, and so I showed him some pictures of

12   those, and we looked at that.  We looked at a number of things.

13   It's kind of a long time ago, but I was developing in my head

14   something I wanted to present to him, kind of inspired by some

15   of the movement that you would see in a Maori piece, but at the

16   same time, a style or an approach to the tattoo that I feel

17   competent with.

18         Honestly, I'm not a Maori expert, but I do feel

19   comfortable and confident doing this kind of work that I do

20   more often, and so to apply those styles, to find my comfort

21   zone in a piece of work inspired by the Maori piece, I felt

22   like that was the direction I wanted to take it, I wanted to

23   show him that because I felt comfortable and I thought it might

24   just fit the bill, what he was looking for.

25   Q.  And is that ultimately at least the style of the tattoo

1    that you created on Mr. Tyson's face?

2    A.   I'm sorry?

3    Q.   Is it a Maori style tattoo that you created?

4    A.   No, no, it definitely is inspired by it, but I would say

5    that the tribal tattooing that you see nowadays in America is

6    probably a derivative of Borneo, you know, a lot of Borneo

7    influence, Polynesian influence, you know, and I guess the

8    American, if you want to call it American tribal, has become a

9    melting pot for a variety of styles.

10   Q.   Okay.  And you looked through the books, and then what did

11   you do?  Did you sketch something onto paper, or did you sketch

12   something out on his face?

13   A.   As I remember, I remember that I had a very strong

14   direction that I wanted to head with this, and I wanted to show

15   it to him.  I don't remember if we drew sketches.  I don't

16   remember.  I don't know.  Honestly I don't remember that

17   detail.

18        The consultation, I do remember this, it reaches the

19   point to where I have a pen, and I say, "Allow me to put this

20   on you so you can see for yourself, and you can look in the

21   mirror."  Ultimately that's going to be the best decision

22   maker, or help him with his decision, and I drew it on him, and

23   he looked in the mirror, and very positive reaction.

24   Q.   Let me ask you this.  Was what you drew on his face a copy

25   of something in a book you showed him?

1    A.  No.

2    Q.  Was this an original creation by you?

3    A.  Yes, it was.

4    Q.  And in the process of creating it, when a tattoo artist

5    creates something on someone's face, what are some issues you

6    have to deal with?

7    A.  Well --

8    Q.  Artistic, aesthetic issues?

9    A.  Yes, my objective, my goal was to flatter portions of the

10   face, flatter muscle structures, the temple, the forehead, the

11   cheek, certainly the lines and movements on the eye piece were

12   considered, and there were parts of his face, all the different

13   elements there were all in consideration.

14   Q.  Let me show you what's been marked as Exhibit 4.  Is that a

15   photograph that you took at the end of your session with Mr.

16   Tyson, or if you don't remember that, is this a photograph you

17   took while he was in your studio?

18   A.  Yeah, right afterwards, yeah.

19   Q.  You were talking about the facial structure, about this

20   tattoo was influenced by his facial structure, or the entire

21   tattoo?

22   A.  I imagine any face, any skull, you know, that form, I don't

23   know, I guess my point there was create a decoration that

24   compliments that part of the face.

25   Q.  Okay.  And Plaintiff's Exhibit 1, what is going on in this

1   exhibit?

2   A.  That's the application of the tattoo itself.

3   Q.  And when you originally drew it on his face, whether you

4   had sketched it before or not, was it in red ink?

5   A.  Yes.

6   Q.  That's the red ink we see there?

7   A.  Yes.

8   Q.  And I notice that you're wearing gloves, surgical gloves.

9   A.  Yes.

10  Q.  Is that something you do?

11  A.  Every time.

12  Q.  And why is that?

13  A.  Prevention of disease transmission.

14  Q.  Did you use disinfectants or alcohol?

15  A.  Yeah, we clean the skin, and there is sterilized equipment,

16  and we own an autoclave, and the autoclave is tested on a

17  regular basis.

18  Q.  And the other photograph, Exhibit 2, what is this?

19  A.  This is after the tattoo was done, Mike is looking at his

20  reflection in the mirror.

21  Q.  And just so we are clear in this, Mr. Whitmill, this tattoo

22  on Mr. Tyson's face is your creation, correct?

23  A.  Absolutely.

24  Q.  One other exhibit while he was in your tattoo studio, we'll

25  mark this as Exhibit 3, which is entitled, "Tattoo Release

1   Form," is that the release form that Mr. Tyson signed that day

2   in your office?

3   A.  Yes, it is.

4   Q.  I see the second to the last bullet point, "I understand

5   that all artwork, sketches, and drawings related to my tattoo

6   and any photographs of my tattoo are the property of Paradox

7   Studio of Dermagraphics," correct?

8   A.  That is correct.

9   Q.  Is that the name of your company back in Las Vegas?

10  A.  That is true.

11  Q.  Finally, Exhibit 5 is a copyright registration.  Is that

12  the copyright registration for your artwork, sir?

13  A.  Yes, it is.

14  Q.  Mr. Whitmill, at the time that Mr. Tyson left your studio

15  that evening, what was your understanding of what he was

16  allowed to do without getting further approval with that piece

17  of artwork you tattooed onto his face?

18  A.  I would have imagined he would be allowed to go anywhere he

19  wanted and be seen anywhere he wants with that tattoo.  It's

20  his likeness now.  He's more than welcome to be anywhere he

21  wants to be with it.

22  Q.  Can he be on TV with it?

23  A.  Absolutely.

24  Q.  Can he go in the boxing ring with it?

25  A.  Absolutely.

```
 1   Q.  Can HBO broadcast him in the boxing ring with it?

 2   A.  Sure.

 3   Q.  Have you seen the movie "Hangover," the original movie?

 4   A.  Yes, I have.

 5   Q.  Now, in court filings in this case, and even in a

 6   conference with the Judge, Warner Brothers has made a point of

 7   stating that you never objected to its use of the tattoo in the

 8   movie, and never sued them over the use of the tattoo in the

 9   first movie, "Hangover."  My first question to you, sir, is

10   that correct?  Did you ever object?

11   A.  No, I have no objection.

12   Q.  Did you ever sue them?

13   A.  No.

14   Q.  So, you in fact never voiced an objection or filed a

15   lawsuit over Warner Brothers' use of the tattoo in the first

16   movie, correct?

17   A.  No, I have no objection to the use of the tattoo.

18   Q.  And why have you not objected or filed a suit over their

19   use of the tattoo in the first movie?

20   A.  Because I don't believe Warner Brothers used the tattoo in

21   the first movie.

22   Q.  Explain that to me.

23   A.  I believe they hired Mike Tyson to appear in that film, and

24   that Mike Tyson looks like that.  The tattoo comes with Mike

25   Tyson now.
```

```
 1   Q.  As part of his identity?

 2   A.  Absolutely.  I don't look at that -- I didn't see it

 3   separate from Mike anywhere.

 4   Q.  An attachment to one of the filings by Warner Brothers on

 5   Friday, I think it's the Kroll filing, I think it's an

 6   advertising poster from the first movie.  That's from the first

 7   movie, "The Hangover."

 8   A.  Okay.

 9   Q.  And in your view, Mr. Whitmill, based on your understanding

10   of what Mr. Tyson's rights were when he left your studio, is

11   Warner Brothers making the use of your tattoo in this

12   advertising poster?

13   A.  I see they are making a use of Mike Tyson, and the tattoo

14   is on Mike Tyson.

15   Q.  Okay.  Mr. Whitmill, do you have a TV in your house?

16   A.  I do.

17   Q.  And is it hooked up to cable or anything?

18   A.  No, it is not.

19   Q.  What do you play on your TV?

20   A.  We have an X Box hooked to it, we get Netflix on it, and we

21   have internet, high speed internet at the house.

22   Q.  But no TV station?

23   A.  No, no.

24   Q.  No cable, no nothing?

25   A.  No, no, no.
```

1   Q.  So how did you first find out about "Hangover II?"

2   A.  A link to a trailer on You Tube was e-mailed to me.

3   Q.  About someone you knew?

4   A.  A friend of mine, yeah.

5   Q.  When did this happen?

6   A.  A month and a week ago, month and a half ago.

7   Q.  So maybe mid or early April of this year?

8   A.  Somewhere in there.

9   Q.  And did you -- and this was a You Tube video?

10  A.  Yes.

11  Q.  And did you watch the video?

12  A.  Yes, I did.

13  Q.  And just -- let me show you here what we marked as

14  Exhibit 17, which is a screen shot from a You Tube video.

15  A.  Uh-huh.

16  Q.  Does that look familiar to you, like the video you watched?

17  A.  That was the first trailer that I've seen for that.

18  Q.  Okay.  Mr. Whitmill, you watched this trailer, as we see

19  here on the screen shot from Exhibit 17 from the trailer, there

20  is the Ed Helms character with the tattoo on his face.  It's

21  hard to see in this version.  Maybe I can clear it up.  Tell us

22  what was your reaction when you saw that trailer?

23  A.  I guess I was surprised.  I didn't know how that could

24  happen there without me having known ahead of time.  I look at

25  that and think if that were any other graphic, or recognizable

1   images, I would imagine that the original creator would have

2   been contacted, and that was my reaction.  Something was

3   missing there.

4   Q.  And did anyone from Warner Brothers contact you about the

5   use of that tattoo in "Hangover II?"

6   A.  No.

7   Q.  In fact, after you created the tattoo and Mr. Tyson left

8   your office in 2003, have you licensed that artwork to anyone

9   else?

10  A.  No, I haven't.

11  Q.  Since the time that Mr. Tyson left your studio in February

12  of 2003, have you had any contact with any representative of

13  Mr. Tyson regarding that artwork?

14  A.  His -- well, his sister called me.

15  Q.  When?

16  A.  About two weeks, three weeks after the tattoo was done.

17  Q.  So back in February or March of 2003?

18  A.  Uh-huh.

19  Q.  Yes?

20  A.  Yes.

21  Q.  And tell us about that conversation.

22          MR. SPERLING:  Objection, hearsay.

23          THE COURT:  I'll overrule it, and I'll hear it.  If

24  it is inadmissible, I won't consider.  Go ahead.

25  Q.  (By Mr. Kahn) Tell me what she said to you, and what you

1  said to her.

2  A.  She was asking me if it was an original piece.  She was

3  asking me if it had been copied.  She was asking me if I traced

4  it.

5  Q.  And you told her?

6  A.  I told her, "I assure you that is an original piece.  It

7  did not come from any other graphic."

8  Q.  Did she mention any reason for the call?

9  A.  She said that they were looking into having it trademarked.

10  Q.  And that was in 2003?

11  A.  Uh-huh.

12  Q.  Has anyone from Mr. Tyson's entourage contacted you since

13  that telephone call from his sister?

14  A.  No.

15  Q.  And that was eight years ago, correct?

16  A.  Yes.

17  Q.  After the first trailer that you viewed on You Tube, Mr.

18  Whitmill, did you begin to see other marketing materials for

19  this "Hangover II" movie?

20  A.  Yeah, yeah.

21  Q.  Let me show you what was actually marked as Exhibit 6 in

22  your verified complaint.  Do you recognize this as the movie

23  poster for "Hangover II?"

24  A.  I guess that's what it is, yes.

25  Q.  And do you see a familiar tattoo in that movie poster?

1   A.   Absolutely.

2   Q.   Is that a copy of the artwork you put on Mr. Tyson?

3   A.   It sure appears that way to me.

4   Q.   I assume no one asked your permission before they put that

5   tattoo in that ad, correct?

6   A.   No.

7   Q.   Exhibit 15, which has been stipulated into evidence at

8   least insofar as it shows the billboards, it shows various

9   advertising billboards that all have the same image, correct,

10  with the three --

11  A.   Similar images.

12  Q.   -- same five elements; the same actors, the monkey, and the

13  tattoo, correct?

14  A.   Yeah, that's what I see.

15  Q.   And obviously no one asked you whether they had your

16  permission to put those tattoos on the billboards, correct?

17  A.   No.

18  Q.   Exhibit 18 is a news release from 7-Eleven that we have

19  shared with opposing counsel regarding a 7-Eleven promotion to

20  celebrate the return of the Wolf Pack, and you see there are

21  five Big Gulp cups displayed in that ad?

22  A.   Yes, I see them.

23  Q.   And we have marked as Plaintiff's Exhibit 16 one of those

24  Big Gulp cups which I'm handing you.  Do you see an image of

25  your tattoo on that cup, sir?

1   A.  Yes, I do.

2   Q.  What's on the back, any language on the back about any sort

3   of saying?

4   A.  It says, "I'm a sick bad person."  Is that --

5   Q.  Yes.  Did 7-Eleven or Warner Brothers ask your permission

6   before they made that image and that saying on the back of the

7   cup, one of their five give-away promotion cups?

8   A.  No.

9   Q.  Exhibit 19, sir, is another part of the 7-Eleven promotion,

10  which are the get well cards.  There are a total of eight of

11  these cards.  It's a little bit harder to see.  I guess we

12  could zoom in.  Do you see the tattoo image on any of those

13  cards?

14  A.  Yes, I can.

15  Q.  And how many of eight cards in the 7-Eleven promotion have

16  your tattoo?

17  A.  Well, I can see three.

18  Q.  Okay.  And finally, this is another exhibit related to the

19  7-Eleven promotion which has been marked as Exhibit 21.  This

20  is apparently an iPhone app that you can download and go

21  scavenger hunting as part of this promotion.  Do you see down

22  at the bottom of Exhibit 21 in that first page there are two

23  what are referred to as badges?

24  A.  I do see those, yes.

25  Q.  Let me give you a close-up from Exhibit 22, which is a

1    blowup of that badge from Exhibit 21.  This is a promotion you

2    can get at 7-Eleven, you get a badge.  Do you recognize that

3    artwork, sir?

4    A.  Yes, I do.

5    Q.  What is that artwork?

6    A.  It looks like the tattoo I designed for Mike Tyson.

7    Q.  Again, no one asked you for your permission?

8    A.  No.

9    Q.  I'm now showing you Exhibit 24, which I will represent to

10   you is a photograph from a shopping center in the Los Angeles

11   area which is hung with promotional banners.  It may be hard

12   for you to see, but do you see any copies of your tattoo shown

13   in that promotional display throughout that shopping center?

14   A.  Well, I can make it out twice.  I can see two of them

15   there.

16   Q.  Okay.  Here is Exhibit 25, a close-up of one of those

17   billboards.  "I have a demon in me."  Do you recognize that

18   tattoo, sir?

19   A.  Yes, I do.

20   Q.  You've had an opportunity now, on Friday the 13th, to see

21   the movie "Hangover," correct?

22   A.  Yes, I did.

23   Q.  What was your reaction?

24   A.  At the end of the film, well, concerning the tattoo scene,

25   or the tattooist in there, stereotypical negative view on

1   tattooing, on tattooists, and the usage of the tattoo

2   throughout the movie, honestly didn't surprise me at all.  Once

3   I started seeing the trailers, the guy wakes up after being

4   drunk the night before with a tattoo, and they try to figure

5   out how everything came to be, I'm not surprised.  The

6   tattooist scene, once again, was certainly not how I like to

7   represent my career.

8   Q.  Have you ever knowingly applied a tattoo after a

9   consultation with someone who you believed was under the

10  influence of alcohol or drugs at the time of that consultation?

11  A.  No.

12  Q.  You spent four hours with Mr. Tyson on February 10th, 2003,

13  the night that you had the consultation and applied the tattoo.

14  Was he doing drugs or drinking at the time of that

15  consultation?

16  A.  No, no, he was very well spoken and seemed just as sober as

17  he could be to me.

18  Q.  Okay.  After you saw that movie, Mr. Whitmill, in a later

19  conversation with me, you said to me, "I lost that battle."

20  What do you mean?

21  A.  I feel somehow inadvertently connected to another

22  stereotype, the negative stereotype being pumped out there in

23  this movie.  This is not an image that I would support, and

24  it's not the image that I've been trying to project through the

25  way that I operate my business and my career over these years,

1   and I feel like -- I just feel like it's a losing battle.

2   Somehow I get connected to what's going to be a huge

3   blockbuster film, how did I get attached to this in such a

4   negative way?  I think that's clear enough, isn't it?

5   Q.  Yes.  Mr. Whitmill, we're almost at an end here.  Have you

6   ever before this case been a plaintiff in a lawsuit?

7   A.  No.

8   Q.  In the answer that Warner Brothers filed to this complaint,

9   and certainly to me on more than one occasion, they have

10  accused you of having unclean hands, and by that they accuse

11  you of infringing a copyright of theirs in the movie "Dark

12  Knight."  Specifically, they reference a skateboard that

13  includes at least a partial image of the face of the late Heath

14  Ledger who was in that movie.  Do you recall that movie?

15  A.  I do.

16  Q.  Do you recall Heath Ledger in that movie?

17  A.  Yes, I do.

18  Q.  And have you in fact created a skateboard with the image of

19  Heath Ledger, or partial image of Heath Ledger?

20  A.  Heath Ledger as the Joker from the movie the "Dark Knight,"

21  yes, I did.

22  Q.  Okay.  Would you tell the Court how you came to create an

23  image of Heath Ledger as the Joker on a skateboard?

24  A.  Well, the point behind choosing that character was to --

25  Q.  Not so much the point behind the character, I mean, what

1    was the sequence of events?  How did you end up painting

2    anyone's face on a skateboard, particularly Mr. Ledger's?

3    A.  The painting occurred prior to Christmas.  Waynesville

4    holds an event called Christmas on the Square.  My studio is

5    located right on the Square.  Being a tattoo shop, and trying

6    to figure out how could we participate with this event, they

7    have hayrides and Santa Claus and live music and what not, and

8    I wanted to show some support for the community, and I've got a

9    big beautiful front window on my store, and so I set up an

10   easel and a skateboard and air brushed a very popular character

11   on the skateboard to try to get -- bring people in to buy

12   raffle tickets for the Toys for Tots run.

13   Q.  Who is the sponsor of Toys for Tots?

14   A.  The Marine Corps.

15   Q.  And so were they involved in this effort to raise money for

16   these children?

17   A.  Yeah, I had called them prior to the Christmas on the

18   Square event and told them my idea, and they were very

19   supportive, and they brought down boxes, and on the day of the

20   event, they had a representative there, and visited with

21   everybody all evening long, and had a pretty good display.

22   Q.  Were you paid for creating the skateboard, sir?

23   A.  No, no, I was not.

24   Q.  And you mentioned people were buying raffle tickets to

25   raise money --

1   A.  Yeah.

2   Q.  -- for these under privileged children.  Did you buy any

3   raffle tickets?

4   A.  Yeah, I bought 200.

5   Q.  $200 worth?

6   A.  Yeah, $200.  They were a dollar a ticket.

7   Q.  And did you have on your website, you have images of this

8   event, do you?

9   A.  Yes, I do.

10  Q.  Let me show you a several page exhibit, 13.  This is from

11  your web page.  This is the Toys for Tots custom skateboard

12  raffle.  Is this last Christmas?

13  A.  It was the one before.

14  Q.  Okay, so this is the first, that's the winning ticket, I

15  gathered?

16  A.  That was the winning ticket.

17  Q.  And here are some pictures from the square.  That's with

18  you painting the image of Mr. Ledger on that skateboard?

19  A.  Yes.

20  Q.  Okay.  And it may be hard for people to read, but it's --

21  well, I can read it.  It says, "Three days before the drawing,

22  I received an e-mail from Drill Sergeant Adam Tiffany informing

23  me that he had been made aware of the fund raising raffle and

24  had organized a toy and cash collection from Bravo Company,

25  31st Engineer Battalion.  Their donation entitled them to

1   approximately 2500 raffle tickets.  Talk about stacking the

2   deck."  They contributed $2,500?

3   A.  They put together toys and cash, but a lot of it,

4   obviously.  This is a photo of they invited me to come meet

5   with everybody who participated.

6   Q.  And that's the photo on the top of this fourth page of

7   Plaintiff's Exhibit 13?

8   A.  Yeah, and you can see the table with all the toys and all

9   the donations there.

10  Q.  And I see that, okay.  You met with Drill Sergeant Adam

11  Tiffany and Al Fagan, who is Al Fagan?

12  A.  Al Fagan is the man in the red jacket, and he was the

13  representative that I contacted originally.

14  Q.  From the Toys for Tots?

15  A.  Yes.

16  Q.  So he's from the Marine Corps?

17  A.  Yes, yes.

18  Q.  And then it says, "Time to draw the winning ticket," and it

19  reads here, "When trying to decide who should pull the ticket,

20  I figured why not a cop, they are ticket professionals, right?

21  So Officer Alex Baker of the Waynesville Police Department met

22  up with me and Al Fagan from the Marine Corps Toys for Tots and

23  pulled the winning ticket instead of writing one," and then

24  below it says, "DS Diana Vazquez accepts the skateboard on

25  behalf of Bravo Company, 31st Engineer Battalion."  One of

1   their 2500 raffle tickets was drawn, and they got the

2   skateboard?

3   A.  Yeah, yeah.  They won it and said they were going to hang

4   it up in their office or the community area of the barracks.

5   Q.  It says, "When the raffle was all done, three boxes of toys

6   and a handful of cash with a combined value of over $3,100, all

7   for Toys for Tots," correct?

8   A.  That's correct.

9   Q.  What is this last photograph?

10  A.  A photograph of the table that's filled with toys that they

11  had donated, and in the middle there you can see how many

12  raffle tickets that was.

13  Q.  Right.  And if Warner Brothers does consider a counterclaim

14  here, sir, let me make clear, was your studio the sponsor of

15  the Toys for Tots event?

16  A.  The Marine Corps was the sponsor.  I hosted it in my shop.

17  Q.  Okay, but the Marine Corps was the sponsor?

18  A.  Yes.

19          MR. KAHN:  I have nothing further, Your Honor.

20          THE COURT:  Cross-examination?

21                  CROSS EXAMINATION

22  BY MR. SPERLING:

23          MR. SPERLING:  Judge, I would like to tender to Mr.

24  Whitmill a copy of the exhibit book that previously has been

25  provided to Mr. Whitmill's counsel and to the Court.

```
 1                   THE COURT:  You may.  I assume you're going to be
 2    asking him about it.
 3                   MR. SPERLING:  I'm sorry, Your Honor?
 4                   THE COURT:  You're going to be asking him about
 5    those exhibits?
 6                   MR. SPERLING:  I am.
 7                   THE COURT:  All right, go ahead.  You may proceed.
 8                   MR. SPERLING:  Thank you.
 9                           CROSS EXAMINATION
10    BY MR. SPERLING:
11    Q.  Mr. Whitmill, I would like to begin by seeing if we can
12    agree on what this case is not about.  Now, one of your primary
13    concerns that led you to filing this lawsuit against Warner
14    Brothers was how you feared you might be portrayed in the film,
15    right?
16    A.  To a degree.  That was part of it.  It was a concern.
17    Q.  And you and your lawyers watched the film ten days ago?
18    A.  Uh-huh, yes.
19    Q.  Yes?
20    A.  Yes.
21    Q.  And you're not portrayed in the film at all, are you?
22    A.  No, no, I'm not.
23    Q.  So that's no longer one of your concerns, is it?
24    A.  My career is portrayed in there, or my job choice, but no,
25    it's not specifically me.
```

1    Q.  So your concern as you sit here today is generally how

2    tattooists are portrayed?

3    A.  That's not my largest concern.

4    Q.  But that's one of your concerns?

5    A.  That's one of them.

6    Q.  Now, let's turn to what this case is about.  You're

7    asserting a claim for copyright infringement, correct?

8    A.  Correct.

9    Q.  Your position is the rights of copyright owners should be

10   strictly enforced and respected, correct?

11   A.  Could you repeat that please?

12   Q.  Sure.  It's your position that copyrights should be

13   strictly enforced and protected, isn't it?

14   A.  I would imagine so, yes.

15   Q.  You claim that Warner Brothers has infringed a copyright of

16   yours, correct?

17   A.  Yes, I have.

18   Q.  You have testified on direct examination that you have a

19   website, right?

20   A.  Yes, I do.

21   Q.  And you use that website to publicize and promote your

22   services, don't you?

23   A.  Yes, I do.

24   Q.  So I want to show you what's been marked as Warner Brothers

25   Exhibit A.  This is from your website, correct?

1   A.  Yes, it is.

2   Q.  This is a painting that you did of the Joker as played by

3   Heath Ledger in the movie "The Dark Knight?"

4   A.  Yes, it is.

5   Q.  You're aware that Warner Brothers owns the copyright on

6   "The Dark Knight," aren't you?

7   A.  Honestly, at the time I was painting it, I wasn't.  It

8   hadn't crossed my mind.  I was more concerned with picking an

9   image that would appeal to enough people that it would pull in

10  some good contributions for the Toys for Tots.

11  Q.  My question for you sir, are you aware now?

12  A.  I'm aware now.

13  Q.  You didn't bother to check with Warner Brothers, did you?

14  A.  No, I didn't.

15  Q.  You did not bother to check with anyone?

16  A.  Yeah, I did not.

17  Q.  And by the way, you talked about community support.  Your

18  website isn't for community support, it's for your own

19  commercial benefit, right?

20  A.  The website, yeah, you could say that.

21  Q.  Now you've testified on direct about the importance to you

22  of controlling the use of your design, correct?

23  A.  Say it again, please.

24  Q.  You testified on direct examination that it's important to

25  you to control the use of the design you did on Mr. Tyson's

1   face, correct?

2   A.  Yes.

3   Q.  That isn't really what this case is about, is it, Mr.

4   Whitmill?

5   A.  I believe so.

6   Q.  Isn't your real goal to extract tens of millions of dollars

7   from Warner Brothers?

8           MR. KAHN:  Your Honor, I would object to this.  This

9   is a hearing in a preliminary injunction.

10          THE COURT:  Overruled.  You can answer.

11          THE WITNESS:  I can answer that?

12          THE COURT:  Yes.

13  A.  No, no, it's not.  Can I say what I think it is?

14  Q.  Well, Mr. Whitmill, are you aware that your counsel has

15  demanded $30 million to settle your claim?

16          MR. KAHN:  Your Honor --

17          THE COURT:  What's it relevant to?

18          MR. SPERLING:  The claim for injunction that's being

19  presented on the basis that the concern Mr. Whitmill has is the

20  control of the use of his design.  That's not at all what Mr.

21  Whitmill is seeking.

22          THE COURT:  I'm going to sustain the objection.

23  Settlement negotiations are not admissible in this or any other

24  proceeding, and I thought you were asking him a different

25  question earlier.

1          MR. SPERLING:  I'll rephrase it, Your Honor.

2          THE COURT:  I don't know that you can rephrase it.

3     I've sustained the objection.

4          MR. SPERLING:  Let me try a different question, if I

5     may.

6          THE COURT:  Okay.

7     Q.  (By Mr. Sperling) What's the amount for which you would

8     give up your claim, Mr. Whitmill?

9          MR. KAHN:  Are we having settlement negotiations?  I

10    object.

11         THE COURT:  I'm going to sustain it.  Don't answer.

12    I've sustained the objection.

13    Q.  (By Mr. Sperling) So I want to ask you some questions about

14    Mike Tyson.  You agree that Mike Tyson is a celebrity, correct?

15    A.  Yes, he is.

16    Q.  And you knew that when you did your tattoo work for him,

17    didn't you?

18    A.  Yes, I did.

19    Q.  You knew he was the heavyweight champion of the world?

20    A.  I'm aware of that.

21    Q.  You knew he appeared in movies?

22    A.  Yes.

23    Q.  He has appeared on television, you knew that?

24    A.  Yes, I have.

25    Q.  In short, you agree he's famous, right?

1   A.  I know he is.

2   Q.  You were pleased that Mr. Tyson came to you for a tattoo,

3   weren't you?

4   A.  I'm sorry?

5   Q.  You were pleased that Mr. Tyson came to you for a tattoo,

6   weren't you?

7   A.  I don't know if I would put it that way.

8   Q.  Well, you testified earlier today, you agreed to bump a

9   customer who had a prior appointment so Mr. Tyson could come

10  right in that day, didn't you?

11  A.  I had left that up to my client.

12  Q.  You took photographs of the tattoo you created on Mr.

13  Tyson's face, right?

14  A.  Yes, I did.

15  Q.  And you had photographs taken of yourself with Mr. Tyson,

16  correct?

17  A.  Yes, I did.

18  Q.  In fact, you had photographs taken of you applying the

19  tattoo to Mr. Tyson's face?

20  A.  Yes.

21  Q.  Do you do that with all your customers?

22  A.  No, I don't.

23  Q.  And you've testified you knew Mr. Tyson was in the first

24  "Hangover" movie, correct?

25  A.  Yes.

1   Q.  He appeared in the movie with the tattoo that you placed on

2   his face?

3   A.  Yes.

4   Q.  You never told Mr. Tyson that you objected to his

5   appearance in the movie, right?

6   A.  I don't object to his appearance anywhere.

7   Q.  You didn't object to his appearance in the Rocky Balboa

8   movie either, right?

9   A.  I didn't see that movie.

10  Q.  Have you seen the documentary about Mr. Tyson called

11  "Tyson?"

12  A.  Yes, I have.

13  Q.  You didn't object to that, did you?

14  A.  No.

15  Q.  You never objected to Mr. Tyson appearing on television

16  shows?

17  A.  No.

18  Q.  You haven't objected to any of the thousands of photographs

19  of Mr. Tyson that have been published on the internet since you

20  created that tattoo on his face, have you?

21  A.  No.

22  Q.  You never told Mr. Tyson he needed your permission before

23  appearing in a movie or a television show, correct?

24  A.  No.

25  Q.  So I would like you to look at what's been marked as Warner

 1   Brothers Exhibit 2 -- excuse me, Exhibit D.  You never objected

 2   to the sale of this action figure, did you?

 3   A.  I haven't seen this action figure, and no, I do not object

 4   to that.

 5   Q.  I would like you to look at what's been marked as Warner

 6   Brothers Exhibit C.  This is the tattoo design on someone

 7   else's face, correct?

 8   A.  Yes, it is.

 9   Q.  You've never objected to that, have you?

10   A.  I've never seen this before.

11   Q.  I'd like you to look at what's been marked as Warner

12   Brothers Exhibit D.  You never objected to the use of Mr.

13   Tyson's tattoo by this online game site, did you?

14   A.  I've never seen that either.

15   Q.  And you've never objected to it?

16   A.  What?

17   Q.  Correct?

18   A.  I don't have an objection to that, no.

19   Q.  I'd like you to look at what's been marked as Warner

20   Brothers Exhibit E.  This is a screen shot of the Mike Tyson

21   Main Event iPhone game from the Rock Live website.  Do you see

22   that?

23   A.  Yes, I do.

24   Q.  You never objected to the use of Mr. Tyson's tattoo on the

25   iPhone game on this website?

1   A.  No.

2   Q.  You've never objected to the Rock Live website that

3   promotes this game, have you?

4   A.  No, I haven't.

5           MR. SPERLING:  Your Honor, I would like to show as

6   Warner Brothers Exhibit F a You Tube video which is of an

7   interactive launch event for a Mike Tyson Main Event game.

8           THE COURT:  Any objection?

9           MR. KAHN:  Your Honor, I object to the lack of

10  foundation.  I don't know what this is.

11          THE COURT:  Overruled.  Have you told him -- have

12  you shown it to Mr. Kahn or given him the site?

13          MR. SPERLING:  We have, Your Honor.  It's on the

14  screen then.

15          (Exhibit F played for the Court.)

16  Q.  (By Mr. Sperling) Mr. Whitmill, you never objected to the

17  use of the tattoo on Mr. Tyson's face at this event, did you?

18  A.  On his face, I don't object to the tattoo on his face at

19  all.

20  Q.  And you've never objected to the use on the faces of the

21  other people, have you?

22  A.  I've never seen that before.

23  Q.  Have you done anything to monitor and police the use of the

24  tattoo?

25  A.  I don't monitor and police.  That's not my job.

 1   Q.  In fact, you didn't register the tattoo until last month,

 2   did you?

 3   A.  Well, I did it after I got with my attorney, and that's

 4   what we decided to do.

 5   Q.  So the answer to my question is, "Yes, I didn't register it

 6   until last month," right?

 7   A.  Yes, I didn't register it until last month.

 8   Q.  And that's more than eight years after you claim you

 9   created it, right?

10   A.  That's correct.

11   Q.  So now you're aware that Mr. Tyson has filed an application

12   to register his tattoo as a trademark, right?

13   A.  I have seen that application, yes.

14   Q.  So I want to show you what's been marked as Warner Brothers

15   Exhibit G, if you can turn to that.  This is Mr. Tyson's

16   trademark registration.  You understand that Mr. Tyson intends

17   to use the trademark on a wide variety of products, correct?

18   A.  Well, I don't claim to know or understand what this is all

19   about.

20   Q.  So even --

21            THE COURT:  Are you asking him -- are you asking him

22   about something on this trademark registration?

23            MR. SPERLING:  I'm asking him if he understands the

24   scope of the uses of the trademark, yes.

25            THE COURT:  Do you understand?

1          THE WITNESS:  No, I don't understand the scope.

2     This is not my area of expertise.

3     Q.  (By Mr. Sperling) Do you understand that the trademark

4     registration would allow Mr. Tyson to use the tattoos of your

5     design completely separate from Mr. Tyson's face?

6     A.  Like I said, I don't know what this is right here.  I'm

7     aware that there was an application, but I don't know what this

8     is right here.  I'm assuming that's what it is.  I don't

9     understand all this.

10    Q.  So I'm specifically asking you without you having to review

11    the trademark registration application whether you understand

12    it would I allow Mr. Tyson to use the tattoo design completely

13    separate from Mr. Tyson's face.

14    A.  I understand what you're saying, yes.

15    Q.  And you've agreed not to oppose Mr. Tyson's trademark

16    registration application, correct?

17    A.  I don't know if I've agreed to not oppose that.  I think

18    that would be best left to the a conversation between me and

19    Mike Tyson.

20    Q.  Well, you know that Geoff Gerber as one of your lawyers

21    told one of Mr. Tyson's lawyers that you would not oppose Mr.

22    Tyson's trademark registration application, don't you?

23    A.  I said in the early stages of all this that I don't have a

24    problem with Mike, that I'm not fighting Mike in this is what I

25    said.  I haven't seen Mike do anything I find out of line.

1   Q.  Okay, I'm not sure that you've answered my question.

2   A.  I'm not sure if I have either.

3   Q.  I'll make sure that you understand it.  Let's take it step

4   by step.  First of all, Mr. Gerber is one of your attorneys,

5   right?

6   A.  Yes.

7   Q.  And he's authorized to represent you?

8   A.  Yes.

9   Q.  And do you know that he told one of Mike Tyson's lawyers

10  that you would not oppose Mr. Tyson's trademark registration

11  application?  I'm asking if you know that.

12  A.  I don't know that specifically.  I know that I asked all my

13  attorneys to make it clear.

14          MR. KAHN:  Your Honor, I would like to object.  I

15  don't know where Mr. Sperling is going, but this is privileged.

16          THE COURT:  It is.  I'm going to sustain the

17  objection.

18          THE WITNESS:  If you're asking me if I know

19  word-for-word what was said, no, I don't.

20  Q.  (By Mr. Sperling) As you sit here today, do you dispute or

21  intend to oppose Mr. Tyson's trademark application

22  registration?

23          MR. KAHN:  He's already asked and answered this.  He

24  doesn't know what it is.

25          THE COURT:  Sustained.

1   Q.  (By Mr. Sperling) You don't have any quarrel as you sit

2   here today with Mr. Tyson, correct?

3   A.  I do not have any quarrel with Mr. Tyson.

4   Q.  You don't object to him using the tattoo for commercial

5   purposes on his face, correct?

6   A.  I don't object to him showing up anywhere with his own

7   likeness and his own tattoo on his face.  I don't object to him

8   promoting himself where he's showing himself out, where the

9   tattoo shows up.  I don't have a problem with that.

10  Q.  And have you authorized your attorneys to speak with Mr.

11  Tyson's attorneys about his trademark registration application?

12          MR. KAHN:  I'll object.  Calls for privilege.

13          THE COURT:  Sustained.

14          MR. SPERLING:  Your Honor, if there is going to be

15  an attempt to walk away from statements made by counsel, I

16  think we're entitled to know the scope of the authorization.

17          THE COURT:  And I don't know if there is going to be

18  an attempt to walk away from statements made by counsel, but

19  maybe you can ask them about that if you get a chance.  This

20  witness has not waived his attorney/client privilege, it's been

21  asserted, and I'm sustaining the objection.

22          MR. SPERLING:  Okay, Your Honor.

23  Q.  (By Mr. Sperling) So now at some point you learned that

24  Warner Brothers was releasing a sequel to "The Hangover,"

25  correct?

 1   A.  That's correct.

 2   Q.  You've testified at some point that the character Stu Price

 3   gets a facial tattoo that's similar to Mr. Tyson's tattoo,

 4   correct?

 5   A.  Yes.

 6   Q.  And when you learned that, you didn't send a letter to

 7   Warner Brothers warning Warner Brothers that you thought the

 8   movie infringed your copyright, did you?

 9   A.  No, I did not.

10   Q.  You didn't call Warner Brothers?

11   A.  No.

12   Q.  You hired some lawyers.

13   A.  Yes, I did.

14   Q.  Your lawyers didn't send a letter to Warner Brothers, did

15   they?

16   A.  No, they didn't, apparently.  I guess not.

17   Q.  They didn't call Warner Brothers?

18         MR. KAHN:  We will stipulate, we did not send a

19   letter to Warner Brothers, we did not call Warner Brothers, and

20   my concern is Mr. Sperling keeps going back into what he's

21   going to hedge into attorney/client privileged communications.

22   We will testify we did not call Mr. Sperling's client, we

23   didn't send them a letter.

24         THE COURT:  I'm going to sustain any further

25   questions on that as to what the lawyers did.

 1              MR. SPERLING:  We can stipulate that Mr. Whitmill's

 2    lawyer didn't do anything to warn Warner Brothers that they

 3    thought there was a copyright infringement, is that correct,

 4    counsel?

 5              MR. KAHN:  Other than filing a lawsuit, Mr.

 6    Sperling.

 7              THE COURT:  They filed a lawsuit.

 8              MR. KAHN:  I think that's a warning.  Would you

 9    agree?

10              THE COURT:  Counsel, address the bench.

11              MR. KAHN:  I'm sorry, Your Honor.

12    Q.  (By Mr. Sperling) You knew that "The Hangover Part II" was

13    scheduled to open on May 26th, correct?

14    A.  I became aware of that, yeah.

15    Q.  It's prominently noted in the promotional materials you've

16    seen, isn't it?

17    A.  I wasn't really paying that much attention to the release

18    date, I was paying attention to other things.

19    Q.  You knew Warner Brothers was advertising the movie, right?

20    A.  I'm sorry, say again.

21    Q.  You knew that Warner Brothers was advertising the movie,

22    right?

23    A.  Yes.

24    Q.  You knew the tattoo on Stu Price's face was shown in the

25    advertising, right?

1   A.  Yes.

2   Q.  You didn't do anything to stop the advertising?

3   A.  I'm sorry, did I do something to stop it?

4   Q.  I'm asking, did you do anything to stop the advertising?

5   A.  I didn't.  I have no idea what my rights are on that.  I

6   saw that happening.  That just didn't seem right.  I contacted

7   an attorney to get some advice.

8              MR. KAHN:  Your Honor, we would --

9              THE COURT:  He filed a lawsuit, so I guess the

10   answer to that question is yes, I filed a lawsuit, we know

11   that.

12              MR. SPERLING:  There are some things before the

13   lawsuit I would like to address.

14   Q.  (By Mr. Sperling) On April 18th you filed a copyright

15   registration, correct?

16   A.  Yes.

17   Q.  That was before the lawsuit.

18   A.  I'm not sure.  I don't remember what date it was.

19   Q.  Well, the lawsuit was filed on April 29th, and you filed

20   the copyright registration on April 18th.

21              THE COURT:  The lawsuit was filed on April 28th.  If

22   you expect this witness to remember the dates, you should

23   remember them.

24              MR. SPERLING:  I'm sorry, Your Honor.  I received it

25   on April 29th.

1    Q.  (By Mr. Sperling) Do you remember prior to filing the

2    lawsuit a copyright registration was filed?

3    A.  Yes.

4    Q.  And the application, I would like you to look at it, it's

5    marked as Warner Brothers Exhibit H.  This is your copyright

6    application, correct?

7    A.  If you say so.  This looks different.  No, wait.  Okay, I

8    was looking at a different page.

9    Q.  My question, is this your copyright registration

10   application?

11   A.  Yes.

12   Q.  The application states that the work being registered is

13   artwork on 3D object, right?

14   A.  Yes.

15   Q.  The 3D object is Mr. Tyson's head?

16   A.  That's correct.

17   Q.  And what you submitted to the Copyright Office is the copy

18   of the work being registered as a photo of Mr. Tyson, correct?

19   A.  The photo here on the next page?

20   Q.  Yes.

21   A.  I suppose that's showing the photograph of the original

22   piece.

23   Q.  That's a photograph of the design on Mr. Tyson's face.

24   A.  Yes, it is.

25   Q.  Now Mr. Whitmill, Warner Brothers estimates that the loss

1    it would incur if the scheduled May 26th release of the film

2    were enjoined would exceed XXX XXXXXXX.  You don't have the

3    assets that would be necessary to post a bond to protect Warner

4    Brothers in the event that an injunction was improvidently

5    granted, do you?

6            MR. KAHN:  Let me object unless Mr. Sperling is

7    stating that the bond would be XXXX XXXXXXX, we do not agree to

8    that.  We will stipulate Mr. Whitmill does not have XXXX

9    XXXXXXX in assets.

10   Q.  (By Mr. Sperling) I have one more question for you, Mr.

11   Whitmill.  If the bond that's posted turns out to be inadequate

12   to compensate Warner Brothers for losses it suffers if an

13   injunction were improvidently granted, you wouldn't have

14   sufficient assets to compensate Warner Brothers for those

15   losses, would you?

16   A.  Probably not, no.

17           MR. SPERLING:  Thank you.

18           THE COURT:  Redirect?

19           MR. KAHN:  Just briefly, Your Honor.

20                   REDIRECT EXAMINATION

21   BY MR. KAHN:

22   Q.  Mr. Sperling showed you Exhibit A, which is the Heath

23   Ledger skateboard you did.

24   A.  Yes.

25   Q.  This is, just so we're clear, this is the same one you did

```
 1   for the Toys for Tots Marine Corps fund raiser, correct?

 2   A.  Yes, it is.

 3   Q.  And you received no compensation for that skateboard,

 4   correct?

 5   A.  No, no, I did not.

 6   Q.  And have you ever sold a copy of that artwork on a

 7   skateboard or otherwise to anyone else?

 8   A.  No, I have not.

 9   Q.  Mr. Sperling took you through a bunch of exhibits that had

10   photographs showing the tattoo generally on Mr. Tyson's face,

11   or on an action figure of Mr. Tyson, or on a video game of Mr.

12   Tyson, and he asked you whether you had any objection to that,

13   and you also stated no, correct?

14   A.  No, I have no objections.

15   Q.  And just to help him understand and the Court understand,

16   why do you not have an objection to objects that capture Mr.

17   Tyson's identity that have that tattoo on them?

18   A.  Because that's his identity.  You know, I'm looking at the

19   action figure here, since 2003, that's what Mike Tyson looks

20   like now.  I have no objection to that whatsoever.  The

21   promotional video for the video game looked like a cartoon

22   character of Mike Tyson.  There is him, his likeness in cartoon

23   form.  The face painting was going on in there, that looks like

24   fans.  They look like fans showing their support for Mike, or

25   the game, or however you want to look at it.  I don't really
```

1  have an objection with that.

2          MR. KAHN:  I have no further questions, Your Honor.

3          THE COURT:  You may step down.  You wish to

4  redirect?

5          MR. SPERLING:  I would, Your Honor.

6          THE COURT:  Okay.  I don't normally allow redirect,

7  as I'm sure you know.  Go ahead.  There is no jury here, so I

8  will allow it.  Then I'll have to allow recross as well, and

9  we'll be here all day.  Go ahead.

10          MR. SPERLING:  That's fine, Your Honor.  You can

11  proceed.

12          THE COURT:  You may step down.  Do you have any

13  further witnesses, Mr. Kahn?

14          MR. KAHN:  Your Honor, I have no further witnesses.

15          THE COURT:  I assume you wish me to receive in

16  evidence the exhibits you've used here today?

17          MR. KAHN:  I do, Your Honor.  We would move for

18  that.

19          THE COURT:  Any objection to any of those exhibits?

20          MR. SPERLING:  No objection.

21          THE COURT:  The exhibits are received in evidence.

22  Do you want me to receive just the ones you've actually used?

23  I think there were some more that you gave me.

24          MR. KAHN:  It would be just the ones that we had Mr.

25  Whitmill identify.

1            THE COURT:  That's fine.

2            MR. SPERLING:  We would move the admission of

3    exhibits that we presented to Mr. Whitmill.

4            THE COURT:  So the exhibits that were used by the

5    defendant and the exhibits that were used by the plaintiff in

6    Mr. Whitmill's testimony are received into evidence.

7            MR. KAHN:  Your Honor, I would like to state for the

8    record that I think it's unfair the way Mr. Sperling has spent

9    a week trying to get us to make a settlement offer, and we

10   eventually gave him based on existing copyright cases a

11   calculation of the range of his client's exposure, and we

12   assured him we would go ahead on the preliminary injunction.  I

13   didn't realize until this moment why he said, "Give me an

14   offer," and I said, "Look at our numbers," and apparently it

15   was an opportunity to be able to state it in open court.  My

16   client is here seeking a preliminary injunction, Your Honor,

17   and that's his primary goal.

18           THE COURT:  Are you asking me to do anything, Mr.

19   Kahn?

20           MR. KAHN:  I wanted to state it for the record.

21           THE COURT:  Okay.  Are you ready to proceed with

22   your evidence?

23           MR. SPERLING:  I'm ready to proceed.  I would like

24   to ask the Court before we present our witness that I believe

25   the Court should at this point deny the Motion For a

1   Preliminary Injunction.  I'll be very brief.

2        The plaintiff has failed to meet the heavy burden that

3   the Supreme Court has made clear he has to satisfy for the

4   extraordinary remedy of a preliminary injunction.  There are at

5   least serious questions about whether the plaintiff will

6   prevail on his claim, including whether the tattoo that he has

7   created is copyrightable in the first instance, whether the use

8   is a parody that's protected as fair use, whether the use is

9   within the scope of Mr. Tyson's implied license, and whether he

10  is estopped by his inaction, but completely apart from those

11  issues, Your Honor, fundamentally he has failed to show that he

12  would show irreparable harm because he can be compensated with

13  money damages if he were to prevail.

14       The response in the brief this morning really takes

15  three points.  One is a group defamation theory because he's a

16  tattooist and tattooists are generally portrayed unfavorably,

17  that's a reason for injunction.  That's not.  There are no

18  claims for group defamation, and even in claims for individual

19  defamation, a prior restraint on speech is not the proper

20  remedy.  An action for money damages is.

21       There is also speculation that he is linked now in a way

22  that he wasn't before to the Mike Tyson design, but in fact he

23  has admitted he's not portrayed in the film.  There is no

24  mention of him in the film.  The example that when you Google

25  him now, he comes up in connection with Mike Tyson and the

 1    tattoo is clear as soon as you look at Google, it's due to the

 2    lawsuit he filed.

 3         There is no association with him in the design in the

 4    film.  The tattooist is in Bangkok, Thailand, and he admits

 5    it's not him.

 6         Finally, what they fall back on without even addressing

 7    the Winter case is that they have lost control, and that's

 8    necessarily irreparable harm, but it's not.  The Supreme Court

 9    has made clear that that's not a basis for showing irreparable

10    harm, and even if there were a presumption to begin with, the

11    presumption can be rebutted.  Here it's quite clear that Warner

12    Brothers Entertainment is an enormous entertainment company

13    fully capable of paying any money damages that he would be

14    awarded if he would ultimately prevail, so based on his

15    inability to show irreparable harm, which is the fundamental

16    lynch pin of obtaining injunctive relief, we would ask that the

17    motion be denied at this time.

18         THE COURT:  Your motion is denied as I told you that

19    it would be when we discussed this in our telephone conference.

20    What I told you when you said unless -- you know, that you had

21    witnesses unless I was going to rule that you didn't have to

22    present witnesses was I told you that I was not going to be

23    able to study this case fully before this hearing.

24         I talked to you all on May the 4th, and you wanted a

25    couple weeks to discuss settlement.  Both of you asked for

1  that.  I gave you a couple weeks to discuss settlement.  Last

2  week, you told me there would be a hearing, and I said fine,

3  and you filed your brief on Friday, and Mr. Kahn filed his this

4  morning, you know, a couple hours before the hearing began.  I

5  watched this movie before this hearing began for a couple hours

6  because you all asked me to do that, and I have looked at your

7  briefs, I've actually read them all, but I cannot say that I

8  have read them in any kind of depth or detail, and if you wish

9  to present witnesses, this is your opportunity.

10            MR. SPERLING:  We're ready to proceed, Your Honor.

11            THE COURT:  Okay, go ahead.  We're going to take a

12  recess at this time, so we'll be in recess for 15 minutes.

13  We'll be back at 3:30.

14                 (A recess was taken.)

15

16                 REPORTER'S CERTIFICATE
         I, TERI HANOLD HOPWOOD, RMR, CRR, Official Court
17  Reporter for the United States District Court for the Eastern
    District of Missouri do hereby certify that the foregoing is a
18  true and correct transcript of the proceedings had in this
    cause as same appears from my stenotype notes made personally
19  during the progress of said proceedings.

20                 /S/ Teri Hanold Hopwood, RMR, CRR
                   TERI HANOLD HOPWOOD, RMR, CRR
21                 Official Court Reporter

22

23

24

25