Volume 1-B -- REDACTED TRANSCRIPT

1

<pre>
 1                UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF MISSOURI
 2                      EASTERN DIVISION

 3

 4   S. VICTOR WHITMILL,           )
                                   )
 5        Plaintiff,               )
                                   )
 6        v.                       )No. 4:11-CV-00752 CDP
                                   )
 7   WARNER BROS.                  )
     ENTERTAINMENT, INC.,          )
 8                                 )
          Defendant.               )
 9

10             PRELIMINARY INJUNCTION HEARING

11        BEFORE THE HONORABLE CATHERINE D. PERRY
                UNITED STATES DISTRICT JUDGE
12
                   **REDACTED TRANSCRIPT**
13
                      MAY 23, 2011
14

15   APPEARANCES:
     For Plaintiff:         Michael A. Kahn, Esq.
16                          Geoffrey G. Gerber, Esq.
                            Peter W. Salsich, III, Esq.
17                          BRICKHOUSE LAW GROUP
                            1006 Olive St., Suite 303
18                          St. Louis, MO  63101-2034

19   For Defendant:         Frederick J. Sperling, Esq.
                            Sondra A. Hemeryck, Esq.
20                          Ann H. MacDonald, Esq.
                            Clay A. Tillack, Esq.
21                          SCHIFF AND HARDIN
                            233 S. Wacker Dr., Suite 6600
22                          Chicago, IL  60606

23   REPORTED BY:           ANGELA K. DALEY, CSR, RMR, FCRR, CRR
                            Official Court Reporter
24                          United States District Court
                            111 South Tenth Street, Third Floor
25                          St. Louis, MO  63102  (314) 244-7978
          PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION
</pre>

Volume 1-B -- REDACTED TRANSCRIPT

2

1                              INDEX

2     WITNESSES:                                    Page

3     DAN FELLMAN                                     3
          Direct Examination By Mr. Sperling         3
4         Cross Examination By Mr. Gerber           10

5     SUE KROLL                                      16
          Direct Examination By Ms. Hemeryck        16
6         Cross Examination By Mr. Gerber           31

7     CHRISTOPHER WHEELER                            46
          Direct Examination By Mr. Sperling        46
8
      MICHELLE SCHULTZ                               53
9         Direct Examination By Mr. Sperling        53
          Cross Examination By Mr. Salsich          55

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Volume 1-B -- REDACTED TRANSCRIPT

3

1  **(PROCEEDINGS STARTED AT 3:30 P.M.)**

2  THE COURT:  You may proceed.

3  MR. SPERLING:  Thank you, Judge.  Warner Bros. calls

4  as its first witness, Mr. Dan Fellman.

5  THE COURT:  All right, sir.  Would you step right up

6  here to the clerk to be sworn.

7  **DAN FELLMAN,**

8  **Having Been First Duly Sworn, Was Examined and Testified As**

9  **Follows:**

10  DIRECT EXAMINATION

11  BY MR. SPERLING:

12  Q    Please state your full name for the record.

13  A    Dan Fellman.

14  Q    By whom are you employed and what is your position?

15  A    I'm the president of domestic distribution for Warner

16  Bros. Pictures.

17  Q    So I'd appreciate it if you'd explain to the Court your

18  job history and your responsibilities.

19  A    I've been president of the division for the last 12

20  years.  I've been an employee for Warner Bros. for 33 years.

21  My primary responsibility is to set the release dates and the

22  release pattern for the motion pictures that we produce

23  annually.

24  Q    So over the course of your 33 years, how many theatrical

25  releases have you been involved in at Warner Bros.?

<u>Volume 1-B -- REDACTED TRANSCRIPT</u>

4

1   A    I have worked on over 700 films for Warner, releasing

2   them at all times of the year and all genres of film.

3   Q    Earlier in your life, did you have experience as a motion

4   picture exhibiter as well?

5   A    Yes, I did.

6   Q    Would you explain that?

7   A    Prior to coming to Warner, I was president of American

8   Theater Management.  I owned theaters and managed theaters as

9   well.

10   Q    For how many years did you do that?

11   A    Approximately ten.

12   Q    Please describe your responsibilities for the original

13   HANGOVER movie and for THE HANGOVER 2?

14   A    I was responsible for setting the distribution date, the

15   release date, and contracting exhibiters across North America

16   to play the movie.

17   Q    So turning to the THE HANGOVER 2, when was the release

18   date announced?

19   A    I actually announced the release date for THE HANGOVER 2

20   on the 30th of July, 2009, approximately two years prior to

21   the opening.

22   Q    Is that unusual?

23   A    It is unusual with the exception of what we call tentpole

24   movies, movies that have such demand built in that you really

25   are sending a signal out to the rest of the industry that we

5

1  are planning the tentpole on that date and we are going to

2  make that date and everyone else should clear out.

3  Q    So what are the dates for the release and distribution of

4  THE HANGOVER 2?

5  A    Well, THE HANGOVER 2 is set to open on Thursday in 3,600

6  theaters across North America representing over 7,200 screens.

7  Q    Now how many tickets have been sold?

8  A    Tickets began selling approximately three weeks ago, and

9  they have been quite brisk.

10  Q    Is the film also going to be released internationally?

11  A    It will be re-released internationally in approximately

12  2,000 theaters and a smaller number of countries fully to be

13  released shortly thereafter.

14  Q    What effect would the entry of an injunction of

15  preventing the May 26th release date have?

16  A    Well, it would be devastating for the movie, for our

17  exhibiter partners, for our financial partners as well.

18  Q    Let's start by looking at the performance of the original

19  HANGOVER film.  How did that film perform at the box office?

20  A    The original HANGOVER was the largest grossing R-rated

21  comedy in the history of the motion picture business.  It

22  grossed $277 million domestically and $192 million

23  internationally.

24  Q    So how do expectations for HANGOVER 2 compare to the

25  performance of the THE HANGOVER?

1   A    I expect HANGOVER 2 to more than double the opening

2   weekend of the original HANGOVER.  The original HANGOVER

3   grossed $45 million in its opening weekend.  I expect HANGOVER

4   2 to gross over $100 million in its opening weekend.

5   Q    What do you base those estimates on?

6   A    Well, the original HANGOVER was basically directed

7   towards a demo of young males and young females over the age

8   of 17.  The movie had such success and broadened the scope of

9   its audience from probably 15 to 80.  After that release, the

10  DVD was so successful, we sold over 18 million copies.  It was

11  also played multiple times on cable television as well.  So

12  the pent-up demand to see the second one is much wider than

13  the first one.

14  Q    Has any surveying or tracking been done of the expected

15  performance?

16  A    Yes, we do tracking and surveying on all of our movies,

17  and it indicates that this movie will open to the level that I

18  expect or maybe even more.  It's tracking on a similar level

19  of movies like Twilight, the Dark Knight, Shrek, movies of

20  that nature, big, big name movies.

21  Q    Why was THE HANGOVER 2 scheduled for release on May 26th?

22  A    I picked May because May is really the beginning of the

23  summer.  It is a great time to launch your film.

24  Approximately 75 percent of colleges are closed along with

25  high schools.  This gives me the opportunity to be one of the

1  first major films in the summertime to secure a large number

2  of prints before all the big summer movies open, and you have

3  to remember that every day in the summer, midweek Monday

4  through Thursday, is like a Saturday night for me.

5  Q    Now if the film were prevented from opening on May 26th,

6  what would be the first date that Warner Bros. could

7  realistically plan to release it?

8  A    It would be many, many months before I could actually

9  come up with a date.

10  Q    Why is that?

11  A    Well, there are a number of reasons.  Primarily, we have

12  films of our own that have been contracted to play in the

13  summertime, and there are many movies that have been

14  contracted by exhibiters from other companies to play during

15  the next few months.  So for us to get in on a large scale

16  basis would take a lot of work and a lot of manipulating on

17  our part.  It would be very, very difficult to do.  The other

18  thing that concerns me about moving it back is if you take a

19  look at the top 25 grossing films in the motion picture

20  history, you will find that almost half of them opened up in

21  the May period.  There is not one that opened up in August or

22  the fall.

23  Q    Now turning from the impact on Warner Bros. to the impact

24  on the theaters that would exhibit the film, what impact would

25  there be on theaters if they weren't able to begin showing the

1  film on May 26th?

2  A    Well, in my estimation, I would think that the theaters

3  involved would lose approximately xxx xxxxxxx in revenue and

4  another xx xxxxxxx in concession sales.

5  Q    Let's look at St. Louis in particular.  Do you know how

6  many screens have contracted to show the movie?

7  A    In the Greater St. Louis area, we will open in 75

8  screens.

9  Q    Now why couldn't these theaters simply replace HANGOVER 2

10 with another film?

11 A    HANGOVER is such a major movie when it was announced two

12 years ago that most of our competitors ran for the hills.

13 They just didn't put an important movie in that date in

14 competition to us.  The only film that is available on the

15 26th of May is Kung Fu Panda, quite a different film and

16 certainly counter programming to the HANGOVER.  I don't know

17 if Your Honor knows it's a G-rated movie as opposed to the

18 R-rated movie that we have, and it would be impossible for

19 those 7,000 theaters to replace a missing film like HANGOVER

20 considering the fact that Kung Fu Panda is already booked and

21 will be opening this Thursday.

22 Q    Now if the film can't be shown in these theaters, what

23 impact would it have on theater profitability?

24 A    Well, theaters operate at a very thin margin.  They have

25 52 weeks a year to generate their profit.  By losing a

tentpole film in one of the most important holidays, Memorial Day Weekend, that can't be reproduced. They would just take a loss, and it would certainly affect their bottom line year end.

Q Now apart from the direct impact on Warner Bros., if the theaters aren't able to show the movie as scheduled, would there be any adverse consequences to Warner Bros. as a result of the impact on these theaters?

A Well, I think most definitely. I think we'd be held responsible for our exhibitors, concerned that they had licensed the movie in good faith from us and we didn't deliver. So I think we'd be in -- certainly they would be looking to us to get whole for the loss of revenue.

Q What would be the effect of delaying the release of the film?

A The effect would be devastating. I can't imagine being able to account for all the dollars that would be lost. My biggest concern would be that of piracy.

Q So let's talk about that. Why are you concerned about piracy?

A Well, I have already shipped over 7,000 prints just in North America, and currently they are sitting on the floor of the projection booths in theaters waiting for the midnight shows this Wednesday, the day after tomorrow. If we were enjoined, I would have to -- I would have to have all those

Volume 1-B -- REDACTED TRANSCRIPT

10

1  prints picked up and shipped back to the studio for security

2  purposes.  It's a virtual certainty that more than one of

3  those prints would be delayed along the way.  Some truck

4  driver would stop or something would happen and we'd be

5  pirated.  The results would be devastating.  We would lose

6  hundreds of millions of dollars.

7           MR. SPERLING:  Thank you.  No further questions.

8           THE COURT:  Cross examination, Mr. Gerber?

9           MR. GERBER:  Thank you, Judge.

10                        CROSS EXAMINATION

11 BY MR. GERBER:

12 Q    Mr. Fellman, I might have misheard you.  Did you say that

13 the only other movie this coming weekend is Kung Fu Panda?

14 A    The movie that will be opening is Kung Fu Panda.

15 Q    But there are other movies that people can go see?

16 A    There are other movies, yes.

17 Q    I haven't had a chance to see Thor yet.  I could go with

18 my family to see Thor this weekend?

19 A    You could.

20 Q    So if -- are you telling us that if THE HANGOVER 2

21 doesn't open this weekend, people won't go to the movies?

22 A    No, I'm not saying that, but your question regarding

23 Thor, Thor has already been licensed to theaters, so these are

24 theaters that will have nothing to play, and Thor has been

25 licensed so they can't buy Thor.

11

1   Q    But there might be some empty seats that they could fill

2   in those showings?

3   A    Not with Thor.

4   Q    All of the --

5   A    They'd be filling maybe the screen with Thor, but they'd

6   have four or five screens in each multiplex that have been

7   committed to play THE HANGOVER 2 that they have nothing to

8   play, so they would have to scramble and fill them in with

9   whatever they could, but nothing could replace the amount of

10  revenue that we would generate by opening THE HANGOVER 2.

11  Q    And you talked about the movie theaters having sold

12  advanced tickets; correct?

13  A    Correct.

14  Q    And you said that they've been selling advanced tickets

15  for about three weeks?

16  A    Most of them have.

17  Q    And that's for about as long as this lawsuit's been

18  pending; correct?

19  A    That's correct.

20  Q    So were they selling advanced tickets before you were

21  served with the complaint in this case on April 29th?

22  A    I don't control when they begin selling tickets.  That is

23  not my business.  That is the business of each theater.  And

24  so some of them sold tickets three weeks, some of them sold

25  tickets two weeks from opening.

Volume 1-B -- REDACTED TRANSCRIPT

12

1    Q    But you didn't call any of them up or send notice to them

2    and say be careful about selling advanced tickets in case

3    we're found -- or we're enjoined from getting this to you?

4    A    No, sir.  My job is to generate the most revenue I can

5    from my films, and so it didn't occur to me to interfere with

6    that process.

7    Q    And you're very successful at that job it seems to me,

8    aren't you?

9    A    I hope so.

10   Q    Mr. Sperling mentioned that you guys are an enormous

11   company.  Is that how you would characterize Warner Bros.?

12   A    We are a large company.

13   Q    And you grossed nearly $2 billion domestically last year?

14   A    Correct.

15   Q    And, in fact, that was only a slight diminishment from

16   the $2.13 billion you guys grossed domestically in the

17   previous year?

18   A    Those are domestic numbers, correct.

19   Q    Right.  You grossed much more -- or you grossed another

20   additional amount from international sales and distribution?

21   A    Correct.

22   Q    So the gross revenues for Warner Bros. over the last

23   several years have been substantially larger than $1 billion a

24   year, $2 billion a year?

25   A    Correct.

13

1   Q    In fact, for ten consecutive years, haven't you grossed

2   over $1 billion a year just domestically?

3   A    Absolutely.

4   Q    In addition to your tentpole films, you release a number

5   of other films every year, don't you?

6   A    We do.

7   Q    And last year, six of your films opened in the number one

8   position, didn't they?

9   A    That is correct.

10  Q    You talked about the concern for piracy of your film.

11  A    I did.

12  Q    And Mr. Sperling has characterized the pre-release copies

13  of THE HANGOVER 2, he has likened it to the nuclear launch

14  codes.  Would you compare it to that?

15  A    I was not here when he made that statement.  I don't know

16  what context that was given in.

17  Q    But the pre-release copies of this movie, you guard very

18  carefully?

19  A    Absolutely.

20  Q    Piracy is a major concern?

21  A    Definitely.

22  Q    You are incredibly concerned about controlling how and

23  when you release your copyrighted material, don't you?

24  A    I do.

25  Q    When did you ship the copies of the pre-release movie to

14

1    the theaters?

2    A    We try to ship them as close to the release date as

3    possible depending upon the location of the theaters, and we

4    have depots in different parts of the country, but generally

5    we make sure the prints are there at least two days prior to

6    the opening.

7    Q    So for 80 theaters, that would be today?

8    A    Absolutely.

9    Q    And for 3,000 some odd theaters, that would be tomorrow?

10   A    No.  All those prints we ship in bulk, so they went out

11   already.

12   Q    When did they go out?

13   A    They started shipping actually last weekend.

14   Q    Last weekend?

15   A    This past Friday.

16   Q    May 20th?

17   A    Yes.

18   Q    The day that you filed your answer in this case?

19   A    I don't know when we filed our answer.

20   Q    So but all of those copies that you shipped out were

21   shipped out approximately three weeks after you were served

22   with the complaint in this case?

23   A    I don't know the dates of the complaints.  That is not my

24   responsibility.  My responsibility is to get these movies

25   opened, and that is the normal course of which we ship our

15

1  prints.

2  Q    And when did you become aware of this lawsuit?

3  A    Not until a few weeks ago.

4  Q    But you were aware of this lawsuit a few weeks ago?

5  A    Yes.

6  Q    And you were aware that Mr. Whitmill was seeking a

7  preliminary injunction to stop the release of this film?

8  A    Yes.

9  Q    And you went ahead and shipped all those copies?

10 A    My job is to open these movies, and if I did not move

11 forward, I would not have prints waiting to open on Thursday,

12 so I had to do what was my responsibility, and that is to move

13 forward and get those prints out in the theater.

14 Q    And Warner Bros. is an enormous company, and it needs to

15 open its tentpole movies when it wants to open its tentpole

16 movies?

17 A    Every company opens their tentpole movies when they like

18 to open them, yes.

19 Q    In fact, the point of announcing the tentpole release two

20 years ago was to get some room and say this is our big

21 release, everybody step back, we're going to take this

22 weekend?

23 A    That is the concept of it, yes.

24 Q    If you are enjoined from releasing this movie, do you

25 know if any of your insurance policies would cover damages?

<u>Volume 1-B -- REDACTED TRANSCRIPT</u>

16

1   A    No, I'm not aware of that.

2          MR. GERBER:  I have no further questions.

3          THE COURT:  Any redirect?

4          MR. SPERLING:  No, Your Honor.

5          THE COURT:  You may step down.  You may call your

6   next witness.

7          MS. HEMERYCK:  The next witness Warner Bros. would

8   call is Sue Kroll.

9          THE COURT:  Ms. Kroll, step up to the clerk to be

10  sworn.

11                      **SUE KROLL,**

12  **Having Been First Duly Sworn, Was Examined and Testified As**

13  **Follows:**

14                  <u>DIRECT EXAMINATION</u>

15  BY MS. HEMERYCK:

16  Q    Ms. Kroll, could you please state your full name for the

17  record.

18  A    It's Sue Kroll.

19  Q    And could you tell us who do you work for and what do you

20  do?

21  A    I work for Warner Bros. Pictures, and I'm president of

22  worldwide marketing.

23  Q    And how long have you been in that position?

24  A    I've been in my current position for a little under 14

25  years, and prior to that, I was the head of international

17

1   marketing for about eight years.

2   Q    And how long have you been employed by Warner Bros. or

3   Warner Bros. affiliates?

4   A    Since 1994.

5   Q    Now let me ask you to keep your voice up just a little so

6   I can hear.  You are currently the president of Worldwide

7   Marketing.  Can you tell us what that job entails?

8   A    Yes.  Essentially, I figure out the strategy, selling

9   strategy, for all of our theatrical releases and then work to

10  develop the campaigns to support it.  That would include all

11  the artwork, promotional campaigns, publicity, doing research

12  and design.  Everything related to the release of our films.

13  Q    And you said you've been with Warner Bros. since 1994.

14  During that time, how many theatrical motion pictures have you

15  been involved in marketing?

16  A    Hundreds.

17  Q    Now are you currently involved in marketing THE HANGOVER

18  2?

19  A    Yes, I am.

20  Q    When is that scheduled to open?

21  A    Thursday.

22  Q    And what is the media budget for THE HANGOVER 2?

23  A    The overall budget is about xxx xxxxxxx.

24  Q    And how much has Warner Bros. spent of that so far?

25  A    As of Friday, we spent xx xxxxxxx of that.

18

1   Q    And what is the current status of the marketing campaign?

2   A    It's essentially done.  It's complete.  The film opens

3   this week.

4   Q    And when did Warner Bros. begin planning the media

5   campaign for THE HANGOVER 2?

6   A    Well, we started planning the overall campaign back a

7   year ago.

8   Q    And what sort of campaign did you plan?  What were the

9   elements of the campaign?

10   A    Well early on, you start thinking about how you're going

11   to advertise the film, how are you going to talk about it,

12   when, where, you know, what kind of date you might have for

13   materials, so that's what we were thinking about.

14   Q    Now when was the first time -- let me back up.  Now,

15   Ms. Kroll, you have obviously seen images of the actor Ed

16   Helms who plays Stu Price in the movie with the tattoo on his

17   face; right?

18   A    Yes.

19   Q    When was the first time an image of Mr. Helms with that

20   tattoo appeared in the media?

21   A    The first appearance was late November.

22   Q    And was that part of Warner Bros.'s campaign?

23   A    That was not part of our campaign.  That was a leak.

24   Q    And what happened?

25   A    The images were leaked onto TMZ onto their website.  We

1  don't know where they came from.

2  Q     Were they picked up by other media outlets?

3  A     Once you are online, things go viral.  That is just the

4  nature of the internet.

5  Q     Did that happen in this case?

6  A     It did.

7  Q     Did these images go viral?

8  A     It did.

9  Q     Let's start talking about movie trailers.

10  A     Okay.

11  Q     When did Warner Bros.'s official campaign to promote the

12  movie actually start?

13  A     Well, our very first trailer, which was a teaser trailer,

14  that went out the end of February.  It was February 24th, and

15  we debuted that on Apple.com and then it went into the

16  theaters the next day.

17  Q     And what is a teaser trailer?  Tell me what that means.

18  A     Well, normally for our films, especially if they are a

19  film of this size, we will develop more than one trailer, and

20  a teaser trailer is designed for very early placement out in

21  the world to let consumers know that the film is coming, so it

22  is essentially an announcement.

23  Q     And did the teaser trailer in this case for THE HANGOVER

24  2 include an image of Ed Helms with the tattoo on his face?

25  A     It did.

<u>Volume 1-B -- REDACTED TRANSCRIPT</u>

20

1   Q    And was there a subsequent more complete trailer that was

2   released?

3   A    Yes.

4   Q    When was that?

5   A    That went out -- its first appearance was April 1st.

6   Q    And about how many theaters has that trailer played in?

7   A    Thousands.  Like over 3,000.

8   Q    And does Ed Helms appear in that trailer with the tattoo

9   on his face?

10  A    Oh, yes, he does.

11  Q    Let's talk about television marketing.

12  A    Okay.

13  Q    I assume there's been television marketing for THE

14  HANGOVER 2?

15  A    Yes, a lot.

16  Q    About how much has Warner Bros. spent on TV advertising?

17  A    We've spent xxx xxxxxxx.

18  Q    And why is that?

19  A    TV is essentially your most important media for promoting

20  the film like THE HANGOVER 2.

21  Q    When did TV ads start to run?

22  A    We started the campaign mid April, and there was a lot of

23  sports programming at the time, playoffs and so on.

24  Q    And why does that matter?

25  A    It is perfectly targeted to the audience for our film.

21

1   The other thing about the timing, you know, we are very

2   fortunate because a lot of the big programs on TV are coming

3   to an end for the season, so we are also promoting a lot of

4   season finales both on network television and on cable.

5   Q    I want to turn now to the print component of the

6   campaign.

7   A    Okay.

8   Q    What was the first kind of poster or print media with Ed

9   Helms in it that you debuted?

10  A    Well, we have developed a lot of artwork to support the

11  film.  The very first was a banner featuring Ed Helms as well

12  as some of the other cast members that went out in theaters.

13  Q    Was there one on Facebook?

14  A    Yes, it did go on Facebook.  That is where it debuted.

15  There is a HANGOVER page on Facebook, and that is where people

16  tend to go first for all the other information.

17  Q    When did that poster debut on Facebook?

18  A    That went out at the same time as our trailer, mid

19  February.

20  Q    And I want to talk a minute about the Facebook.  So you

21  said there is a HANGOVER page on Facebook?

22  A    Yes.

23  Q    Can someone be friends with THE HANGOVER?

24  A    Yes.  That is exactly what it is intended for, so people

25  go on and they exchange their ideas and look at artwork and

22

1  whatnot, everything related to THE HANGOVER.

2  Q    How many friends on Facebook does THE HANGOVER have?

3  A    We have 11 and a half million friends for the film THE

4  HANGOVER.

5  Q    You talked about a poster being on Facebook at some

6  point.

7  A    And then it went into theaters.

8  Q    When was that?

9  A    And that was in March.  And then the entire -- so there

10  were two phases for the campaign.  So that artwork went, then

11  it lead to individual character banners, and by April, all of

12  the artwork was in theaters.

13  Q    About how many theaters are displaying this artwork?

14  A    Thousands and thousands of theaters.

15  Q    Is there also an outdoor advertising campaign?

16  A    Yes, very extensive outdoor campaign.

17  Q    What does that include?

18  A    That includes big outdoor billboards in certain markets,

19  sides of buildings, bus shelters, bus sites.

20  Q    And Ed Helms appears with the tattoo in those?

21  A    Absolutely he does.

22  Q    And when did the outdoor advertising start?

23  A    Around the same time in April, beginning of April.

24  Q    All right.  If you could turn in your binder to tab I.

25  A    Which tab?

Volume 1-B -- REDACTED TRANSCRIPT

23

1   Q    Tab I.  That is Warner Bros. Exhibit I.  Can you tell us

2   what that is?

3   A    This is our print ad campaign, so these are all our

4   banners and sheets.

5   Q    And does that exhibit show the dates on which this print

6   ad campaign opened in various --

7   A    Yes, it does.

8   Q    And that is what you just testified about?

9   A    Yes.  Yes, it's all here.

10  Q    Now we talked about Facebook.  Is there more to the

11  internet campaign for THE HANGOVER?

12  A    Yes.  The internet campaign is very extensive for the

13  film, so not only do we debut artwork on Facebook, but we also

14  have dedicated a website for THE HANGOVER 2.  We also paid for

15  advertising in broad based mainstream sites like Yahoo, AOL,

16  those kinds of sites, movie sites, and we also had, you know,

17  interactive activities and the like.  We have had an extensive

18  sustaining presence online for months.

19  Q    Now we talked about advertising.  Is publicity different

20  from advertising?

21  A    Yes, it is.

22  Q    Does Warner Bros. have a publicity campaign for THE

23  HANGOVER 2?

24  A    Yes, very extensive.

25  Q    Can you talk about that, describe that.

24

1   A    Okay.  Well, you know, our advertising campaign is

2   essentially paid advertising.  Publicity is designed to garner

3   editorial support out there in the world, you know, get

4   photographs placed in magazines, our movie stars on covers,

5   lots of editorial coverage as well as exposure on television,

6   and so there is a very big effort that is underway to support

7   the film.

8   Q    Did Warner Bros. hold a press junket for THE HANGOVER 2?

9   A    Yes.  We just completed the press junket.  It was last

10  week.  We flew in essentially over 200 journalists from all

11  over the world.  You put them in a room with each of your

12  talent and your director, and they go back and broadcast in

13  their local market and interview, also print journalists.

14  Q    And why does Warner Bros. engage in this publicity

15  campaign?

16  A    Well, publicity is a huge market.  It is a marketing

17  strategy, a huge part of any film.  It is designed to give

18  more support for your campaign and more information about a

19  film or movie star, whatever it might be.

20  Q    Does it help to build anticipation for the film?

21  A    Absolutely.  It helps you build awareness.

22  Q    Turn to Tab J in your binder there.

23  A    Okay.

24  Q    So that is what's been marked as Warner Bros. Exhibit J.

25  Can you tell me what this is?

25

1    A    Okay.  This is a domestic publicity timeline, key dates.

2    Q    So what does that show?  What does that list?

3    A    This shows that essentially every day beginning in

4    January, there was some publicity activity related to THE

5    HANGOVER 2.

6    Q    And so this is the kind of publicity that we were talking

7    about a minute ago?

8    A    Yes.  It includes guest appearances, articles that were

9    placed, photographs that appear that we may have placed, yes.

10   Q    And how many single-spaced pages is this document?

11   A    It's three or four.  A little over three.

12   Q    And does Warner Bros. also have any promotions involving

13   third parties that promote the film?

14   A    Yes, it does.

15   Q    Specifically the one with 7-Eleven?

16   A    Yes, it does.

17   Q    And I want to ask you about something called the 7-Eleven

18   Scavenger promotion.  Do you know anything about that?

19   A    Yeah, a little bit.

20   Q    Tell me what you know about that.

21   A    Well, Scavenger is a mobile application that you can

22   download, and 7-Eleven took advantage of that.  You play

23   games, you interact with the program, and you are able to win

24   prizes.

25   Q    Did the 7-Eleven scavenger hunt include a prize that had

Volume 1-B -- REDACTED TRANSCRIPT

26

1   to do with the tattoo?

2   A    It did, two tattoos.

3   Q    And tell me about those.

4   A    Well again, this is their execution of the game, and

5   there were two tattoos selected.  One was the tattoo in

6   question and a monkey tattoo as well.

7   Q    And are these actual tattoos or what are they?

8   A    No.  You download them and they stay on your phone.

9   Q    They are electronic?

10  A    Yeah, they are electronic.

11  Q    And how popular was it?  What was the status or what

12  happened with that?

13  A    Well, it is interesting.  It actually was not popular.

14  Only 187 people actually downloaded the tattoo.  In my

15  estimation, it is just a failure of the program.  There should

16  be like our Facebook page, there is 11 and a half million

17  people who access it.  It was a very small group of people, so

18  it was very short lived.

19  Q    And has Warner Bros. done anything with respect to those

20  downloaded tattoos?

21  A    As soon as this transpired, the tattoo was changed over

22  to a program, so it is just a logo now, so nobody actually has

23  it.  It is not in anyone's phone.

24  Q    So because of electronic, you are able to exchange it?

25  A    Yes.  It doesn't even exist anymore for anybody.

Volume 1-B -- REDACTED TRANSCRIPT

27

1    Q    So we talked about advertising, promotions, publicity.

2    Has the film attracted a lot of interest among members of the

3    public?

4    A    It has.

5    Q    How would you characterize it?

6    A    Well, it's been incredible actually.  We subscribe to a

7    tracking service that measures the awareness and interest of

8    the public.  It works exactly in the same way as the Nielsen

9    tracking.  And we are currently tracking at the same level as

10   a film like Pirates of the Caribbean, Twilight, Shrek,

11   Transformers, very broad based films.

12   Q    Is that unusual?

13   A    It is.  This is the most highly anticipated R-rated

14   comedy of all time, and that is very unusual for a film like

15   this to be tracking as a broad based film.

16   Q    Those other films are not R-rated movies; they are more

17   generally --

18   A    Yeah, they are all audience films, essentially for males

19   and females of all ages, family films as well, Shrek, so it's

20   very anticipated.

21   Q    Now how would an injunction against the movie opening on

22   May 26th, the scheduled release date, affect the marketing

23   effort that Warner Bros. has expended for THE HANGOVER 2?

24   A    Can you say that again?

25   Q    So if the movie is not able to open on time because of an

1   injunction, how would that affect the marketing that Warner

2   Bros. has done for the film?

3   A    Well, it's almost unthinkable.  You know, everybody knows

4   it's coming.  People have plans to see it.  It's been promoted

5   very heavily obviously in paid advertising, publicity, and so

6   on, and I believe we would essentially have to remarket the

7   film.

8   Q    Assuming it would release at some point in the future?

9   A    Correct, yes.

10  Q    So would Warner Bros. have to remarket it through a new

11  campaign, same expenditure of money?

12  A    Yeah.  I mean, you know, it depends on timing, the date.

13  When you think about the, you know, thousands and thousands of

14  pieces of material that are out there with the incorrect date

15  or the television that's been running, every article that's

16  been written, every internet site, all that would have to be

17  changed out.  It would need to be freshened.  You have to

18  remind people once again that the film is going to be in

19  theaters and of the appropriate date.

20  Q    You would essentially be starting all over again with a

21  new release date?

22  A    Yes.  It is a very crowded environment out there.  There

23  are movies opening behind us every weekend.

24  Q    What about the impact on the publicity efforts?  Would

25  Warner Bros. be able to duplicate the same three and a quarter

1  single-spaced pages of publicity that it's been able to for

2  THE HANGOVER 2 if it were delayed for months?

3  A    Well, it would be difficult.  These publicity campaigns

4  are planned months and months in advance.  And a lot of

5  publications, you know, they plan six to eight months out.

6  Now they've already given us their commitment.  We have

7  appeared on covers.  We have been in these publications, so it

8  is very likely that they have commitments for all the upcoming

9  films throughout the summer or the rest of the year.

10  Moreover, even if they wanted to promote us again and work

11  with us, I mean, those commitments would probably be difficult

12  for them to give us that kind of coverage, but also certain

13  publications, it is of no value to them anymore.  These

14  stories have to run, so they are running a business as well.

15  Why would they want to do the same thing again.  It would be

16  very tough to recreate.

17  Q    And the press junket, would you do another press junket?

18  A    Sure, you can invite people into a press junket and ask

19  them, but the coverage would be pretty spare.

20  Q    And what impact do you think that would have on the

21  movie?

22  A    Well certainly, you know, it would not be the most highly

23  anticipated film.  It would be tough for people to find.

24  Q    Let's talk now about the first HANGOVER movie.  Were you

25  responsible for marketing that movie?

30

1   A     I was.

2   Q     Was Mike Tyson featured in advertising for that movie?

3   A     He was.

4   Q     Why was that?

5   A     It is very interesting when that happened.  We went out,

6   we tested the film, and the scene -- there is a scene in which

7   Mike Tyson is standing there and he punches Zach Galifianakis.

8   It was at the time our highest tested scene for the film, and

9   subsequently as we were developing our television campaign, we

10  took that moment and we cut television spots with it, and it

11  also was the most memorable and highest tested scene in the

12  majority of our TV, so he ended up being a huge part of our

13  advertising for that film.  He is in everything.

14  Q     So using trailers?

15  A     Trailers, TV, any print.

16  Q     And about how many theaters did the trailers for the

17  first HANGOVER movie show Mike Tyson?

18  A     Again, it's thousands.

19  Q     You mentioned that Mike Tyson was in some print

20  advertising; correct?

21  A     Yes, he was.

22  Q     And this is in your book as Exhibit K.

23  A     Okay.  Yes, I see it.

24  Q     So what is Defendant's Exhibit K?

25  A     This is one of our character banners.  We created a

31

1   series for this film, all our main characters as well as the

2   baby and the chicken and the tiger and Mike Tyson.

3   Q    And this is the one with Mike Tyson?

4   A    Yes.

5   Q    Did it appear in theaters all over the country?

6   A    Yes, everywhere.

7         MS. HEMERYCK:  Thank you.  No further questions.

8         THE COURT:  Cross examination.

9         MR. GERBER:  Thank you.

10                    CROSS EXAMINATION

11  BY MR. GERBER:

12  Q    So this is the most anticipated R-rated comedy of all

13  time; correct?

14  A    Yes.

15  Q    But if there is a delay in opening the film, you have to

16  start your advertising entirely from scratch?

17  A    Yes.  I'm assuming that this would not be happening.

18  Months and months would go by before this would happen.  Yes,

19  we would.

20  Q    How many months of a delay would it require before you

21  had to start from scratch?

22  A    You know, it's difficult to say.  It is a very

23  competitive summer, a lot of films, a lot of advertising out

24  there.  You know, people do need to be reminded when things

25  are coming out.

32

1    Q    So is it important that the marketing push is timely with

2    respect to the release of the movie?

3    A    Yes, it is.  I mean, there are different stages of it,

4    but it's important that you are out there right before the

5    film is opening a few weeks in advance.

6    Q    You still have that binder there; correct?

7    A    Yes, I do.

8    Q    Exhibit J.

9    A    Exhibit J.  The time line?

10    Q    Yes, please.

11    A    Uh-huh.

12    Q    I believe you testified that this reflects the publicity

13    that you have had since the beginning of January; correct?

14    A    Yes.  It's key publicity activities.

15    Q    So it's the important publicity; key being important?

16    A    Yes, it is important.

17    Q    And you said if we look at this, we'll see that from

18    January 1 to the present, there's been a key publicity event

19    almost every day?

20    A    Yes.  I mean, you know, this outlines, you know,

21    appearances, when we supplied artwork, a number of different

22    kinds of things related to publicity, but yes.

23    Q    How many key publicity dates were there in January?

24    A    There are four.

25    Q    Okay.  That wouldn't be every day in January though?

 1  A    No.

 2  Q    How many key publicity dates are there in February?

 3  A    Seven.

 4  Q    So a few more but again not every day; correct?

 5  A    That is correct.

 6  Q    How many key publicity dates did you have in March?

 7  A    Eleven.

 8  Q    All right.  Still we're not at every day yet, but it's

 9  increasing again.  How many for April?

10  A    There are nine.

11  Q    And so for January, February, March, and April, the first

12  four months of the year, you had those key publicity events,

13  and they fill up the first page; is that correct?

14  A    They do.

15  Q    And then the next three pages are key publicity events

16  that occurred or set to occur all after April 29th when you

17  were served with this lawsuit; is that correct?

18  A    That's right.

19  Q    So just in the last three weeks, you had more publicity

20  involved than you did in the first four months of this year;

21  is that correct?

22  A    Yes, that is correct.

23  Q    So the publicity for this continued to build as you head

24  towards the release date?

25  A    Yes.

34

1    Q    Do you follow that same pattern with your advertising?

2    A    Yes, we do.

3    Q    So you start with a small amount of advertising and

4    increase it as you come up to the release date of May 26th; is

5    that correct?

6    A    That's right.

7    Q    I think you testified that with respect to the original

8    HANGOVER movie, there was screening and testing of scenes to

9    see which scenes were the most engaging of the audience.  I

10   may be mistaken what you were looking for in that.

11   A    Yeah.  It is not a testing of individual scenes.  You

12   test the cumulative, so you test the film, you test the entire

13   30 second TV spot, the entire trailer, and then as part of

14   what people respond to, they'll mention specific things.  We

15   ask them, we prompt them, what did you like, what did you find

16   funny, and it is a way of assessing what works best.

17   Q    And when you see strong responses to individual scenes,

18   individual characters or elements, those are the things that

19   you brought out to market to promote the film?

20   A    It is part of the consideration, absolutely.

21   Q    And that was why you chose to market and promote

22   Mr. Tyson in connection with the original HANGOVER movie; is

23   that correct?

24   A    That is.

25   Q    And was Mr. -- I believe you said Mr. Tyson's presence in

35

1   the movie was heavily marketed; is that correct?

2   A    It was prominently marketed.

3   Q    I apologize, sorry.  Prominently marketed?

4   A    Yes, it was.

5   Q    And that was because Mr. Tyson tested there was a strong

6   response?

7   A    People enjoyed watching him.  He interacted with our main

8   characters.  He became a part of the campaign.

9   Q    You are involved in promotional relationships with other

10  parties like 7-Eleven?

11  A    Yes, my division is.

12  Q    And you are responsible for overseeing those

13  relationships as the head of that division?

14  A    I am.

15  Q    And so you are aware of that promotional licensing

16  arrangement between Warner Bros. and 7-Eleven for the THE

17  HANGOVER 2?

18  A    I am aware of the arrangement.  I have not reviewed the

19  contract, but I am absolutely aware of the arrangement, yes.

20  Q    And do you know does Warner Bros.'s contracts for a

21  promotional event like that require Warner Bros. to approve

22  all of the intellectual property that's used in those

23  promotions?

24  A    So the artwork, the images that they present?

25  Q    Right.

36

1   A    Yes, they are reviewed and approved.

2   Q    And 7-Eleven wouldn't be allowed to use any of the

3   artwork or promotional materials, images associated with the

4   THE HANGOVER 2 unless Warner Bros. approves it?

5   A    You know, I'm not familiar with all the specifics in the

6   contract.

7        MS. HEMERYCK:  Your Honor, I object.  It calls for

8   the witness to speculate.

9        THE COURT:  I'll overrule it, but if you don't know,

10  just say you don't know.

11       THE WITNESS:  Yeah, I don't know specifically.  I

12  don't.

13  Q    (By Mr. Gerber) But you are aware that the Scavenger

14  application and association with its promotion included a

15  tattoo icon badge of the tattoo from Mr. Tyson's face?

16  A    Yes, I know.

17  Q    And you stated that after this lawsuit was filed, that

18  icon badge was removed from the production?

19  A    It was.

20  Q    The leak that you talked about.

21  A    Yes.

22  Q    Was that the first time that the image of the Stu

23  character with the tattoo on his face made it to the public?

24  A    Yes, it was.

25  Q    That wasn't something that you planned as part of your

37

1   marketing?

2   A    No, it was not.

3   Q    Was that frustrating to you that this would be leaked out

4   prior to your marketing?

5   A    Yeah.

6   Q    Because as part of your marketing plan that you work on

7   for a year in advance, you want to control how that

8   information is released to the public?

9   A    That is exactly right and how it looks.

10  Q    Because the control over the artwork and images that you

11  use are the utmost importance to you?

12  A    Yes.  And this image was also, you know, a shot of a

13  shot, a production shot, and it didn't serve our purposes at

14  all in terms of how we would present and market the film.

15  Q    You wouldn't have presented or marketed the film using

16  that image?

17  A    No.

18  Q    And you would prefer to control how an image like that is

19  used?  You would prefer for it not to have appeared?

20  A    Yeah.  It just -- yeah, it was inadvertent, and we would

21  always prefer that.

22  Q    When you were planning the marketing and promotion of the

23  THE HANGOVER 2, did you do the same or similar screening and

24  testing of the movie and of the trailers for response?

25  A    We did, yes.

38

1   Q    And did you base your marketing decisions in part on

2   those results?

3   A    Yes, in part.

4   Q    And are the images that are reflected in your print

5   advertising a reflection of the value you attributed to those

6   images based on that testing?

7   A    No, not the print work.  We don't test print.

8   Q    You test trailers though?

9   A    Yes, exactly, we test trailers and television spots.

10  Q    That was going to be my next question.  Do you base your

11  trailers, what you decide to put in that, is that based on the

12  value you attribute to those scenes from the testing?

13  A    In part, yes.

14  Q    And you said I believe the teaser trailer was important?

15  A    Sure.  It's important to tell people a film is coming,

16  state your date.

17  Q    But is the teaser trailer any more important than any of

18  the other trailers?

19  A    Well, the teaser trailer is your first introduction, your

20  first managed introduction to the consumer, and it creates a

21  lot of excitement.  The follow-up campaign, the follow-up

22  trailers, do a much better job of telling people what the

23  story is and what the movie is about, so they are important

24  for different reasons.

25  Q    And the teaser trailer, did it have the images of Stu

1    with the tattoo on the upper left portion of his face?

2    A    Yes.  The three main characters featured in the teaser

3    are simply walking through the streets of Bangkok, and because

4    it was on his face, it was featured, yes.

5    Q    And then the follow-up trailers, did they all have images

6    of Stu with the tattoo on the upper left portion of his face?

7    A    Yes, they do.

8    Q    Did you do any trailers that didn't include images of Stu

9    with the tattoo in the upper left portion of his face?

10   A    There were a couple of television spots that included

11   some footage from the early part of the film.  I mean, Stu

12   appears in a very small portion of the film without that

13   tattoo, so there were a couple spots, but the majority of the

14   campaign takes place after they wake up in Bangkok.

15   Q    The spots that didn't feature Stu with a tattoo, when

16   were those released?

17   A    They are all part of the media mix.  They are out there

18   now, and they have been out there part of the campaign.

19   Q    For how long have those been out there?

20   A    Since mid April or so.  Probably -- I don't know

21   specifically, but some were during the campaign time.

22   Q    Would you mind turning to Exhibit I in the binder.

23   A    Yes.

24   Q    I think that you said that the dates on here reflect the

25   beginning of the use of those materials in your marketing

40

1    campaign; is that correct?

2    A    It is.

3    Q    So the Facebook debut was -- or the debut for this

4    particular image in the upper left-hand corner of the first

5    page of Exhibit I debuted in theaters on April 8th and on

6    Facebook on March 28th?

7    A    Yes.

8    Q    By the way, how expensive is it to maintain a Facebook

9    site for a movie such as this?

10   A    You know, I don't know exactly how much it is.  We have

11   an ongoing relationship with Facebook.

12   Q    Would it be xxxxxxxx xx xxxxxxx?

13   A    No, it wouldn't be that much.

14   Q    Would it be xxxxxxxx xx xxxxxxxxx xx xxxxxxx?

15   A    Yeah.

16   Q    And then the middle set of images were beginning to be

17   released on April 11th?

18   A    Yes.

19   Q    And then the larger banners all the way to the right were

20   released on May 2nd after the lawsuit in this case was served

21   on Warner Bros.?

22   A    Yes.

23   Q    On the second page, the in-theater hanging art.

24   A    Yeah.

25   Q    There are six separate images?

41

1   A     Yes.

2   Q     There are six separate images there.

3   A     Yes.

4   Q     One of which has Stu with the tattoo on his face?

5   A     Yes.

6   Q     Do these six images represent some of the elements that

7   you felt would be valuable in promoting and marketing the

8   film?

9   A     Yes.

10  Q     The outdoor elements on the following page, it looks to

11  me like all of those advertising pieces first appeared May 2nd

12  after the filing of this lawsuit and Warner Bros. being

13  served?

14  A     Yes.

15  Q     And the April 18th post date for the images on the next

16  page for outdoor advertising for walls.

17  A     Yes.

18  Q     Do I read this correctly, the ones on the left side came

19  out on April 18th in L.A. and the ones on the right in New

20  York?

21  A     That's correct.

22  Q     None of that was in Missouri?

23  A     That is correct.

24  Q     This may be slightly off track, but how much of your

25  promotional and marketing budget do you spend to advertise in

42

1    Waynesville, Missouri?

2    A    I don't know.

3    Q    Any?

4    A    Well, there is no outdoor in Missouri, okay?  We don't

5    have outdoor here.  But all these same images are all over the

6    theater and all over the internet and all over television, but

7    there are certain markets that are outdoor markets.

8    Q    Okay.  But if you don't go to the theater and if you

9    don't watch broadcast television or cable television, you are

10   not going to see any of those advertisements, are you?

11   A    No.  I mean, they are online as well.

12   Q    If you go to your Facebook page?

13   A    Anywhere.  They are all over.  We just posted images on

14   Facebook, but they are absolutely everywhere, all over the

15   internet, all the major sites.

16           THE COURT:  Are you going to go through all of those?

17           MR. SPERLING:  I will ask just two more questions.  I

18   won't go through the rest.  The Court can look at those.

19   Q    (By Mr. Gerber) If I could ask one more question about

20   these.  I saw the movie a week ago, almost a week and a half

21   ago, and none of the images that I see in your print

22   advertising could I find in the movie.  Are these stills from

23   the movie?

24   A    No.  I mean, we have a photo shoot that we take during

25   the film, and they are scenes that are designed for print

43

1    work.  So, in other words, the scene when they wake up in the

2    hotel room in Bangkok, that is what you see here, but it has

3    to be assembled in such a way that it could be used on a

4    poster.  But these are actually -- these are moments from the

5    film executed for print.

6    Q    For example, in this particular image --

7    A    Yes.

8    Q    This isn't a scene from the movie because they were

9    actually never in the same room at this point in time.

10   A    That's right.  It is a setup shot that we did during the

11   photo shoot.

12   Q    And do you spend any effort in trying to figure out how

13   to design and configure these shots?

14   A    Oh, of course, effort and money.

15   Q    Money goes into this.  And I can see here the tattoo on

16   the upper left of Mr. Helms's face.

17   A    Yes.

18   Q    If we look at a similar image here -- maybe I can zoom in

19   a little bit more -- do you see the back of the monkey's

20   jacket there?  It's a little hard to see.

21   A    Yeah.

22   Q    You've seen the movie, haven't you?  I saw pictures of

23   you at the red carpet premier last week.

24   A    Yes.  I have seen it many times.

25   Q    What image is on the back of the monkey's denim jacket in

44

1  the movie?

2  A    This is the Rolling Stones.

3  Q    Well, that is what is in the movie is that iconic image

4  of the Rolling Stones with the mouth and the tongue.

5  A    Yeah, I can't actually see what this is.  It is very

6  small.

7  Q    All right.  But this image, you can tell it doesn't have

8  any of the red that the Rolling Stones logo would have.  This

9  image is actually something more like wings on the back of the

10 jacket.  It's not the Rolling Stones image.  Why did you when

11 you consciously chose how to frame and put this image together

12 and have that tattoo front and center in the upper third did

13 you change out the monkey's wardrobe?

14 A    I can't answer that.  I didn't personally change out the

15 wardrobe.

16 Q    But the jacket is a key piece in the film, isn't it?

17 A    Well, I mean, everybody is wearing their clothes, I mean,

18 it's part of his costume.

19 Q    But for a plot device, the monkey has the code inside his

20 pocket in the jacket.  The jacket has to be the same from the

21 beginning to the end or the plot doesn't hold up.

22 A    Right.

23 Q    And the monkey's jacket has the Rolling Stones logo on

24 the back of it, but all of your conscious print advertising

25 chose not to do that.

1   A    The role of advertising is not necessarily a literal

2   interpretation of what you are seeing in the film.  This is

3   designed so that the images are conveyed in the best possible

4   way.  So this would have been set by a designer so it fits

5   into the aspect ratio of what we are ultimately going to

6   complete and sell on.  I didn't make that decision.

7   Q    Do you know if any of the insurance policies that Warner

8   Bros. might carry would cover damages if you were enjoined in

9   the suit?

10  A    I don't have knowledge of that.

11          MR. GERBER:  No further questions.

12          THE COURT:  Redirect?

13          MS. HEMERYCK:  No redirect, Your Honor.

14          THE COURT:  You may step down.  You all may proceed.

15          MR. SPERLING:  Thank you.  Warner Bros. calls as its

16  next witness Chris Wheeler.

17          THE COURT:  Mr. Sperling, I know you've been very

18  brief with your witnesses, and I appreciate it.  Is there any

19  way to stipulate what these other witnesses will say?  I'm

20  trying to figure out if there is anything contested.

21          MR. SPERLING:  This witness will be very short.  This

22  witness will be five minutes, Your Honor.

23          THE COURT:  That is fine.

24          MR. SPERLING:  And then just to advise the Court, the

25  next witness will be less than 15 minutes, and then we would

46

1    like a very brief opportunity to address the Court on the

2    plaintiff's motion not to have Professor Nimmer testify.

3                        **CHRISTOPHER WHEELER,**

4    **Having Been First Duly Sworn, Was Examined and Testified As**

5    **Follows:**

6              MR. SPERLING:  Judge, to try to make this more

7    compact, perhaps after this witness, we can briefly confer

8    with counsel for the plaintiff, and if we can stipulate to

9    portions of the testimony, we will make it even more compact.

10             THE COURT:  Okay.  That is great.  I appreciate it.

11                        DIRECT EXAMINATION

12   BY MR. SPERLING:

13   Q    Please state your full name for the record.

14   A    Sure.  My name is Christopher Matthew Wheeler.

15   Q    Mr. Wheeler, what is your profession?

16   A    I am an attorney.

17   Q    Where are you licensed to practice?

18   A    The state of California.

19   Q    I'd appreciate it if you would describe for the Court

20   your employment and your job responsibilities?

21   A    Sure.  I have my own law practice, and in addition to

22   handling and assisting clients in a number of matters

23   including general counsel, I also perform services for other

24   attorneys on a contractual basis, and one of the other

25   attorneys I perform services for is Mr. Kia Kamran.

Volume 1-B -- REDACTED TRANSCRIPT

47

1    Mr. Kamran assigns a number of tasks to me from time to time.

2    Q    Have you ever been asked to do any work in connection

3    with Mike Tyson?

4    A    Yes, I have.

5    Q    When were you first asked to perform work for Mr. Tyson?

6    A    I can't speak to an exact date, but within the past 12

7    months, perhaps a little longer, maybe 18.

8    Q    Have you done any work in connection with the trademark

9    registration application of Mr. Tyson?

10   A    Yes, I have.

11   Q    Would you describe that?

12   A    Sure.  The trademark application, Mr. Kamran had

13   contacted me, said that we needed to file an additional

14   trademark application for Mr. Tyson.  Mr. Kamran provided me

15   with the different goods and services and different areas of

16   commerce where the application was going to be filed in.  He

17   provided me with a copy of the mark, and I completed the

18   trademark application as he had requested.

19         MR. SPERLING:  May I approach the witness?

20         THE COURT:  Sure.

21   Q    (By Mr. Sperling) I'd like you to look at what has been

22   marked as Warner Bros. Exhibit R.  Do you recognize this?

23   A    Yes, I do.

24   Q    What is it?

25   A    That is a drawing of the logo mark that I was instructed

48

1    to register.

2    Q    Please describe the work that you did in connection with

3    the submission of the trademark registration application?

4    A    After completing the application, I handed it -- or

5    electronically sent it to Mr. Kamran for his final review and

6    approval.  He reviewed and approved it.  He then affixed his

7    electronic signature to the document, returned it to me with

8    the instruction to file it.  I then electronically filed it

9    with the U.S. Patent and Trademark Office and paid the

10   prescribed fee by credit card.

11   Q    I would like you to look at what's been marked as Warner

12   Bros. Exhibit G.

13   A    I have it.

14   Q    What is it?

15   A    This would be a digital reproduction of the trademark

16   application.  There is no physical copy of the application any

17   longer.

18   Q    So this is the application that you prepared and filed?

19   A    That is correct.  It's entirely electronic.

20   Q    After you filed the application, what happened next in

21   connection with the application?

22   A    We were contacted by the examining attorney.

23   Q    And were you involved in that communication?

24   A    No, I was not.

25   Q    Do you know the contents of it?

49

1   A    Yes, I do.

2   Q    Please describe.

3   A    The examining attorney contacted Mr. Kamran and

4   instructed us to change some of the description of goods and

5   services for the purposes of clarification.

6   Q    I'd like you to look at what's been marked as Warner

7   Bros. Exhibit S.

8   A    I am looking at it.

9   Q    Can you describe what that is?

10  A    This would be an examiner's amendment issued by the

11  trademark examiner.  She had had a conversation with

12  Mr. Kamran either by e-mail or over the phone and would issue

13  this as a matter of course as a follow-up to confirm in

14  writing that the changes be made to the application.

15  Q    And this is printed from the USPTO website?

16  A    That is correct.

17  Q    After the goods and services were amended, what happened

18  next with regard to the application?

19  A    Shortly thereafter, the application was approved by the

20  trademark examiner and published for opposition in the U.S.

21  Patent and Trademark Office official gazette.

22  Q    I would like you to look at Warner Bros. Exhibit T.  What

23  is that?

24  A    This would be the Notice of Publication issued by the

25  trademark office reflecting what I have just told you.

50

1    Q    Now looking again at the trademark registration

2    application --

3    A    What exhibit was that please?

4    Q    That is Exhibit G.

5    A    Thank you.

6         THE COURT:  I wasn't trying to make you talk faster.

7    You don't need to talk faster.  You are going plenty fast.

8    Q    (By Mr. Sperling) Do you have that in front of you?

9    A    I do.

10   Q    What are the goods and services that are covered by the

11   published trademark application?

12   A    It is a wide range of goods and services, but to give

13   their general categories, it is things like perfume, vitamins,

14   children's toys -- there is a face mask in that category --

15   gym bags, different types of food products including ice,

16   sports drinks, wearing apparel clothing, other types of toys,

17   things that would be used in performing a sport.  There is

18   also some services such as appearances by sport celebrities at

19   conventions and things like that, and there is some other

20   categories as well.

21   Q    Is there any requirement or restriction that the design

22   be used on Mr. Tyson's face?

23   A    No.

24   Q    So it could be used in a wide variety of commercial

25   products?

51

1   A    Yes.

2   Q    So after you filed the application, did you have any

3   contact with anyone representing Mr. Whitmill?

4   A    Yes, I did.

5   Q    Would you describe that?

6   A    Sure.  On the date that the suit that we're here about

7   was filed, I received a phone call at Mr. Kamran's office from

8   Mr. Geoff Gerber.

9   Q    Can you describe the contents of that conversation?

10  A    Sure.  Mr. Gerber was calling us to alert us that there

11  had recently been a lawsuit filed, that Mike Tyson's name was

12  associated with that lawsuit, however, that Mr. Tyson was not

13  named as a defendant, a plaintiff, he wasn't named at all in

14  the lawsuit, that we should let Mr. Tyson know that, and to

15  please convey a message from Mr. Whitmill that there was no

16  interest in interfering with Mike or his ability to use the

17  face tattoo.

18  Q    And has there, in fact, been any opposition?

19  A    There has been none.

20          MR. SPERLING:  No further questions, Your Honor.

21          THE COURT:  Cross examination?

22          MR. SALSICH:  No questions, Your Honor.

23          THE COURT:  All right.  You may step down.

24          MR. SPERLING:  Your Honor, may we have a five-minute

25  break.  We will confer with plaintiff's counsel to see if we

1   can stipulate.

2           THE COURT:  Okay.

3           MS. HEMERYCK:  Even before that, I just want to move

4   the admission of the exhibits that were used with Ms. Kroll

5   that she testified about.

6           THE COURT:  So the exhibits that you have used with

7   Ms. Kroll are received into evidence.

8           MR. SPERLING:  And, Your Honor, we would also move

9   the admission of the exhibits addressed with Mr. Wheeler.

10          THE COURT:  Okay.  So all the exhibits that have been

11  used in defendant's case will be received into evidence at

12  this time.  We'll take a five-minute recess.

13          **(Court Recessed from 4:45 p.m. until 4:50 p.m.)**

14          THE COURT:  Ms. Hemeryck, are you ready?

15          MS. HEMERYCK:  Yes, Your Honor.  And we're going to

16  call Michelle Schultz who will be very short because I'd like

17  to read the stipulation that the parties agreed to into the

18  record.

19          THE COURT:  Okay.  That sounds fine.

20          MS. HEMERYCK:  So the parties have stipulated that

21  Warner Bros. Exhibits B, C, D, E, L, M, N, and O are images

22  that Warner Bros. found on the internet, and they are

23  admitted; is that correct:

24          MR. SALSICH:  Yes, we have no objection to that.

25          MS. HEMERYCK:  So we move for the admission of those

1    exhibits.  Some of them are already in, Your Honor, but we

2    didn't have the background.

3              THE COURT:  So those are received into evidence then.

4              MS. HEMERYCK:  Thank you.  The parties also stipulate

5    to Warner Bros. Exhibits P and Q, which are Mike Tyson's

6    employment agreements for HANGOVER 1 and HANGOVER 2, and we

7    move the admission of those as well.

8              THE COURT:  All right.  And without objection, those

9    are received as well.

10             MS. HEMERYCK:  So I will call Ms. Schultz.  Again,

11   her testimony will probably take five minutes.

12             THE COURT:  Okay.  Ms. Schultz, please step right

13   over here to be sworn.

14                        **MICHELLE SCHULTZ,**

15   **Having Been First Duly Sworn, Was Examined and Testified As**

16   **Follows:**

17                     <u>DIRECT EXAMINATION</u>

18   BY MR. SPERLING:

19   Q    Ms. Schultz, what is your profession?

20   A    I am an attorney for Warner Bros.

21   Q    And what is your title?

22   A    Vice president and senior litigation counsel.

23   Q    And how long have you been with Warner Bros.?

24   A    Since 2007.

25   Q    Ms. Schultz, are you familiar with something called

Volume 1-B -- REDACTED TRANSCRIPT

54

1   Tyson's Main Event?

2   A    I am.

3   Q    What is that?

4   A    Tyson's Main Event is an app that is available online.

5   You can download it onto an iPhone or an iPad, and it is a

6   game that features a Mike Tyson cartoon character that you

7   fight.

8   Q    And did you download that Mike Tyson's Main Event to your

9   iPad?

10  A    Yes.

11  Q    And have you played the game?

12  A    Yes.

13  Q    Does the Main Event app make any use apart from Mike

14  Tyson's face of the image of Mike Tyson's tattoo?

15  A    Yes, it does in two ways.  One is Mike Tyson is an

16  animated character, and there is a tattoo on his face.  Also,

17  there is a separate section of the app where you can purchase

18  it's called Power Punch, and the icon for the Power Punch is

19  Mike Tyson's tattoo.  So you can purchase that, and then when

20  you are playing the game, if you press on the icon, it gives

21  you super power.

22        MS. HEMERYCK:  And, Your Honor, we actually have an

23  iPad with the game loaded on it if the Court would like to see

24  that?

25        THE COURT:  I think I understand what it is.  I don't

55

1   think I need to.

2           MS. HEMERYCK:  No further questions.

3           THE COURT:  Okay.  Cross examination.

4                     CROSS EXAMINATION

5   BY MR. SALSICH:

6   Q    Ms. Schultz, the third party uses of the Tyson tattoo

7   that are embodied in Exhibits B, C, D, E, L, M, N, and O,

8   would you agree that all of those uses refer to Mike Tyson as

9   Mike Tyson in some way?

10  A    I actually don't have the exhibits.

11          THE COURT:  Is this something I can tell by looking

12  at them?

13          MR. SALSICH:  Yes, you can, Your Honor.

14          THE COURT:  So I don't need to know what she thinks.

15          MR. SALSICH:  That is true.

16  Q    (By Mr. Salsich) Let me ask you, Ms. Schultz, how long

17  did you search for those images?

18  A    I actually didn't.  I asked our legal assistant to look.

19  Q    Do you know how long she spent looking for it -- or he?

20  A    No.

21  Q    Okay.

22  A    It's a she.

23  Q    The Mike Tyson employment agreements that are Exhibits P

24  and Q, do you -- do you have those in front of you?

25  A    I do.

Volume 1-B -- REDACTED TRANSCRIPT

56

1  Q    If you would turn to in Exhibit P paragraph 6(e).  I

2  believe it is on page 7.

3  A    I'm sorry, 6(e)?

4  Q    Yes, paragraph 6, subparagraph E.

5  A    I actually don't --

6  Q    On page 7.

7  A    Oh, I see it.

8  Q    You see it says Name and Likeness?

9  A    Yes.

10  Q    In that paragraph, is it fair to say that Mr. Tyson

11  grants to the producer the right to use his name, voice, and

12  likeness in various connections with the first HANGOVER movie?

13  A    Yes.

14  Q    Does that paragraph say anything about licensing any

15  copyrights that he would have?

16  A    That paragraph by itself?

17  Q    Yes.

18  A    No.

19  Q    Are you aware of whether there is any reference to any

20  copyrights granted by Mr. Tyson anywhere in Exhibit P?

21  A    I actually haven't read Exhibit P.

22  Q    Well, I represent to you that there are none and feel

23  free to read it if you would like to.

24         THE COURT:  What is the question?

25         MR. SALSICH:  There are no references to any

1  assignment of any copyrights by Mr. Tyson anywhere in his

2  employment agreement in the first HANGOVER movie.

3          THE COURT:  You just told us that.  You just made

4  that representation and now you are asking her to verify?

5          MR. SALSICH:  I just asked if she had any reason to

6  disagree with me, Your Honor.  I apologize.

7          THE COURT:  Do you have any reason to disagree with

8  that?

9          THE WITNESS:  I don't.  But as I said, I didn't read

10  the contract.

11          MR. SALSICH:  Those agreements are already admitted

12  into evidence, and the Court can take notice of what's in

13  those agreements.

14          THE COURT:  Thank you.

15          MR. SALSICH:  That is all I have.  No further

16  questions.

17          THE COURT:  Any redirect?

18          MS. HEMERYCK:  No, Your Honor.

19          THE COURT:  You may step down.  Thank you.  That was

20  fast.  Okay.  Other witnesses?

21          MS. HEMERYCK:  Our last witness is David Nimmer.

22          THE COURT:  So why don't you step up to the lectern

23  and just tell me why shouldn't he just enter an appearance and

24  make the argument because isn't it legal argument?

25          MS. HEMERYCK:  Your Honor, in this particular

1   circumstance, I think it is entirely appropriate.  It is, of

2   course, up to the Court's discretion.  The Court has

3   discretion to hear Professor Nimmer's testimony if the Court

4   thinks it would be helpful.  There is no jury here.  This is

5   an obscure and complex legal issue, very novel.  There is no

6   case law out there on this.  As the Court knows, Courts do

7   hear expert testimony on obscure and complex legal issues in

8   other contexts; for example, foreign law.  In fact, there is a

9   federal rule, Federal Rule 44.1, that codified the preexisting

10  practice of allowing experts, legal experts, on what foreign

11  law provides.  And again, it's purely discretionary to the

12  judge in that case if it is going to be helpful to the judge.

13  The same thing with patent law.  Patent law is considered

14  complex, a lot aren't familiar with it, and, therefore, judges

15  will hear expert testimony on what patent law provides.  Here

16  we have got no jury, so you don't have to be concerned with

17  the issue that is raised with the jury being overly influenced

18  by an expert or being confused about whether the expert or the

19  judge is the one stating the law.  In fact, all the cases that

20  were cited by the plaintiff in their opposition are cases

21  involving jury trials.  There is no jury here.  The question

22  is, will Professor Nimmer's testimony about this very obscure

23  and novel issue of copyright law on which he is clearly an

24  expert be helpful to the Court.  We submit that it clearly

25  would be and we think the Court should hear it.

59

1      THE COURT:  I'm not going to.  I am going to sustain

2  the motion in limine.  I think it is just legal argument, and

3  I would be much more interested in hearing arguments from the

4  counsel in the case as to this case.  So that is really what I

5  would rather spend time doing.  So we talked about you all

6  giving me some arguments; correct?  Are you ready to do that?

7      MR. SPERLING:  Do you want to hear argument today,

8  Your Honor?

9      THE COURT:  Uh-huh.  Didn't we talk about that?

10     MR. KAHN:  Yes.

11     MR. SPERLING:  I didn't understand the Court was

12 going to hear argument today, but if we could have five

13 minutes, we are prepared to argue.

14     THE COURT:  Yeah, I think it will be -- yeah, okay,

15 five minutes.

16     MR. SPERLING:  We have this reply brief that we

17 received as you did, so we haven't had a chance to fully

18 digest it.

19     THE COURT:  Look, my questions -- I know this case

20 is, you know, an area of law that is novel and complex.  I

21 don't think it is all that novel and complex frankly.  I have

22 a few questions, so I am going to take five minutes, and then

23 I would like for you each to give me no more than 15 minutes

24 worth of argument, less than that if possible, and try to

25 answer the questions I have, and then we can come back in the

1   morning after I have had more time to study it, come back in

2   the morning at 9, and my intention would be to give you my

3   rulings at 9.  If I have any further questions, I would ask

4   them then, which it's possible I would because as I said, I

5   haven't actually read this, but I read some of it while I was

6   watching your movie.

7           MR. KAHN:  I hope it was his part, Your Honor.

8           THE COURT:  No.  It was your part, Mr. Kahn.

9           MR. SPERLING:  We appreciate that, and we very much

10  appreciate the Court's intention to rule promptly.

11          THE COURT:  Yeah, I mean, that seems to be more

12  important, so five-minute recess.

13          **(Court Recessed from 5:00 p.m. until 5:05 p.m.)**

14          THE COURT:  Okay.  Are you all ready?

15          MR. SPERLING:  Yes.

16          THE COURT:  Mr. Kahn.

17          MR. KAHN:  Thank you, Your Honor.

18          THE COURT:  So here's the questions I have for you.

19  I need you to tell me about, well, three things really,

20  irreparable harm, this issue of posting of bond, and how you

21  think that the name of the Mike Tyson trademark stuff

22  including the fact that he could use the tattoo without his

23  face behind it affects your case.  Those are the three

24  questions I have.  You can put them in whatever order that you

25  want.

1          MR. KAHN:  Okay.  First it was irreparable harm, it

2    was the trademark at the end, and the middle was the bond?

3          THE COURT:  Right.

4          MR. KAHN:  Okay.  Let me address the first and the

5    third.  Mr. Gerber can quickly address the second and then we

6    will be done.  The irreparable harm here, Your Honor, when

7    Mr. Sperling was making his argument about group defamation

8    and loss of control and all the rest, this is not a group

9    defamation claim.  The irreparable harm is that this is a work

10   of art that my client created, owns the copyright of, and this

11   is what he has lost control of.  He has lost the control which

12   the copyright law gives to him to be able to control what kind

13   of uses, what derivative uses, what other types of uses, are

14   allowed to be made with his art, and that is why the Courts

15   consistently found, including cases both against and by Warner

16   Bros., that infringement of copyright is a special area where

17   part of it is control.  That's his irreparable harm.  As he

18   testified about having lost the battle, it's not that he's

19   simply been associated with a slimy tattoo artist in the film

20   that he might find offensive, it is that he was never given

21   the opportunity.  Nobody came to him and said, Here, we'd like

22   to use your tattoo in this and give him the opportunity to say

23   no, use a different tattoo, I don't want to be associated with

24   this film.  That's the harm to Mr. Whitmill.

25          As far as the trademark goes, Your Honor,

62

1   Mr. Whitmill earlier testified -- and this picture is probably

2   the best example of it -- that he doesn't object to any

3   appearance by Mr. Tyson that is connected -- where this tattoo

4   is connected to Mr. Tyson.  So the problem -- there is no

5   issue for him in this online boxing game or in the movie Rocky

6   whatever it was 4 or 5 where Mr. Tyson appears as Mr. Tyson.

7   Those are not issues.  As far as -- and as we pointed out in

8   our brief, trademark and copyright are really two separate

9   areas of the law, and if you have a trademark, that isn't a

10  defense against a claim of copyright infringement; if you have

11  a copyright, it is not a defense of a claim of trademark

12  infringement.  In this particular area with this application,

13  at least based on our initial review which is the conversation

14  Mr. Gerber had with Mr. Tyson's lawyer, it is our

15  understanding -- which may not be the case, and the time for

16  filing an objection to this trademark application hasn't

17  expired -- it was our understanding that everything having to

18  do with this trademark registration would be directly

19  connected to Mr. Tyson.

20       THE COURT:  Right.  So you are making a distinction.

21  You are not saying it has to be on his face.  You are saying

22  as long as it's directly connected to him, there is --

23       MR. KAHN:  At least in the trademark context, Your

24  Honor.

25       THE COURT:  Right.  Okay.

1      MR. KAHN:  So that if it's Mike Tyson boxing gloves

2   and there is a tattoo -- I don't want to speak for my

3   client -- but there is a tattoo on the boxing glove or some

4   other sports equipment, if it is connected to him, my client

5   can live with that under the trademark law, and it doesn't

6   have any bearing on his other copyright interests, including

7   the rights to control derivative works and reproduction.

8      And as far as the bond, my client doesn't have

9   the xxxx xxxxxxx, but I do want Mr. Gerber because he is the

10  one --

11     THE COURT:  And I didn't -- I mean, if you wanted to

12  say anything else, these are the questions I had for you.  I

13  mean, I told you you can have a few more minutes, and you may

14  if you wish to, but you don't have to.

15     MR. KAHN:  You know, Judge, we think at least under

16  the likelihood of success on the merits of the copyright

17  claim, we believe and we have tried to express it in our reply

18  brief that it is a clear case.  It is not even a close case.

19  The fair use argument I think is a complete mick-wig

20  (phonetically).  Any tattoo, any tattoo, any tribal type

21  tattoo on the face of that actor the next morning other than

22  the one connected to Mr. Tyson which apparently from the test

23  marketing they decided would be a great way to promote the

24  movie, any tattoo would work.  The movie wouldn't have been

25  affected one bit.  Even that line with Mr. Tyson telling the

1  character to get that tattoo off his face, there is no parody

2  here.  If you look at the marketing, if you look at the

3  promotional tie-ins, this is not a fair use.  This is an

4  infringement.  But I will let Mr. Gerber speak.

5          THE COURT:  Okay.  Mr. Gerber.

6          MR. GERBER:  With respect to the bond, I am not sure

7  exactly what --

8          THE COURT:  Well, the question is, you know, wouldn't

9  I be required if I enjoined this lawsuit to require your

10 client to post a bond and wouldn't it have to be a bond that

11 would be most likely in excess of anything he would be able to

12 post because of the losses that the defendants have argued

13 about?

14         MR. GERBER:  Well, I think there is case law to

15 support and has in this circuit, Courts have required in

16 copyright infringement cases no bond or a nominal bond.  You

17 know, I don't want to argue against my client's position.  I

18 don't think that is the better case law.  I think that Judge

19 Bennett's well-reasoned and thoughtful decision, collecting

20 almost every bond case in the circuit in -- was it Curtis

21 1000?

22         THE COURT:  Is that in your brief?

23         MR. GERBER:  It's in the brief.  You can go to the

24 last page.  I think that that is a well-reasoned decision, and

25 Judge Bennett came out -- I will say that at the same time, he

1    had another case.  He came out on the side that a bond is

2    required.  At the same time, he had -- or within a month or

3    two, he had another pending case -- I didn't cite it -- where

4    he does cite it in the Curtis 1000 case where he didn't

5    require a bond, but the facts are so unique to that case that

6    I think that they are inapplicable, and I think his reasoning

7    is sound that the modern trend and despite what Eighth Circuit

8    cases are out there -- I have cited them because it does give

9    you discretion -- is that some bond is usually required these

10   days.  The Eighth Circuit has not reversed any preliminary

11   injunction because no bond was required.  That said, there are

12   copyright cases that will allow -- in the Eighth Circuit that

13   will allow for the posting of a nominal bond, and I have cited

14   a couple of those cases here.

15           And I have read a ton of these cases.  What I think

16   it comes down to is that the district court has a tremendous

17   amount of discretion in setting the bond.  And in balancing

18   the equitable factors in setting the bond, the Courts look to

19   the strength of the likelihood of success on the merits, and

20   they look at this balancing of undue hardships, and they are

21   going to take a strong look at what is the real harm to the

22   defendant, typically the party opposing the bond -- or

23   opposing the preliminary injunction.  They are going to look

24   to see which of the damages are attributable to the continuing

25   infringement.  You know, and Warner Bros. has come out in

1  other cases where they have sought injunctions in copyright

2  cases -- and I have cited those in the brief -- where they

3  successfully argued that you cannot count infringing activity,

4  you cannot count wrongful conduct when you look to what those

5  damages are.  So after April 29th, you know, they continued to

6  rack up costs and expenses, and they spent a tremendous amount

7  of money, and all of that after they were served with this

8  complaint knowing that they were accused of copyright

9  infringement, knowing the preliminary injunction.  They didn't

10 warn the movie theaters.  You know, they didn't say, hey, we

11 may be enjoined here.  They went full steam ahead.  And it is

12 a pattern of practice where they are an enormous company.

13       This is the most highly anticipated R-rated comedy of

14 all time, and it is just too big to stop.  And I hate to be

15 here where there's one set of copyright laws and remedies for

16 a multi billion dollar corporation when they go after the

17 company that is going to turn out the infringing Harry Potter

18 lexicon and another set of copyright laws and remedies that

19 are available to a tattoo artist in Waynesville.  Those

20 remedies should be available to all, and you have to balance

21 the equities in doing that.  I think that is really what all

22 the case law says is that the judge has a tremendous amount of

23 discretion.  And we cited the cases.  Warner Bros. has been

24 through this before.  I will hand over -- I have got them over

25 here.  I will make sure the clerk has them.  I have got the

1   docket sheet from Pacer for the Hart versus Warner Bros. case

2   where the Court in the Eastern District of Virginia required a

3   100,000-dollar bond for a preliminary injunction after the

4   release of The Devil's Advocate, and we have cited that, but I

5   don't have the opinion.  It is not available on Pacer.  I have

6   got a copy of the district court's preliminary injunction

7   order enjoining Warner Bros. from releasing the Dukes of

8   Hazzard film, and they required a $5 million bond in that

9   case, but the plaintiff in that case had been on and off in

10  litigation with Warner Bros. for years and was a corporate

11  entity that could bring substantial resources to bear, not

12  anything on the scale of Warner Bros.  But there are very,

13  very few cases out there where I could find bonds of this type

14  because the cases just really don't go there.  We tried to

15  cite everything on point that we could in this reply brief.

16          THE COURT:  Right.  And as I said, I haven't had time

17  to study your reply belief in great detail, but I will look at

18  those cases, so thank you.

19          MR. GERBER:  Thank you.

20          MR. SPERLING:  Judge, I'd like, if I may, to respond

21  to points raised in the reply brief that we haven't had a

22  chance to address before, and there were two critical

23  statements that were made by the plaintiff's counsel that I

24  think are very important to this case that I would like to

25  address.

68

1      THE COURT:  Okay.  Go ahead.

2      MR. SPERLING:  So, Judge, let me briefly respond on

3   the four critical merits issues that don't have to be decided

4   by the Court but that I think either is clear that we are

5   likely to prevail on or that are at least very serious issues.

6   Let me talk for a moment about the implied license.  Now by

7   its nature, an implied license is not written, and it wasn't

8   communicated orally.  This is an implied to the fact license.

9   In the reply, they treat it as if it were implied to the law

10  license.  It's implied to the fact by the conduct of the

11  parties.  And the question is --

12      THE COURT:  Let me ask you this.  Your brief filed on

13  Friday seemed to put most of its eggs in the basket that they

14  are trying to copyright Mike Tyson's head or face.  I mean,

15  you spent a lot of time arguing that, and I don't see that as

16  their argument, so I don't know if that's where your implied

17  license is going or not.

18      MR. SPERLING:  No.  That is a completely different

19  argument.  That has to do with copyrightability, and I will

20  address that very briefly, but that is not this point at all.

21  The point here is, they admit that there is an implied

22  license, so now the question is what is the scope of the

23  implied license.  That is what the Court ultimately will have

24  to determine because it is not written down and it wasn't

25  expressed in a conversation between Mr. Whitmill and

1   Mr. Tyson.  So how do you find the scope?  You find the scope

2   by the conduct of the parties.  What do we see?  We see that

3   eight years ago, as we heard from Mr. Whitmill today,

4   Mr. Tyson's wife spoke to him about filing a trademark

5   application.  No objection; apparent acquiescence in that.

6            THE COURT:  His sister.  Isn't that what he said?

7            MR. SPERLING:  I apologize, his sister.

8            THE COURT:  Okay.  Go ahead.  I just wanted you all

9   to know that I was listening.

10           MR. SPERLING:  Better than me apparently.  So at the

11  very inception, Mr. Whitmill understood and had no objection

12  to a trademark use which by its nature is not on Mr. Tyson's

13  face.  What did he say in his testimony?  He said, "It's his

14  likeness now, he can do with it what he wants," and what the

15  plaintiff's counsel told you when he just argued in front of

16  you is the harm is being associated -- he said it's got to be

17  connected to Tyson.  Well, it sure is connected to Tyson in

18  this movie.  He is in the movie again.  He is in the same

19  scene with Ed Helms with the tattoo on.  He makes that

20  critical comment in the movie which really is an important

21  part of parody and satire, "You better get that tattoo off

22  your face."  He is intimately associated with the movie.  He

23  was very important in the first movie.  He acted in the second

24  movie.  He never told anyone there was any concern about the

25  use of the same tattoo he had on his face on the other actor's

1   face.  He acquiesced in it.  What Mr. Whitmill told you when

2   he testified earlier today was it's his likeness.  Well, that

3   is exactly what the Warner Bros. contract with Mike Tyson

4   says, that they have the right to use his likeness.

5   Mr. Whitmill defined it that way.  That is exactly what they

6   did.  So that is the implied license.

7           The estoppel argument is equally important.  So

8   Mr. Whitmill put the design on Mike Tyson's face knowing he

9   was famous, and then Mike Tyson appears in Rocky Balboa, a

10  documentary Tyson, THE HANGOVER, ads for it.  Not only no

11  objection, but the trademark isn't registered.  It isn't

12  registered for eight years, and there is no notice whatsoever.

13  Warner Bros. was entirely reasonable here.  They had no reason

14  to believe, nor did anyone, that anyone but Mike Tyson had a

15  right to control the use of the design, and Mike Tyson had no

16  reason to believe that either.  Because the license is

17  implied, no one, including Mike Tyson, had any reason to

18  believe that anyone other than Mike Tyson had the right to

19  control the use.  And the trademark registration is critical

20  for that.  This is a case where the copyright and trademark

21  are inseparable.  It is the same design.  We already see it is

22  being used in applications independent of Mike Tyson's face,

23  and Mr. Whitmill's lawyer tells Mr. Tyson's lawyer we are not

24  going to interfere with it.  They are not going to oppose the

25  registration.  They're not going to try to stop it.  They are

71

1   not going to interfere with it.  Why is that important, Judge?

2   Because it shows you based on his conduct what he understood

3   the scope of the implied license to be.  And that is what is

4   consistent with how Mike Tyson acted in the movie with Warner

5   Bros.

6          The issue about controlling Mr. Tyson's face is the

7   copyrightability that Professor Nimmer addresses.  No Court

8   has ever held -- indeed it is a case of first impression --

9   whether you can have a copyright on human flesh.

10          THE COURT:  And you think that is what they are doing

11   here?  I mean, I didn't see the plaintiffs making that

12   argument.  I understand your argument.

13          MR. SPERLING:  Well, they do because they claim a

14   copyright, and it is a seriously contested issue in this

15   instance particularly.  Remember, he didn't do the initial

16   design before.  It is a different situation.  If you create

17   the design, you have a copyright in that design, then you put

18   it on someone's face, that is a different issue.  But that is

19   not what happened here.  He created the design in the first

20   instance on the face, and the reason that is so important is

21   under the copyright laws, you have a right to prevent the

22   alteration or expression of the original, not copies, but the

23   original.  Well, the original is on Mr. Tyson's face.  What

24   that would mean is that he can't alter it, he can't remove it,

25   he doesn't control his own face anymore.  That is what it

72

1  would mean under the copyright laws if a design that is

2  created in the first instance on his face has copyright

3  protection as opposed to a sketch that is created separately.

4       And then finally, the parody point.  Now the Supreme

5  Court in Acuff-Rose is extraordinarily clear on this.  If

6  there is a colorable claim for fair of use, no injunction

7  should issue.  This is far more than a colorable claim.  I

8  think when the Court looks at the reply, they --

9       THE COURT:  Explain that to me.  Explain what is the

10  parody here.

11       MR. SPERLING:  Well, sure.  You have got this

12  powerful figure, Mike Tyson, in the original film with the

13  tattoo on his face.  What does he do?  He knocks someone out

14  when he is angry at them.  He is the epitome of male

15  aggression.  Instead, now you have this milk toast character

16  with the same tattoo on his face.  It's a real spoof on men

17  and their misadventures.

18       THE COURT:  Yeah, I get that.  I thought you had to

19  have something that was parodying or commenting on the actual

20  copyrighted thing.  They are not saying they have got a

21  copyright on men and their stupid behavior, and so how is this

22  a parody with regard to the tattoo?

23       MR. SPERLING:  Well, it is a parody about the

24  powerful tattoo on Mike Tyson's face which shows up on this

25  milk toast's face and then you have the interaction between

73

1    Tyson and the character himself.  Now I realize that matters

2    of art and comedy are in the eye of the beholder, but the

3    tracking shows people find this very funny, very compelling,

4    and the Supreme Court's made it clear if there is even a

5    colorful claim, you don't enjoin it because rights of

6    expression are throughout our history protected.  It is not a

7    minor point.  It is an important point.

8            Judge, turning from those issues, and I want to save

9    a moment for Ms. Hemeryck to address the bond issue, which is

10   a significant issue also, there is no irreparable harm.  There

11   is no question that if the case proceeds and if the plaintiff

12   were to prevail on the merits, he can recover money damages,

13   and there is no question that Warner Bros. can pay those money

14   damages.  Now the plaintiff doesn't even respond in their

15   brief to one of the two key Supreme Court cases on this point.

16   They ignore it altogether.  In the Winter case, Your Honor,

17   the Supreme Court was absolutely clear.  In order to issue an

18   injunction, the plaintiff bears the burden of establishing all

19   elements including irreparable harm, so there is no

20   presumption.  But even if there were, it's been rebutted here.

21   It is clear that this is the kind of case where damages can be

22   computed.  It is a percentage of profits based on the

23   contribution that the alleged copyright infringement of the

24   alleged copyright contributed, and there is no question --

25            THE COURT:  What about the argument that it is the

1    loss of control or the ability to control?

2        MR. SPERLING:  So what that argument really is is a

3    way of smuggling back in an irrebuttable presumption after

4    all, because if that were the case, you would have an

5    injunction in every case of copyright infringement.  And that

6    is what the Supreme Court said you can't have.  They said they

7    have got to prove their burden.  And even if there were a

8    presumption any longer in the Eighth Circuit, which we think

9    it is clear there isn't after the Winter case, we have

10   rebutted that.  This is clearly a case where damages can be

11   computed.  This is clearly a case where the defendant can pay

12   the damages.  So the loss of control argument if it were

13   accepted overrides the Supreme Court precedent and makes an

14   injunction mandatory in every case of copyright infringement.

15       There is also the balance of harms which is a very

16   significant issue here.  It's all out there, Judge.  For

17   whatever reason, for whatever reason, the plaintiff chose not

18   to seek the temporary restraining order.  In essence, their

19   argument today is that Warner Bros. should have self-enjoined.

20   They should have shut down the process they were engaged in

21   even though we submit, Your Honor, they were quite reasonable

22   based on Mr. Tyson's conduct with them and based on

23   Mr. Whitmill's lack of conduct to believe they were acting

24   appropriately.  The plaintiff when he discovered this could

25   himself or through his lawyers have contacted Warner Bros.  We

1   know that one of his lawyers had been prior counsel for Warner

2   Bros. for three years.  They knew who to contact.  They could

3   have tried to head this off, but instead they waited.  They

4   waited a few weeks.  They did a copyright registration.  They

5   waited a few more weeks.  They filed a complaint.  They didn't

6   seek a TRO, and now they say, Oh, my God, Warner Bros. has

7   gone forward instead of cutting its own throat.  You are not

8   required to cut your own throat.  That would be a bad rule.

9   You wouldn't need a Court order at that point.  They had

10  alternatives.  There was so many ways this harm could have

11  been prevented.  For whatever reason, they chose not to

12  address any of them.

13          Your Honor, the balance of harms here, the harms to

14  Warner Bros. is extraordinary.  In the argument, you hear the

15  rules should be the same for everyone.  The rules should be

16  the same for everyone.  You shouldn't be allowed to sit on

17  your rights and let someone justifiably believe they are

18  engaging in proper conduct, not warn them when you could have

19  done so, and then swoop in and try to leverage huge money out

20  of them.  And let me be clear about this.  I am sure the Court

21  appreciates what this is about.  If the Court were to enter an

22  injunction, it is an enormous leverage to try to extract tens

23  of millions of dollars.  That's what it is.  It's a final

24  decision for all practical purposes where there's been

25  discovery before these important legal issues have been

76

1    addressed.  There is no reason to do that here.  There is an

2    adequate remedy of law, and there is a defendant who can pay

3    if the need were ever to arise.  I would like to let Ms.

4    Hemeryck briefly address the bond issue.

5            THE COURT:  Ms. Hemeryck.

6            MS. HEMERYCK:  And I will be very brief, Your Honor.

7    As Mr. Sperling just pointed out, plaintiff's counsel in

8    arguing against a bond here argued that the same remedy should

9    be available to all parties, and Mr. Sperling pointed out of

10   course that is true.  And the fact is that damages are equally

11   doubled.  The remedy of damages is an adequate remedy here

12   that Warner Bros. can pay and is certainly available here to

13   the plaintiff.  Furthermore, there is no legal entitlement to

14   a preliminary injunction.  As the Supreme Court made clear in

15   Winter, a preliminary injunction is an extraordinary remedy

16   never granted as a right, so there is no entitlement to a

17   preliminary injunction.

18            The cases that plaintiff cites in support of the

19   argument that there should be only a minimal bond here simply

20   are not on point.  In every one of those cases, and I am sure

21   Your Honor will look at them, but in every one of them, the

22   Court either found an absence of substantial harm to defendant

23   or that the harm to defendant was minimal, or that the harm

24   was very remote, or that the plaintiff would be capable of

25   compensating the defendant for any damages it sustained in the

1    event of an injunction.  There is not a single case they have

2    cited where you have got a situation like this where the

3    defendant in the event of an improperly granted injunction is

4    going to suffer hundreds of millions of dollars of damage that

5    plaintiff can't possibly compensate for.  Thank you.

6              THE COURT:  Mr. Kahn.

7              MR. KAHN:  Just two quick points, Your Honor.  One is

8    that Warner Bros. continues not to get it.  We are seeking

9    both a preliminary injunction an a permanent injunction, and

10   regardless of the Court's order tomorrow, we are hoping it

11   will be a preliminary injunction, our plan is to go forward

12   one way or the other to ask the Court to bifurcate this and

13   schedule an early hearing on a permanent injunction.  We can

14   worry about damages if any after that.  So this is an

15   important form of relief.  Mr. Sperling tries to create the

16   impression that we've been sitting on our rights -- or my

17   client had been sitting on his rights since he fist learned

18   about this in early April.  He makes a big deal about the fact

19   that he went ahead and filed a copyright registration.  He may

20   not be aware, but you can't file a lawsuit without a copyright

21   registration or at least going on file, so that needed to be

22   done in order to bring a file for copyright infringement.  And

23   one of the reasons there was not a TRO, Your Honor, as this

24   Court will recall, was that early on, one of Mr. Sperling on

25   behalf of his client first threats was to file a motion to

1    disqualify us.  In fact, his first proposal was if you don't

2    withdraw your motion for a preliminary injunction, we will

3    file a motion to disqualify you.  So from that point on, Your

4    Honor, things slowed up.  If you recall, that is when the

5    Court had the status conference.  You set a time for the

6    filing of the motion to disqualify.  We brought it in and had

7    you notify Mr. Sperling the Dowd Bennett firm in case we were

8    disqualified.  So there are reasons why this case has moved at

9    the pace it has moved.  It is not that we've been sitting back

10   trying to, you know, do something here.  We are prepared to go

11   forward on both the permanent injunction and the preliminary

12   injunction, and it's not simply a matter about money.

13            MR. SPERLING:  One point in response, Your Honor.

14            THE COURT:  You may.

15            MR. SPERLING:  So the Court will note, Your Honor,

16   that when the complaint was filed, the motion for preliminary

17   injunction was filed, there was no motion for a temporary

18   restraining order.  Moreover, the Court will recall during the

19   first telephone conference of this case, there was no

20   discussion about seeking a temporary restraining order.  It

21   had nothing to do with any of the other matters that were

22   going on in the case.

23            THE COURT:  All right.  Well, here's what I am going

24   to do.  I am going to go re-read all this stuff and consider

25   your arguments and your evidence, and I would like you all to

79

1   be here at 9 or someone to be here at 9:00 a.m.  You don't all

2   have to be here.  I need one lawyer from each said.  That is

3   all that is required to be here.  And at 9:00 a.m. tomorrow, I

4   will I believe give you my opinion then.  If I have questions

5   raised by some of the things tonight, I will ask for further

6   clarification.  I am hoping that won't happen.  But I can tell

7   you my decision in the morning.  And even if I have questions,

8   I will still try to tell you my decision tomorrow because

9   obviously, this is an issue where time is important.  Okay.

10  So thank you both sides, and this matter will be in recess

11  until 9:00 a.m. tomorrow morning.

**(PROCEEDINGS CONCLUDED AT 5:35 P.M.)**

12

13

14

15

16

17

18

19

20

21

22

23

24

25

80

1                       CERTIFICATE

2

3      I, Angela K. Daley, Registered Merit Reporter and

4  Certified Realtime Reporter, hereby certify that I am a duly

5  appointed Official Court Reporter of the United States

6  District Court for the Eastern District of Missouri.

7      I further certify that the foregoing is a true and

8  accurate transcript of the proceedings held in the

9  above-entitled case and that said transcript is a true and

10  correct transcription of my stenographic notes.

11      I further certify that this transcript contains

12  pages 1 through 79 inclusive and that this reporter takes no

13  responsibility for missing or damaged pages of this transcript

14  when same transcript is copied by any party other than this

15  reporter.

16      Dated at St. Louis, Missouri, this 24th day of May, 2011.

17

18

19      _____
        /S/Angela K. Daley
20      Angela K. Daley, CSR, RMR, FCRR, CRR
        Official Court Reporter
21

22

23

24

25